IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| DONNIE LEE ROBERTS, | § | |
| | § | |
| Petitioner | § | |
| | § | |
| -VS- | § | CIVIL NO.  1:09-cv-00419-TH |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent | § | |

## PETITION FOR WRIT OF HABEAS CORPUS
### *28 U.S.C. § 2254* - DEATH PENALTY

TO THE HONORABLE DISTRICT COURT:

COMES NOW, Petitioner Donnie Lee Roberts, by and through his attorney of record,

Douglas Milton Barlow, and  presents this Application for Writ of Habeas Corpus pursuant

to *28 U.S.C. § 2254*.  In support, petitioner shows the following:

I.

Mr. Roberts was charged by indictment with the offense of capital murder, proscribed

by Texas Penal Code § 19.03.  The indictment alleged that the petitioner intentionally caused

the death of Vickie Bowen by shooting her with a deadly weapon, a rifle. (CRI 2).   A jury

found petitioner guilty of capital murder and answered the special issues in a manner

resulting in a punishment of death; the conviction and sentence were affirmed on direct

appeal to the Texas Court of Criminal Appeals on April 18, 2007.  *Roberts v. State*,  220

S.W.3d 521 (Tex. Crim. App. 2007).  The state writ of habeas corpus was denied on May 13,

2009, in a perfunctory order by the Texas Court of Criminal Appeals.  *Ex parte Roberts*,

2009 WL 1337443 (Tex. Crim. App. 2009).

## II.
## JURISDICTION

Mr. Roberts invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 2254.

## III.
## CUSTODY

Mr. Roberts is a citizen of the United States and a resident of the State of Texas.  He

is presently in the respondent's custody at the Polunsky Unit in Livingston, Texas, pursuant

to a judgment of conviction and sentence of death.

## IV.
## STANDARD OF REVIEW

**Standard of Review: § 2254(e)(1) & § 2254(d)**

AEDPA provides standards for the review of the merits of Mr. Roberts's claims

through the provisions of 28 U.S.C. §§ 2254(d) & 2254(e)(1):

28 U.S.C. § 2254(d) provides that:

(d) An application for a writ of habeas corpus . . . shall not be granted with
respect to any claim that was adjudicated on the merits in State court
proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to or involved an
> unreasonable application of clearly established Federal law . . . ; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

It is important to note that § 2254(d) is a bar to the grant of habeas relief, rather than to the

Court's review.

Therefore, for the Court to apply § 2254(d), it must first determine whether Mr. Roberts' claims merit relief when reviewed *de novo*. Only then does the Court examine whether relief is barred under § 2254(d). *See Ramdass v. Angelone*, 530 U.S. 156 (2000) and *Weeks v. Angelone*, 528 U.S. 225 (2000) (each thoroughly discussing the merits of the claims prior to discussing the applicability of § 2254(d)).

28 U.S.C. § 2254(e)(1) provides that:

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus . . . a determination of a factual issues made by a State court shall be presumed to be correct.   That Petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

The AEDPA's presumption of correctness is similar to that in previous law.  Prior to the passage of the AEDPA, the law also provided that the federal courts were to presume state court fact findings correct, absent convincing evidence. *See Sumner v. Mata*, 440 U.S. 539, 550 (1981); *Bell v. Lynaugh*, 663 F.Supp. 405, 411 (E.D. Tex. 1987).  The statute appears to be a codification of the Supreme Court's habeas jurisprudence in *Sumner*, and §2254(e)(1) places no greater burden on a petitioner than existed prior to the enactment of the AEDPA.

## CLAIMS FOR RELIEF

**CLAIM NUMBER ONE: FALSIFICATION OF CREDENTIALS AND PERJURY OF THE STATE'S EXPERT WITNESS AT THE PUNISHMENT PHASE VIOLATED MR. ROBERTS' FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW UNDER THE 14TH AMENDMENT.**

**CLAIM NUMBER TWO: MR. ROBERTS' FEDERAL CONSTITUTIONAL RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED WHEN THE WITNESS FOR THE STATE AT THE PUNISHMENT PHASE OF MR. ROBERTS' TRIAL COMMITTED PERJURY WHEN HE FALSIFIED HIS EXPERT QUALIFICATIONS.**

**CLAIM NUMBER THREE:  MR. ROBERTS' RIGHT TO DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT UNDER THE PRINCIPLE OF *ROMANO V. OKLAHOMA*, 512 U.S. 1, 6-7 (1994) WAS VIOLATED.**

**CLAIM NUMBER FOUR: MR. ROBERTS WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL WHEN TRIAL COUNSEL FAILED TO TAKE REASONABLE ACTIONS DURING VOIR DIRE BASED ON THE TDCJ-ID EMPLOYMENT OF THE JURY AND OTHER FACTORS.**

**CLAIM NUMBER FIVE: MR. ROBERTS  WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL WHEN TRIAL COUNSEL FAILED TO REBUT THE STATE'S EXPERT WITNESS IN THE PUNISHMENT PHASE.**

**CLAIM NUMBER SIX: MR. ROBERTS WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL WHEN TRIAL COUNSEL FAILED TO USE KNOWN WITNESSES AND OTHER MATERIAL DEVELOPED BY THE DEFENSE INVESTIGATORS THAT OFFERED A CLEAR DEFENSE THEORY AND MITIGATION EVIDENCE.**

**CLAIM NUMBER SEVEN: THE TRIAL COURT ERRED IN FORCING THE DEFENSE TO TURN OVER ITS INVESTIGATOR'S NOTES TO THE PROSECUTION FOR CROSS-EXAMINATION OF DEFENSE WITNESSES.**

**CLAIM NUMBER EIGHT: THE MITIGATING INSTRUCTION IMPROPERLY NARROWS THE DEFINITION OF MITIGATING EVIDENCE TO THAT WHICH REDUCES A DEFENDANT'S "MORAL BLAMEWORTHINESS" THUS UNCONSTITUTIONALLY LIMITING HIS ABILITY TO PLACE HIS CONSTITUTIONALLY RELEVANT MITIGATING EVIDENCE WITHIN THE EFFECTIVE REACH OF HIS JURY.**

**CLAIM NUMBER NINE: THE TRIAL COURT ERRED BY DENYING THE PETITIONER'S REQUESTED CHARGE REGARDING THE DEFINITION OF MITIGATION BASED ON *TENNARD V. DRETKE*.**

**CLAIM NUMBER TEN: THE TRIAL COURT ERRED BY REFUSING TO ALLOW THE DEFENSE EXPERT TO TESTIFY THAT ROBERTS' COMBINED USE OF ALCOHOL AND CRACK COCAINE CAUSED HIM TO COMMIT THIS CAPITAL MURDER.  EXCLUSION OF PETITIONER'S EVIDENCE PROFFERED AS A BASIS FOR A SENTENCE LESS THAN DEATH, COMBINED WITH THE FAULTY INSTRUCTION DEFINING MITIGATING EVIDENCE PREVENTED THE PETITIONER FROM GAINING THE JURY'S EFFECTIVE CONSIDERATION OF HIS CONSTITUTIONALLY RELEVANT MITIGATING EVIDENCE.**

**CLAIM NUMBER ELEVEN: THE PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO OBJECT TO "VICTIM IMPACT EVIDENCE" FROM A VICTIM NOT NAMED IN THE INDICTMENT.**

**CLAIM NUMBER TWELVE: THE TRIAL COURT ERRED IN ADMITTING VICTIM IMPACT EVIDENCE AND IT DENIED THE PETITIONER DUE PROCESS.**

**CLAIM NUMBER THIRTEEN: THE PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO OBJECT TO THE PROSECUTOR'S REPEATED SUGGESTIONS THAT IF THE JURORS SENTENCED HIM TO LIFE IMPRISONMENT, HE MIGHT BE RELEASED MUCH SOONER THAN 40 YEARS BECAUSE THE PAROLE LAWS MIGHT BE CHANGED IN HIS FAVOR.**

**CLAIM NUMBER FOURTEEN:  THE TRIAL COURT ERRED BY NOT ALLOWING TESTIMONY AS TO HOW A SENTENCE OF DEATH WOULD AFFECT MR. ROBERTS' FAMILY, WHILE ALLOWING SIMILAR TESTIMONY CONCERNING HOW THE VICTIM'S DEATH HAD AFFECTED HERS. THIS PREVENTED MR. ROBERTS FROM OBTAINING THE JURY'S EFFECTIVE CONSIDERATION OF HIS OWN CONSTITUTIONALLY RELEVANT MITIGATING EVIDENCE, PROFFERED AS A CIRCUMSTANCE WHICH A JUROR MIGHT FIND WARRANTED A SENTENCE OF LIFE RATHER THAN DEATH.**

**CLAIM NUMBER FIFTEEN: MR. ROBERTS' MOTION TO PRECLUDE THE DEATH PENALTY SHOULD HAVE BEEN GRANTED. THE FACTORS THAT MADE THIS CASE DEATH-WORTHY SHOULD HAVE BEEN PASSED ON AND SPECIFIED BY A GRAND JURY, RATHER THAN ALLOWING THE STATE UNFETTERED DISCRETION TO SEEK THE DEATH PENALTY OR NOT.**

**CLAIM NUMBER SIXTEEN: THE MITIGATION SPECIAL ISSUE IS UNCONSTITUTIONAL BECAUSE IT DOES NOT HAVE A BURDEN OF PROOF, THUS ALLOWING THE JURY TO GIVE NO EFFECT TO MITIGATING EVIDENCE.**

**CLAIM NUMBER SEVENTEEN:  THE MITIGATION SPECIAL ISSUE IS UNCONSTITUTIONAL BECAUSE IT DOES NOT IMPOSE A BURDEN OF PROOF ON THE STATE'S EVIDENCE THAT IS OFFERED AS "ANTI-MITIGATING" EVIDENCE.**

**CLAIM NUMBER EIGHTEEN:  THE TRIAL COURT ERRED BY REFUSING MR. ROBERTS' REQUEST TO GIVE THE FINAL ARGUMENT AT PUNISHMENT ON THE MITIGATION SPECIAL ISSUE.**

**CLAIM NUMBER NINETEEN: MR. ROBERTS WAS DEPRIVED OF DUE PROCESS AS A RESULT OF THE PROSECUTION'S VIOLATION OF A MOTION IN LIMINE IMPROPERLY SUGGESTING TO THE JURY THAT THEIR VERDICT MAY NOT BE THE FINAL DESTINATION OF MR. ROBERTS' SENTENCE DUE TO POSSIBLE REVERSAL BY A HIGHER COURT.**

## STATEMENT OF FACTS

Many of the facts concerning the actual issues will be summarized under each specific claim.  But to provide context for the claims, a summary of the offense from the Court of Criminal Appeals opinion:

At the time of the murder, appellant lived with the victim, Vicki Bowen. Appellant was unemployed, often drank alcohol, and used cocaine. Bowen worked as a dental assistant. On October 15, 2003, she went shopping with co-worker Brenda Bland, but she did not show up for work the next day. Because Bowen was a punctual person who always called if she was going to be late, Bland became concerned and went to Bowen's house to check on her. When Bland arrived at the home, she found the front door open. After knocking and receiving no answer, Bland entered the home and found Bowen dead. Bland noticed that Bowen was still in the scrubs she had worn at work the previous day. She was covered by a blanket and was lying face down with her head turned to the side in a pool of blood. Blood spatters were present in the living room on the coffee table, the couch, and the walls. The medical examiner would later determine that Bowen died from two gunshot wounds to the head.

It was immediately apparent from an examination of the scene that Bowen's television and her son's truck were missing. That same day, the police found appellant after tracking down the stolen truck. It was later determined that appellant had taken the truck, the television, Texans/Titans football tickets, jewelry, a Western Union money order, a .22 rifle, and a .22 pistol. Appellant had sold the football tickets for one hundred dollars. He had bought cocaine from Edwin Gary on October 15 on three different occasions, the last of which involved trading the .22 caliber pistol. Appellant had apparently abandoned the .22 rifle, later determined to be the murder weapon, a few blocks from where he was found. The Western Union money order was found in the residence at which appellant had parked his truck, but the television and the jewelry were never recovered.

Appellant was interviewed and gave a confession. In that confession, he acknowledged that he had "a crack cocaine problem" and that he would go to bars, get drunk, and then look for drugs. With regard to the victim's death, appellant said, "I pointed the gun at her and I told her just give me some money." Later in the interview, appellant stated:

I pointed the gun at her and I said, "if you'd just give me some money."

8

And she said "No." And then I said, "Look, it doesn't have to be this way." That's all I remember saying to her. And the next thing I know, I shot her.

At trial, appellant testified to a different sequence of events. He claimed that he picked up the .22 rifle because it was out of place, near the door. He also claimed that he saw what looked like a .22 pistol in Bowen's pocket and that she moved her hand to her pocket to reach for it. He then said that he "must have chambered a round into the .22 rifle at that time," but he did not remember if he pulled the safety off. He also claimed that he did not remember his gun firing but that he knows it did. Appellant further testified that he did not intend to rob Bowen at the time he shot her, but he admitted to taking items of her property later.

*Roberts v. State,* 220 S.W.3d 521, 524 -525 (Tex. Crim. App. 2007).

On direct appeal, Mr. Roberts alleged the evidence was insufficient to support the verdict because there was no nexus proven between the murder and the robbery, but the Court of Criminal Appeals rejected that contention. *Robert*, 220 S.W.3d at 525. The Court considered this issue, determining:

Appellant begins his argument by saying, "It may seem bold to claim that the evidence is insufficient to prove capital murder where the defendant said he pointed a gun at the victim and told her to give him the money." He claims that the evidence is nevertheless factually insufficient because there was "no other evidence to show that a robbery took place." He claims that his request for "the money" was a request for twenty dollars that Bowen typically left for him in the morning. He also asserts that he and the victim shared expenses and that testimony at a pre-trial hearing established that he gave Bowen ninety-five percent of his pay when he was working. He concedes that he took property from the house for the purpose of obtaining cocaine but contends that the removal of the property was a mere afterthought. He concludes that any dispute over money was a domestic dispute rather than a robbery.

By his own admission, appellant pointed a gun at the victim and demanded money from her immediately before he killed her. Appellant does not claim that the money he demanded was actually his, and he implicitly concedes that some of the evidence that might support such an assertion was never presented to the jury. Even if it had been, the evidence at trial showed that appellant was unemployed at the time of the shooting, and therefore, the

9

jury could legitimately conclude that the money demanded was not the result of shared finances. Moreover, appellant attempts to buttress his suggestion that he and the victim were arguing over a sum the victim regularly paid him by characterizing his videotaped description of his demand as "give me the money." But our review of the videotape indicates that appellant said, "give me some money," which suggests he was not talking about a previously-agreed-upon payment. Even if we were to assume, however, that he was demanding  only money that the victim had regularly paid him in the past, it would be more than understandable for the victim to decide that she would not continue to advance sums of money to support his drug habit. That he believed she should continue to give him money did not absolve him of the intent to take money he knew did not belong to him or of his threat (and ultimately use) of deadly force to accomplish that objective.

Moreover, several items of the victim's property were discovered missing at the same time the victim's body was discovered, and it was determined that appellant possessed these items either the day of the murder or the next day. A jury could have inferred that appellant took these items shortly after the murder. And from that conclusion, the jury could have further inferred that the murder was committed during the course of a robbery.

Finally, we observe that a "domestic dispute" was not the only apparent possible motive for murder. By his own admission, appellant had a "crack cocaine problem," and his statements suggested that he also had an alcohol problem. That he bought cocaine on three different occasions on the same day further supports a conclusion that appellant had a cocaine addiction. Statements in appellant's confession, along with his conduct, amply support the conclusion that he needed money to purchase the drugs to satisfy this habit. The evidence was factually sufficient to support the underlying offense of robbery. Point of error one is overruled.  (Footnote omitted).

*Roberts*,  220 S.W.3d at 525 -526.

**CLAIM NUMBER ONE: FALSIFICATION OF CREDENTIALS AND PERJURY OF THE STATE'S EXPERT WITNESS AT THE PUNISHMENT PHASE VIOLATED MR. ROBERTS' FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW UNDER THE 14TH AMENDMENT.**

This issue was raised and rejected on state habeas review.  Dr. Frederick Mears perjured his credentials to the jury in Mr. Roberts' case. The jury relied on Dr. Mears' opinion that Mr. Roberts would be a future danger and Mr. Roberts was unjustly sentenced to death. During the punishment phase of the Petitioner's trial, the State called Dr. Frederick Mears as an expert psychologist in order to determine whether there was a probability that Mr. Roberts would commit future criminal acts of violence that would constitute a continuing threat to society.

Before he gave his opinion, Dr. Mears stated he earned the following degrees:

1. Bachelor's Degree in Psychology from East Texas State University (now called Texas A&M);

2. Masters of Art Degree in Experimental Psychology from TCU;

3. Ph.D. in Education Research and Psychometry from Colorado;

4. A second doctorate in psychology in neuropsychology in 1987; and

5. Masters of Science in Psychopharmacology from CA Institute of Professional Psychology in 2000. (RR 30, 211-212).

However, in another case, *Texas v. Rosales*, Trial Court Cause No. 97-425, 078; 364th District Court of Lubbock County, Texas, Dr. Frederick Mears testified he had a bachelor's

11

in psychology, a master's in psychology, a doctorate in psychology and another doctorate in neuropsychology.[1] In *Rosales*, when queried specifically about his 1969 Ph.D., Dr. Mears testified that the degree was actually in research and statistical methodology. Furthermore, when specifically asked about his second doctorate degree, Dr. Mears testified that his specialization was in neuropsychology, psychopathology.

Additionally, Dr. Mears admitted that the curriculum vitae (C.V.) he submitted in the *Rosales* case differed from the C.V. he supplied to the District Judge in a Midland death penalty case. Dr. Mears further admitted that he changes his C.V. when he submits it to drug companies.[2]

In addition to these discrepancies of degrees, state writ counsel conducted an evidentiary hearing in the Walker County 12th Judicial District Court, *Ex Parte Raymond Levi Cobb*, about this subject.  On September 3, 2002, Dr. Mears presented himself for writ counsel's questions concerning the same discrepancies as cited above. Dr. Mears admitted under oath he had only one doctor degree, although he told Mr. Roberts' jury he had different credentials. State writ counsel averred he had  personal knowledge that Dr. Mears stated under oath he had only one doctor degree.  State writ counsel requested an evidentiary hearing which was never held about this very issue.  Additionally, transcripts could be shown to Dr. Mears in an effort to allow him to answer this claim revolving around differing

---

[1]*See* Writ Exhibit C: *Texas v. Rosales*, Trial Court Cause No. 97-425, 078; 364th District Court of Lubbock County, Texas.

[2]*Id.*

credentials he presented to juries around the State of Texas. The Polk County District Attorney hired Dr. Mears and reviewed his credentials before Dr. Mears was presented to Mr. Roberts's jury.

The findings by the trial court were nebulous, at best.  The district court found that Dr. Mears merely used "different terminology in describing his first doctorate in *Rosales* than he used in the instant case." (Finding 22).  The court failed to find Dr. Mears lied - and that the official title of Dr. Mears' doctorate was not material to the jury.  (Finding 37).  The finding that Dr. Mears did not mislead the jury is clearly not supported by the record. (Finding 46).  Further, that this misrepresentation should not be imputed to the state is unreasonable in light of the law and the facts.

The federal constitutional principle prohibiting knowing use of false evidence is basic to the due process of law mandated by the Fourteenth Amendment. To establish a due process violation based on the state's use of false or misleading testimony, the defendant must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution knew the witness's testimony was false. *Giglio v. Unites States*, 405 U.S. 150, 152-54, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *May v. Collins*, 955 F.2d 299, 315 (5th Cir.), cert. Denied, 504 U.S. 901, 112 S.Ct. 1925, 118 L.Ed..2d 533 (1992). A knowing use of perjured testimony may be raised in applications for habeas relief. *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340,79 L.Ed. 791 (1935); *Pyle v. Kansas*, 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942).

13

The State had a duty to disclose evidence favorable to the accused that is material to guilt or punishment. *See id.* at 86-87, 83 S.Ct. at 1196-97. To establish this due process violation, an accused must show that the State withheld evidence, that the evidence was favorable, and that the evidence was material to the defense. *Little v. Johnson,* 162 F.3d 855, 861 (5th Cir.1998). " *Brady* applies equally to evidence relevant to the credibility of a key witness in the state's case against a defendant." *Graves v. Dretke,* 442 F.3d 334, 339 (5th Cir.2006) (citing *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)), *cert. denied,* 549 U.S. 943, 127 S.Ct. 374, 166 L.Ed.2d 253 (2006).   The evidence that the State's own witness was a liar should well have been known by the entity that hired him.

Knowledge of the falsity of testimony on the part of any member of the "prosecution team" includes both the investigative and prosecutorial personnel and may be imputed to the prosecutorial personnel. *Giglio v. U.S.*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). The District Attorney in Mr. Roberts' case should have recognized the misleading nature of the evidence when Dr. Mears testified at trial and gave false testimony concerning his credentials.

The aforementioned principles apply equally even when the falsehood goes only to the witness' credibility or reliability. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177, 3 L. Ed.2d 1217 (1959); *Giglio, supra; United States v. Bagley*, 473, U.S. 667, 676, 87 L. Ed.2d 481, 490, 105 S. Ct. 3375, 3380 (1985) (principle applies to both exculpatory

14

evidence and impeachment evidence). Furthermore, regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. *Unites States v. Harris*, 498 F.2d 1164, 1169 (3d Cir.), *cert. denied sub nom. Young v. United State*, 419 U.S. 1069, 95 S. Ct.655, 42 L. Ed. 2d 665 (1974).

In holding that the above-cited rule should apply even when the false testimony only bears on the credibility of the witness, the *Napue* Court reasoned that:

> the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. As stated by the New York Court of Appeals in a case very similar to this one, *People v. Savvides*, 1 N.Y. 2d 554, 557; 136 N.E. 2d 853, 854-855; 154 N.Y. S. 2d 885, 887.
>
> "It is of no consequence that the falsehood before upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth...That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair."

*Napue* at 269.

Mr. Roberts proved by a preponderance of the evidence that the error contributed to his conviction or punishment. Upon reference to Dr. Frederick Mears testimony in the case of *Texas v. Rosales*, his testimony in the evidentiary hearing in Walker County and finally, the testimony of Dr. Mears in the trial of Mr. Roberts, it is clear Dr. Mears committed perjury and testified falsely concerning his credentials.

The false testimony concerned the reliability and credibility of Dr. Mears, and since the testimony was in fact false, if knowledge of the falsity can be imputed to the prosecution, Mr. Roberts is entitled to relief.  The prosecution hand picked this particular expert to testify as to the future dangerousness of Mr. Roberts.  Clearly, a review of his CV was completed - and the State offered actual testimony which was not true. Dr. Mears was "the" expert for the State.

The complained of error was material and *not* harmless. The testimony of Dr. Mears, presented to the jury in the guise of an "expert" upon the *future dangerousness* of Mr. Roberts had clear results: the petitioner received the death penalty following the testimony. The false evidence was material because there is a reasonable likelihood that it could have affected the jury's verdict. *See, e.g., Goodwin v. Johnson*, 132 F.2d 162 (5th Cir. 1997); *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 773 (1997); *Thompson v. Cain*, 161 F. 3d 802 (5th Cir. 1998); *Fuller v. Johnson*, 114 F.3d 491 (5th Cir. 1997).

The findings by the state habeas court that this was not true and not material is just not consistent with the fact and the law.  The state findings are unworthy of deference.

**CLAIM NUMBER TWO: MR. ROBERTS' FEDERAL CONSTITUTIONAL RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED WHEN THE WITNESS FOR THE STATE AT THE PUNISHMENT PHASE OF THE PETITIONER'S TRIAL COMMITTED PERJURY WHEN HE FALSIFIED HIS EXPERT QUALIFICATIONS.**

The pertinent facts to this issue are presented in Claim One. Dr. Frederick Mears' testimony was materially inaccurate evidence and violated Mr. Roberts' Eighth Amendment rights under *Johnson v. Mississippi*, 486 U.S. 578, 108. Ct. 1981, 100 L. Ed. 2d 575 (1988). "The Eight Amendment serves to assure that the State's power to punish is 'exercised within the limits of civilized standards,'" *Woodson v. North Carolina*, 428 U.S. 280, 293 (1976)(*citing Trop v. Dulles*, 356 U.S. 86, 100 (plurality opinion). "[C]entral to the application of the Amendment is a determination of contemporary standards regarding the infliction of punishment." *Woodson* at 288 (*citing Gregg v. Georgia*, 428 U.S.153, 176-182 (1976). "It is now well established that the Eighth Amendment draws much of its meaning from 'the evolving standards of decency that mark the progress of a maturing society.'" *Woodson* (*quoting Trop* at 101)(plurality opinion).

The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special "'need for reliability in the determination that death is the appropriate punishment'" in any capital case. *See, Gardner v. Florida*, 430 U.S. 349, 363-364 (1977) (WHITE, J., concurring in judgment) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)); *Johnson v. Mississippi*, 486 U.S. 578, 108 S. Ct. 1981, 100 L. Ed 2d 575 (1988); *Jurek v. Texas*, 428 U.S. 262, 271-272

17

(1976). Although "there can be 'no perfect procedure for deciding in which cases governmental authority should be used to impose death,'" it is also "clear that such decisions cannot be predicated on mere 'caprice' or on 'factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Johnson v. Mississippi,* 486 U.S. 578, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988) (*quoting Zant v. Stephens*, 462 U.S. 862, 884-885, 887, n. 24 (1983). Sentencing procedures should not create "a substantial risk that the death penalty be inflicted in an arbitrary and capricious manner." *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978) (*quoting Gregg v. Georgia*, 428 U.S. at 188).

In *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981(1988),  the sole evidence to support one of the factors required for an aggravated finding justifying imposition of the death penalty was found to be constitutionally deficient under an Eighth Amendment analysis. Therein, the only evidence was a certified copy of a judgment of conviction from a sister state. Some 20 years later, that conviction was overturned. The Supreme Court held:

> It is apparent that the New York conviction provided no legitimate support for the death sentence imposed on applicant. It is equally apparent that the use of that conviction in the sentencing hearing was prejudicial. The prosecutor repeatedly urged the jury to give it weight in connection with its assigned task of balancing aggravating and mitigating circumstances "one against the other." *Id*.; 13 Record 2270; App. 17; see 13 Record 2282-2287; App. 26-30. Even without that express argument, there would be a possibility that the jury's belief that applicant had been convicted of a prior felony would be "decisive" in the "choice between a life sentence and a death sentence.

*Johnson,* 108 S.Ct. at 1987.

Because Dr. Mears' testimony was perjured and inaccurate, the jury's consideration

of it rendered his sentencing proceeding so unreliable that the proceeding violated the Eighth Amendment. *See, Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978) (plurality opinion); *Woodson v. North Carolina*, 428 U.S. 280, 305, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976). As in *Johnson*, *supra*, Dr. Mears' perjured testimony provided no legitimate support for Mr. Roberts' death sentence. Also as in *Johnson*, in this case, the State argued Dr. Mears' testimony supported a finding that Mr. Roberts would be a future danger to society. Furthermore, as Dr. Mears testimony was highly prejudicial to Mr. Roberts.

The state habeas court rejected this challenge as well, relying upon the finding that Dr. Mears' testimony wasn't really a lie, and even if it had been misleading, it did not infect the trial to such an extent to render the sentence of death unreliable.  (Finding 55).  This finding, in light of the seriousness of the perjury and the importance of the witness, is unreasonable in light of the law and the facts.

**CLAIM NUMBER THREE:   MR. ROBERTS' RIGHT TO DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT UNDER THE PRINCIPLE OF *ROMANO V. OKLAHOMA*, 512 U.S. 1, 6-7 (1994) WAS VIOLATED.**

The facts of this claim rest upon the facts presented in Claim One.  The introduction of Dr. Mears' testimony also violated the Due Process Clause of the Fourteenth Amendment under the principle of *Romano v. Oklahoma*, 512 U.S. 1, 6-7 (1994). The proper analytical framework in which to consider this claim is found in *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 40 L. Ed. 2d 431, 94 S. Ct. 1868 (1974). *See, Romano v. Oklahoma*, 512 U.S. 1, 6-7 (1994). The relevant question in this case, therefore, is whether the admission of Dr. Mears' testimony so infected the sentencing proceeding with *unfairness* as to render the jury's imposition of the death penalty a denial of due process. *Id.*(citations omitted).

The perjured testimony seriously infected the sentencing proceeding with *unfairness* as to render the jury's imposition of the death penalty a denial of due process. The State of Texas presented a doctor as an expert, asserting that he was highly trained. Credentials were stated to the jury as if factually correct and then the jury heard the doctor's opinion. The jury relied on the doctor's opinion in making their ultimate decision, which resulted in Mr. Roberts' death sentence.

The state habeas court found that Mr. Roberts' right to Due Process was not violated. (Finding 49).  In fact, this finding is not reasonable in light of the perjured testimony and the law previously presented.

**CLAIM NUMBER FOUR: MR. ROBERTS WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL WHEN TRIAL COUNSEL FAILED TO TAKE REASONABLE ACTIONS DURING VOIR DIRE BASED ON THE TDCJ-ID EMPLOYMENT OF THE JURY AND OTHER FACTORS.**

This issue was presented and rejected on state habeas.  The finding by the state habeas court was based upon the fact that defense counsel did not urge a peremptory strike for either juror Benfer or Epps and further, the trial attorney liked both of these jurors despite their employment history at TDCJ-ID.  (Finding 882-84).

Polk County, Texas is known to have a large number of TDCJ-ID units within its jurisdiction and surrounding counties. Along with such a number of prison units attaches a large number of TDCJ-ID employees and numerous relatives of those employed by TDCJ-ID. Two of the twelve-member jury in Mr. Roberts' case were composed of the following individuals:

•     Mr. Raymond Lee Epps - employed by TDCJ-ID as a Correction Officer at the Polunsky Unit where death row is located, and

•     Mr. Paul Benfer - employed by TDCJ-ID as a Transportation Officer

During the individual voir dire of Mr. Raymond Lee Epps, one of the two Defense Counsel appointed for Mr. Roberts was not even present at the voir dire. Remaining Defense Counsel, Stephen Taylor, told Mr. Epps that Defense Counsel Don Cantrell "had to leave us a little early this afternoon." (RR 13, 98).

During the individual voir dire of Mr. Paul Benfer, Mr. Benfer actually stated he knew

Prosecutor Hon, one of the two prosecutors conducting the trial. Because Mr. Hon coached his two son's baseball team and attended the same Church. (RR 10, 99). He advised he would not let this knowledge influence how he heard the evidence. (RR 10, 100). While questioning Mr. Benfer on the subject of continuing threat, the State acknowledge his status as a correction officer and stated, "We have individuals such as yourself that deserve to be protected." (RR 10, 103). This line of questioning is more accurately noted by writ counsel as indoctrinating the potential juror for a death vote against Mr. Roberts by placing fear in the heart of the potential juror on a personal, day to day level, even before trial began.

Defense Attorney Don Cantrell asked Mr. Benfer, "Having worked 20 years for TDCJ and the Institutional division thereof and having known Mr. Hon and working somewhat with two possible witnesses in this case, you were asked a question in the questionnaire as to whether or not you would be bothered or it would bother you having to respond to family or coworkers or anybody about your decision in this case; is it true? Mr. Benfer responds, "that is correct" but never answers the question here. (RR 10, 127). No follow up questioning is done on the subject and the Defense actually accepted Mr. Benfer with no objection.

The two-step analysis set out by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), is the standard for appellate review of counsel's effectiveness during trial. First, Mr. Roberts must show that counsel's performance was so deficient as not to function as the "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *U.S. Const. amend. VI*; *see Strickland*,

466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.  The constitutional right to counsel does not guarantee errorless counsel, therefore, the effectiveness of counsel must be determined by the entire representation. The second *Strickland* prong requires Mr. Roberts to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694.  Rather, the issue is whether he received a fair sentencing hearing resulting in a verdict worthy of confidence. *cf. Kyles v. Whitley*, 514 U.S. 419 (1995).

Factors that mitigate an individual defendant's moral culpability "ste[m] from the diverse frailties of humankind." *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976)(plurality opinion of Stewart, Powell, and Stevens, JJ.). The Supreme Court further noted that:

> This Court has previously recognized that "(f)or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 61, 82 L.Ed. 43 (1937). Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. *See Williams v. New York*, 337 U.S., at 247-249, 69 S.Ct., at 1083-1084; *Furman v. Georgia*, 408 U.S., at 402-403, 92 S.Ct., at 2810-2811 (Burger, C. J., dissenting).

*Woodson*, 428 U.S. at 304, 96 S.Ct. at 2991.  Especially in a case such as this - where there was arguably evidence this was not a capital case and there was actually no robbery.  Mr.

23

Roberts offers the profound words of Judge Biery of the Western District on the proper evaluation of a capital case:

> In a nation whose landscape is dotted with synagogues and churches, the entreaties of "thou shalt not kill" and "forgive your enemies" are challenged by retribution and revenge, understandable responses to violent crime. The divergence between what is said on the Sabbath and what is done on election day has given secular America its macabre politics of death, collectively imposed upon the predators among us through the might of the State. Having democratically given vent to normal human emotions in the face of incredibly heinous acts, the legal exercise of the power to end a life requires careful scrutiny by some objective entity bound by the rule of law. The alternatives to the imposition of the ultimate punishment within a framework of due process are the anarchy of a lynch mob or the whim of a dictator and the concomitant devolution of society to the level of those deserving execution.
>
> For the Constitution to be more than mere words, even those accused of capital murder must have competent advocacy against the strength and resources of government. Though frequently and pejoratively quoted out of context, Dick the Butcher recognized lawyers as protectors of English rights; hence they must be killed to achieve illegitimate seizure of sovereignty.FN1
>
>> FN1. William Shakespeare, The Second Part of King Henry the Sixth act 4, sc. 2:
>> Cade: I thank you, good people; there shall be no money; all shall eat and drink on my score; and I will apparel them all in one livery, that they may agree like brothers, and worship me their lord.
>> Dick: The first thing we do, let's kill all the lawyers.
>>
>> III The Histories and Poems of Shakespeare 561 (Players Illus. ed., Spencer Press, Inc. (1955).

*Adanandus v. Johnson* , 947 F.Supp. 1021, 1030 (W.D.Tex. 1996).  Mr. Roberts was entitled to effective assistance of counsel on voir dire.  Two jurors with prison backgrounds - indeed one working at Death Row - were simply not the type of jurors who could fairly serve on this jury.

**CLAIM NUMBER FIVE: MR. ROBERTS  WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL WHEN TRIAL COUNSEL FAILED TO REBUT THE STATE'S EXPERT WITNESS IN THE PUNISHMENT PHASE.**

Defense Trial Attorneys did not rebut State expert witness Dr. Mears' damaging testimony against Mr. Roberts because they did not give notice of their experts to the State in advance as required. Speaking in a bench conference about this important problem was the following conversation between Defense Trial Attorney Taylor and Prosecutor Mr. Hon:

Mr. Hon:      Judge, while we're up here and on the record, I am concerned or I'm getting an impression that they are planning on putting on another expert behind Dr. Mears. And I don't think they have given notice.

Mr. Taylor:   You don't have to give notice on rebuttal.

Mr. Hon:      I beg your pardon. Under the expert rules of discovery you are suppose to give me notice of every expert you are planning on calling in trial.

Mr. Taylor:   You have been given notice about every one of them.

Mr. Hon:      I have never been given any designation on any other experts other than the first one you gave me, Steve. **I have asked three times now and in the jury selection; and if you all are planning on putting anybody else on, you all haven't given me any information at all about putting on another expert**.

25

(Emphasis supplied)

(RR 30, 224-225).

After Dr. Mears testified, the Defense attempted to call Dr. John F. Edens to testify about a study he conducted. Because the Defense did not give the State notice of Dr. Edens by the deadline imposed, the Court did not allow Dr. Edens to testify and sustained the prosecutor's objection about the same. (RR 31, 189-192).

Further, the State called Dr. Quijano to testify. (RR 29, 234-310).  Dr. Quijano testified as a clinical psychologist that specialized in the study of abnormal behavior. Dr. Quijano reviewed offense reports from the alleged capital murder in Polk County and offense reports from an unresolved murder in Louisiana, to which alleged Mr. Roberts confessed. Also reviewed were transcripts from interviews with investigators from Polk County and Louisiana, along with personal interview with Mr. Roberts in jail. Dr. Quijano diagnosed Mr. Roberts with alcohol dependence, cocaine and antisocial personality features. (RR 29, 240).

The Defense had a witness who worked with Dr. Quijano in the past, Dr. Roger Saunders from Conroe, Texas. Dr. Saunders was at the Courthouse for most of the trial that did not testify for the Defense. Dr. Saunders, like Dr. Edens, was not noticed to the State by the deadline imposed.

The State's expert, Dr. Mears, went on to testify that he reviewed police records from several states about Mr. Roberts, offense reports, crime scene videos and transcripts of the videos, affidavits of probable cause, written materials, statements of witnesses describing the

26

crime scene and voluntary statements. (RR 30, 231). In addition, Dr. Mears administered a mental status exam to a relative of Mr. Roberts and a general clinical interview with Mr. Roberts about his past and childhood. (RR 30, 232). Dr. Mears listened to the trial testimony and reviewed psychological tests included the MMPI administered by Dr. Phil Mosman, a Defense expert. (RR 30, 233-234). Dr. Mears then stated Mr. Roberts in his opinion, would be a future danger to society or those who he is with in close proximity for a long period of time. (RR 30, 235). Dr. Mears testified the material he relied upon for this opinion was "superb." *Id*. Dr. Mears testified he reviewed material about the death of Al Crow and stated the burning of the body was a very significant factor and indicated what kind of mental framework of violence and lack of respect for human life and human body that Mr. Roberts had. Dr. Mears characterized Mr. Roberts stating, "You want to look at how loose a cannon, if I may use that word, we have. What the person's potential over a long period of time to become physically aggressive, to engage in getting into tissue of other people." Objection was offered and sustained by the Judge. An instruction was give to disregard any spontaneous comment. (RR. 30, 236).

Dr. Mears went on in detail to proclaim different situations Mr. Roberts had experience to show him to be a future danger including:

1. Dousing Al Crow's trailer with gin and lighting it on fire; (RR 30, 237-238)

2. That there would be a killing in his jail cell; (RR 30, 238-240)

3. Using a knife to commit a robbery at a Circle K in Louisiana; (RR 30, 240-241)

27

4. That Mr. Roberts knew to of his alleged crime victims, which meant Mr. Roberts was a     "broad spectrum killer," according to Dr. Mears; (RR 30, 241-243)

5. That the murder of Vickie Bowen involved a head shot; (RR 30, 243-244)

6. That substance dependency was not related to a predisposition to commit murder; (RR 30, 245)

7. That it is significant that Mr. Roberts told him he had flashbacks of people dying, death, and blood in dreams. (RR 30, 251)

8. That Dr. Mears did not support many of the diagnosis that Dr. Mosman made. (RR 30, 237-268).

The findings by the trial court were that there was insufficient time to designate Dr. Edens as an expert and thus his testimony was not allowed.  (Findings 89-94).  The state habeas court also found that the testimony might have been duplicative of another defense witness, Dr. Longmire.  (Finding 94).

Under Texas law, a trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *Green v. State*, 934 S.W.2d 92, 101-02 (Tex.Crim.App.1996); *Montgomery v. State*, 810 S.W.2d 372, 379-80 (Tex.Crim.App.1991). This applies to the testimony of experts not designated timely.  *See Cunningham v. State,* 2006 WL 1720443, 1 (Tex.App.-Eastland 2006)(explaining that the trial court found that appellant had not designated Dr. Smola as an expert pursuant to the State's request and that Dr. Smola's testimony "is not in line of direct rebuttal of the testimony of Patti Henry," thus

the exclusion was not error for that reason).

Civil law is instructive in the instant case when late designated experts may be allowed to testify.  District courts consider four factors in determining whether the testimony of a late-designated expert witness should be permitted: 1) the explanation for the failure to identify the witness; 2) the importance of the testimony; 3) potential prejudice in allowing the testimony; and 4) the availability of a continuance to cure such prejudice. *Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 883 (5th Cir. 2004).

The rebuttal testimony was necessary - and important to rebut damning evidence from Dr. Mears.  It was ineffective to now have "found" this witness within the proper time frame. Clearly, defense counsel believed Dr. Edens could have assisted in the case.  Yet, the fundamental importance of either properly designating the expert or, at the very least, making a bill of exception, was not done by counsel.

The Fifth Circuit considered a case where an expert pathologist was not called and determined there was not ineffective assistance of counsel because it did not go to the heart of the defense case:

> Contrary to Pondexter's argument, counsel did not build his "entire case around" the alternative defensive theory that the victim was deceased when he fired the shot. As set forth in the text of the opinion, the instant claim of ineffective assistance of counsel does not involve his primary defense theory that he fired no shots.

*Pondexter v. Dretke,* 346 F.3d 142, 147 (5th 2003).   In *Pondexter*, the defendant's primary defense was his assertion that a co-defendant had shot the victim. The pathologist would

29

have supported an alternative claim that the defendant shot the victim a second time but the victim was already dead at that point.  In the case *sub judice*, whether Mr. Roberts would be a future danger was the absolute heart of the defense case.  (Especially in light of the inadmissible evidence the State proffered).

After *Pondexter* was remanded, it was again appealed and the Fifth Circuit further supplemented the discussion regarding the need for a pathologist:

> Pondexter relies heavily on *Rompilla*, maintaining it requires us to review the prejudice prong of this IAC claim *de novo*, rather than, under AEDPA deference, deciding whether the state-court decision was unreasonable. It is unnecessary, however, to decide this question because, even under a *de novo* standard of review, Pondexter fails to establish prejudice.
>
> Under such plenary review, Pondexter fails to establish that, had trial counsel consulted with, and/or presented, a pathologist, the jury's verdict would have been  different. The jury was presented with the testimony of an eyewitness that Pondexter shot the victim after Henderson fired the first shot. The State also presented the medical testimony of Dr. Guileyardo. He testified that the second bullet entered the left side of the victim's face and exited below her right ear, perforating her oral cavity, boring a hole through her tongue, and shattering her right jawbone. It was Dr. Guileyardo's opinion that both gunshot wounds were inflicted while the victim was still alive, and that either shot could have killed her.
>
> Pursuant to our *de novo* review, we conclude that the jury, cognizant of overwhelming evidence of guilt, would have found Pondexter guilty even if trial counsel had consulted with, and/or called, a pathologist. As a result, there is not a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different". *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052 (emphasis added).

*Pondexter v. Quarterman,*  537 F.3d 511, 523 -524 (5th Cir. 2008).

The State and the trial court combined with ineffective assistance of counsel deprived Mr. Roberts of the right to present his defense and rebut serious and material claims by the

State.  The findings by the state habeas court are unreasonable in light of the law and the

facts.

**CLAIM NUMBER SIX: MR. ROBERTS WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL WHEN TRIAL COUNSEL FAILED TO USE KNOWN WITNESSES AND OTHER MATERIAL DEVELOPED BY THE DEFENSE INVESTIGATORS THAT OFFERED A CLEAR DEFENSE THEORY AND MITIGATION EVIDENCE.**

Mr. Roberts told his attorneys about a defense to the charged capital murder that was not presented to the jury. This defense was alluded to in the Defense's closing argument at the guilt phase of trial. Defense Counsel Mr. Taylor told the jury:

"I don't know if Vickie Bowen had the pistol. The pistols weren't printed. The cartridges weren't printed. It wasn't tested for blood. We have no idea whether she had the pistol herself. We do know, I believe, that the holster for the pistol was found behind the couch." (RR 24. 56).

Further, when the State's Expert, Dr. Quijano testified during a voir dire conducted by Defense Counsel; Dr. Quijano was forced to read from his notes from the personal interview with Mr. Roberts the following:

"His version of what happened in this murder case, he said he was drinking in two bars; and he was intoxicated. He had a $20 crack cocaine at about 4:00 p.m., and it affected him for about 20 minutes. At around 5:30 or so, he got the news that he got his job back. He went home at 6:30 and noticed unusual things, including a loaded rifle by the door. Vickie had a pistol in her uniform pocket, that she was still in uniform, that Vickie was angry; and felt that she would confront him to leave because her parents were coming and the father was an ex-chief of police. Vickie yelled something, which he cannot recall what she yelled - what she yelled and then he shot her but does not remember pulling the trigger."

(RR 29, 292).

The Defense team was aware of this defense but did not present available witness to prove the defense. In reality, Mr. Roberts had told the police investigators a false version of the murder because **he wanted the death penalty** for the offense directly after the offense as he was in a time of despair over the situation. Mr. Kevin Templeton, an investigator for the Defense has executed an affidavit for writ counsel focusing light on the actual defense that existed and has exposed the material  Defense Attorneys knew about but did not cover in the trial.

Defense Investigator Templeton, a former Houston Police Officer, conducted a series of interviews with individuals who had personal knowledge, information and relationships with Vickie Bowen.[3] He interviewed a past boyfriend of Ms. Bowen named Charlie Jones. The address of this individual was known to the Defense Attorneys; his business address was listed in their investigator's report and the home address was listed within the State's file that writ counsel was permitted to review by Mr. Hon.

Mr. Jones advised Ms. Bowen had two different unique personalities: one he liked very much and another mean and violent. *Id*. Mr. Jones advised Ms. Bowen pointed a .22 caliber revolver at him placing him in fear of his life. Mr. Roberts had described a very similar situation known to the Defense team but not presented to the jury completely. Mr. Jones was able to wrestle the gun from Ms. Bowen. In another situation, Ms. Bowen stabbed Mr. Jones in the leg. *Id*.

---

[3]See Writ Exhibit D: Sworn Affidavit of Investigator Kevin D. Templeton.

33

Defense Investigator interviewed a bar owner name Gail Collins who stated Ms. Bowen would attempt to pick fights at her bar if Mr. Jones was present so she banned her form the bar and had knowledge about the stabbing. She advised Ms. Bowen was difficult to deal with when had been drinking. *Id*.

Defense Investigator interviewed Ms. Brenda Bland, a co-worker of Ms. Bowen. Ms. Bland also talked of the two incidents with Mr. Jones and temper of Ms. Bowen when drinking. Finally, Defense Investigator stated in his affidavit that he noticed a bullet hole in the plywood flooring of Ms. Bowen's home that had no blood stain associated with this section. *Id*. The Defense team was never granted access to the interior of the mobile home and this hole could have been developed to show other firearms had been discharged at the home in the past; further demonstrating the likelihood of Mr. Roberts' later assertions.

Defense Mitigation Specialist, Cheryl Pettry interviewed and developed mitigation witnesses that were not presented by the defense. Ms. Pettry has also prepared an affidavit for writ counsel and writ counsel incorporates the material in the statement in this argument.[4] The witnesses contacted and interviewed, but not called by the Defense were:

1. Adolph Harkins

2. Gary Welch

3. Mike Smith

4. Donna Harkins

---

[4]See Writ Exhibit E: Affidavit of Mitigation Specialist Cheryl Pettry.

34

5. Candice Harkins

The mitigating evidence these witnesses could have testified to is that:

1. Mr. Roberts was an alcoholic;

2. Mr. Roberts was mis-diagnosed and did not receive the correct treatment;

3. Mr. Roberts' biological father is an alcoholic;

4. Mr. Roberts' mother suffered from mental illness and was hospitalized in a mental institution several times;

5. Mr. Roberts was intoxicated at the time of the offense. The capital felony was committed while the defendant was under the influence of extreme mental and emotional disturbance;

6. The victim was a participant in the Mr. Roberts' conduct-a-domestic dispute;

7. The killing occurred in a heated or panicked moment;

8. Mr. Roberts was an abused child;

9. Mr. Roberts grew up in an unpredictable, chaotic environment;

10. Mr. Roberts witnessed about to his mother;

11. Mr. Roberts had poor upbringing;

12. Mr. Roberts is a loving and caring father to his daughter;

13. Mr. Roberts has demonstrated concern for others;

14. Mr. Roberts counseled niece to not use drugs;

15. Co-workers of Mr. Roberts thought highly of him;

35

16. Mr. Roberts was a good employee;

17. Mr. Roberts does not exhibit psychopathology or anti-social personality;

18. Mr. Roberts is remorseful;

19. Mr. Roberts is unlikely to be a danger to others while serving life sentence;

20. Mr. Roberts had good conduct while awaiting trial; and

21. Mr. Roberts has and will continue to have support and love from his family and friends.

Mr. Roberts was denied a fair trial based on Issues 4-6.  His right to present witnesses was infringed because of his attorney's own actions.  An attorney must have a firm command of the facts of the case and governing law before he can render reasonably effective assistance of counsel.

Defense counsel did not attempt to develop the sole defense scenario of the petitioner. Trial counsel obviously developed their theory of the case long before trial began, yet took no action to insure the testimony required to prove their allegations was ready at the guilt phase of Mr. Roberts' trial.

Defense Counsel did not call certain mitigation witnesses interviewed by their Mitigation Specialist. The jury did not hear important testimony that had bearing on Mr. Roberts' punishment.  Defense Counsel in Mr. Roberts' case *knew* about the mitigation witnesses and other information and then just did not submit the information to the jury. This is especially true when one reviews the damaging and calculated evidence the State brought

at the punishment phase using experts and other witnesses.

It is also apparent defense counsel did not properly prepare for the State's expert witnesses testimony as they did not even notice the State of their own rebuttal witnesses that were present in the courthouse as required. This fact demonstrates defense counsel had a lack of preparation for trial. This counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and there was a reasonable probability that, but for trial counsel's deficient performance, the result of the proceeding would have been different.  Whether the *Strickland* standard has been met is judged by the "totality of the representation."

Not noticing your expert witness, taking steps to prove Mr. Roberts' disclosed theory of the case or not calling available mitigation witnesses is not trial strategy.  There is a strong presumption trial counsel's actions were strategy, however, such a presumption cannot be argued in this case. The trial attorney should have noticed all expert witnesses as required to assist in damage control of the State's experts. The jury did not hear all of the Defense mitigation witnesses or expert's uncalled testimony that would have been presented had proper notice been issued in a timely manner. The very reason our justice system provides jury trials is so a jury can hear live testimony concerning key witnesses and judge their credibility and then make a decision based on the evidence they heard. Not presenting available Defense expert witnesses is per se ineffective assistance of counsel. Mr. Roberts was prejudiced by the defense team's conduct.

## CLAIM NUMBER SEVEN: THE TRIAL COURT ERRED IN FORCING THE DEFENSE TO TURN OVER ITS INVESTIGATOR'S NOTES TO THE PROSECUTION FOR CROSS-EXAMINATION OF DEFENSE WITNESSES.

This issue was raised and rejected on direct appeal.  The Court of Criminal Appeals had a difficult time deciding how to deny this claim but seemed to choose procedurally defaulted with a back up of it "may" have been acceptable:

> In point of error three, appellant contends that the trial court erred when it ordered the defense to turn over its investigator's notes to the prosecution for cross-examination of the defense punishment-phase witnesses. Appellant further claims that this error was "structural," and thus immune from a harmless error analysis, because his right to counsel was violated.
>
> Appellant's investigator was a "mitigation specialist" who talked to a number of defense witnesses who testified at the punishment phase of the trial. The investigator took notes relating to these interviews. From the record of the conversations between the trial court and the parties set out in appellant's brief, it appears that the notes involved some direct quotations of statements by witnesses and some opinions of the investigator. The trial court permitted defense counsel to excise the latter from the notes before turning the  notes over to the prosecution. The notes relating to a particular witness were turned over after that witness testified.
>
> Appellant has failed to include in his brief any record citations showing that the redacted notes were ever made a part of the record or that a bill of exceptions outlining the content of these notes was filed. In fact, by saying, "[p]ortions of the notes may have been excised; it is hard to tell from this record," his brief suggests that the notes were not in fact made a part of the record. The State responds that the notes are not in the record and no bill of exception regarding the notes was ever filed. A party has an obligation to make appropriate citations to the record in support of his argument. If the notes are in the record, appellant has failed to include the proper record references. If, as seems more likely, the notes are not in the record, then appellant procedurally defaulted error by failing to include a matter in the record necessary to evaluate his claim.  (Footnote omitted).

*Roberts*,  220 S.W.3d at 526 -527.  What there is absolutely no doubt about is that the notes

of the defense witnesses were work product which amazingly, the trial court ordered turned

over to the prosecution.  There *was* an objection to this.  (RR27 72).  The notes given were

taken by the mitigation specialist and were work product.  (RR27 104-05).  On direct appeal,

Mr. Roberts argued that this evidentiary violation was a Due Process violation because it

went to the very heart of the defense case.  (Defense brief at 36).

The right to investigate and keep as work product those notes is not a new rule or one

the district attorney in Polk County should have been unfamiliar with.  As the Fifth Circuit

has explained:

> The attorney-work-product doctrine protects from disclosure materials
> prepared by an attorney acting for his client in anticipation of litigation.
> *Hickman v. Taylor*, 1947, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451. This
> doctrine is distinct from and broader than the attorney-client privilege, *United
> States v. Nobles*, 1975, 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 2170, 45
> L.Ed.2d 141; *Hickman v. Taylor, supra*, 329 U.S. at 508, 67 S.Ct. at 392; it
> protects materials prepared by the attorney, whether or not disclosed to the
> client, and it protects material prepared by agents for the attorney. *United
> States v. Nobles*, supra, 422 U.S. at 238-39, 95 S.Ct. at 2170 (**investigator's
> report prepared for attorney in anticipation of litigation held protected
> work product**).(emphasis supplied)

*In re Grand Jury Proceedings*, 601 F.2d 162, 171 (5th Cir. 1979).  Under the Rules of

Evidence, these documents were clearly not discoverable.  Under Due Process, the right to

investigate and present a defense was severely compromised by the State herein.  In a reverse

case, a defendant in the Ninth Circuit sought discovery of the issues used to determine

whether the Government would seek the death penalty:

> Likewise, the more general work product privilege applies to the death
> penalty evaluation form and prosecution memorandum. In *Hickman v. Taylor*,

329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the Supreme Court first acknowledged the work product privilege, whose primary purpose is to "prevent exploitation of a party's efforts in preparing for litigation." *Admiral Ins. Co. v. United States Dist. Court*, 881 F.2d 1486, 1494 (9th Cir.1989); *see also United States v. Nobles*, 422 U.S. 225, 238-39, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (noting that the work product privilege also applies in criminal cases). Additionally, Rule 16 of the Federal Rules of Criminal Procedure recognizes the work product privilege and exempts from production "reports, memoranda, or other internal government documents made by the attorney for the government or any other government agent investigating or prosecuting the case." *Fed.R.Crim.P. 16(a)(2)*. Thus, the documents in question here fall squarely within the ambit of the work product privilege as they both are internal government documents prepared by the U.S. Attorney in anticipation of litigation. *See Furrow*, 100 F.Supp.2d at 1175; *United States v. Nguyen*, 928 F.Supp. 1525, 1552 (D.Kan.1996).

We therefore conclude that the specific documents at issue in this case-the death penalty evaluation form and the prosecution memorandum-are not subject to discovery because they are protected by the deliberative process and work product privileges.

*United States  v. Fernandez*,  231 F.3d 1240, 1247 (9th Cir. 2000).

Just as that defendant was absolutely not entitled to such discovery because it was work product, Mr. Roberts was absolutely entitled to keep his investigator's notes secreted from the State.   The trial court violated the rules and the Court of Criminal Appeals determination is unreasonable in light of the facts and the law.

**CLAIM NUMBER EIGHT: THE MITIGATING INSTRUCTION IMPROPERLY NARROWS THE DEFINITION OF MITIGATING EVIDENCE TO THAT WHICH REDUCES A DEFENDANT'S "MORAL BLAMEWORTHINESS" THUS UNCONSTITUTIONALLY LIMITING HIS ABILITY TO PLACE HIS CONSTITUTIONALLY RELEVANT MITIGATING EVIDENCE WITHIN THE EFFECTIVE REACH OF HIS JURY.**

**CLAIM NUMBER NINE: THE TRIAL COURT ERRED BY DENYING THE PETITIONER'S REQUESTED CHARGE REGARDING THE DEFINITION OF MITIGATION BASED ON *TENNARD V. DRETKE*.**

These issues were considered together on direct appeal by the Court of Criminal

Appeals.  In rejecting these claims, the Court held:

> In point of error four, appellant contends that the trial court's instructions relating to the mitigation special issue unconstitutionally narrowed the definition of mitigating evidence to that evidence which reduces the defendant's moral blameworthiness. In point of error six, he contends that the trial court erred in refusing to include in the charge his requested instruction defining mitigating evidence more broadly. He summarizes his mitigating evidence as falling into four categories: (1) his abused and neglected childhood, (2) alcohol and cocaine dependence, (3) low IQ, and (4) his good qualities as a father, family member, and worker. He concedes that the definition given in the charge is required by statute  but contends that the definition constitutes an improper screening test in violation of *Tennard v. Dretke*. We have already decided this very claim adversely to appellant's position.  Moreover, appellant does not explain how the jury instructions that were given prevented the jury from giving effect to any of his alleged mitigating evidence, and we perceive no barrier to the jury doing so.  Points of error four and six are overruled. (Footnotes omitted).

*Roberts,*  220 S.W.3d at 534.  These summary rejections of the claims are unreasonable in

light of the facts and the law in the case *sub judice*.

The crux of Mr. Roberts' claim is that the statutory definition of mitigating evidence

is unconstitutionally restrictive.  The Code of Criminal Procedure provides that:

in answering the issue submitted under Subsection (e) ... the jury: (4) shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

*Tex. Code Crim. Proc. art. 37.071 sec. 2(f)(4).*

Mr. Roberts offered evidence concerning his character and background that he wanted the jurors to consider as mitigating - evidence that could legally persuade one juror to determine a life sentence was more appropriate than a death sentence.  However, the nomenclature of "moral blameworthiness" is not the same as weighing his background and character.

In *Tennard v Dretke*, 124 S. Ct. 2562 (2004), the United States Supreme Court reversed the Fifth Circuit's refusal to grant a certificate of appealability (COA) to a defendant who was sentenced under the Texas capital sentencing scheme prior to the legislative revisions which took place in the aftermath of *Penry v. Lynaugh*, 492 U.S. 302, 328, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989) (*Penry I*). *Tennard*, relying upon *Penry I*, argued that Texas' two special issues-deliberateness and future dangerousness-did not allow the jury to give effect to his mitigation evidence and that the trial court's failure to issue a supplemental mitigation instruction that would allow the jury to give full effect to his evidence rendered his death sentence unconstitutional.  The state court and the Fifth Circuit both held that the lack of an adequate mitigation instruction was irrelevant. The courts both determined that *Tennard* had failed to satisfy the Fifth Circuit's threshold standard for "constitutionally relevant" mitigating evidence, that is, evidence of a 'uniquely severe permanent handicap

42

with which the defendant was burdened through no fault of his own," and evidence that "'the criminal act was attributable to this severe permanent condition."124 S. Ct. at 2562.

The Supreme Court's rejection of that threshold test was central to its decision to reverse in *Tennard*.  They held that "the Fifth Circuit's test had no foundation in the decisions of the Supreme Court.  Neither *Penry I* nor its progeny screened mitigating evidence for "constitutional relevance" before considering whether the jury instructions comported with the Eighth Amendment." *Id*., 124 S. Ct. at 2562.  Rather, they held that the jury must be given an effective vehicle with which to weigh mitigating evidence so long as the defendant has met a "low threshold for relevance," which is satisfied by "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Id*.,  124 S. Ct. at 2562 (*quoting McKoy v. North Carolina*, 494 U.S. 433, 440, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (1990)).[5]

The instruction in this case, under prevailing law, does not provide an effective vehicle or a nexus for the consideration of mitigating evidence and "moral blameworthiness."

---

[5]

In *Tennard*, the Supreme Court quoted Judge Baird of the Court of Criminal Appeals, who had recognized the constitutional defects nearly a decade prior:

> Judge Baird dissented, maintaining that the Court of Criminal Appeals had "consistent[ly]" held, in the wake of *Penry I*, that "evidence of mental retardation cannot be adequately considered within the statutory" special issues. 960 S.W.2d, at 67. The court had strayed from its precedent, Judge Baird wrote, and instead of asking simply whether the jury had a vehicle for considering the mitigating evidence, had "weigh[ed] the sufficiency of [Tennard's] mitigating evidence." *Id*., at 70.

*Tennard*,  542 U.S. at 280.

Mr. Roberts presented some evidence of a horrible childhood with an alcoholic and abusive father.  There was also substantial evidence about his drug addiction combined with evidence that he was a good person with good qualities as a worker, father, and family member.  This type of evidence did not specifically make him less blameworthy for the capital murder of Vickie Bowen.

Importantly, the prosecution highlighted this fact in its closing: "Is there anything that reduces the defendant's moral blameowrthiness for the offense that he has committed and type of life that he has lead?[sic] (RR32 18-19).  The jury was, in effect, told by the statutory definition and reinforced by the prosecutor that the abuse in Mr. Roberts' background did not make him commit the murder, so it was not mitigating.  The Fifth Circuit has stated that the instructions are not to be considered in an isolated fashion, either:

> However, **the context of the proceedings is relevant in determining whether the jury could reasonably have given effect to the mitigating evidence**. *Boyde v. California*, 494 U.S. 370, 383, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990); *Penry*, 532 U.S. at 800-02, 121 S.Ct. 1910 ("[W]e will approach jury instructions in the same way a jury would-with a commonsense understanding of the instructions in the light of all that has taken place at trial.") (internal quotations omitted); *Simmons v. South Carolina*, 512 U.S. 154, 171, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994)("[I]n some circumstances the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.") (internal quotations omitted). In that vein, O'Brien argues that the prosecutor's comments prejudiced the jury such that it was unable to give meaningful effect to any of the mitigating evidence presented. Indeed, the district court recognized that the prosecutor's comments seemed intended to restrict the jury's consideration of mitigating evidence. Although a "crucial assumption underlying the system of trial by jury is that parties will follow instructions given them by the trial judge," *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6, 103 S.Ct. 843, 74

44

L.Ed.2d 646 (1983); *see Penry*, 532 U.S. at 799, 121 S.Ct. 1910 prosecutorial misrepresentations may have a decisive effect on a jury. *Boyde*, 494 U.S. at 384-85, 110 S.Ct. 1190; *see Penry*, 532 U.S. at 799-800, 121 S.Ct. 1910 (finding it logically and ethically impossible for the jury to follow the jury instructions). **In an instance where prosecutorial statements allegedly influence a jury's interpretation of the statutory charge, the proper inquiry is whether there is a reasonable likelihood that the jury has applied the instructions in a way that prevents it from considering constitutionally relevant evidence**. *Boyde*, 494 U.S. at 380, 110 S.Ct. 1190. This is particularly true in capital cases where there is "a strong policy in favor of accurate determination of the appropriate sentence." *Id*. (Emphasis added).

*O'Brien v. Dretke*, 156 Fed.Appx. 724, 736, 2005 WL 3529255, 10 (5th Cir. 2005).  The

confluence of the opaque "moral blameworthiness" lit up by the prosecution resulted in a

reasonable likelihood that the jury applied the instruction in a way that prevented them from

considering constitutionally relevant evidence.  The United States Supreme Court has also

weighed in more recently on the constitutionally impermissible definition used in Texas

capital cases:

A careful review of our jurisprudence in this area makes clear that well before our decision in *Penry I*, our cases had firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future. Three of the five cases decided on the same day in 1976- *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)-identified the background principles we would apply in later cases to evaluate specific rules inhibiting the jury's ability to give meaningful effect to such mitigating evidence.

*Abdul-Kabir v. Quarterman,* 550 U.S. 233, 246, 127 S.Ct. 1654, 1664 (2007).  As the Court

so eloquently explained, "Indeed, the right to have the sentencer consider and weigh relevant

mitigating evidence would be meaningless unless the sentencer was also permitted to give effect to its consideration." *Abdul-Kabir,* 550 U.S. at 252.  The Court of Criminal Appeals determination otherwise, (the exact same court that the United States Supreme Court reversed in *Tennard v. Dretke*), is unreasonable in light of the facts of this case and Supreme Court precedent.

**CLAIM NUMBER TEN: THE TRIAL COURT ERRED BY REFUSING TO ALLOW THE DEFENSE EXPERT TO TESTIFY THAT ROBERTS' COMBINED USE OF ALCOHOL AND CRACK COCAINE CAUSED HIM TO COMMIT THIS CAPITAL MURDER.  EXCLUSION OF PETITIONER'S EVIDENCE PROFFERED AS A BASIS FOR A SENTENCE LESS THAN DEATH, COMBINED WITH THE FAULTY INSTRUCTION DEFINING MITIGATING EVIDENCE PREVENTED THE PETITIONER FROM GAINING THE JURY'S EFFECTIVE CONSIDERATION OF HIS CONSTITUTIONALLY RELEVANT MITIGATING EVIDENCE.**

The prosecution's expert was allowed to testify that Mr. Roberts would be a future danger to society, thus asking the jury to vote for death.  The defense sought to have its own expert testify regarding the effects of Mr. Roberts' long term use of drugs and alcohol as what caused Mr. Roberts to commit the instant offense.  There was no reason for this limitation of the testimony by Dr. Katherine McQueen.

The state had filed a motion regarding the qualifications of defense expert Dr. McQueen.  (RR29 3).  Dr. McQueen testified she had reviewed Roberts' videotaped statements, as well as other documents in relation to his personal history. (RR29 6).  She had also done clinical research with regards to addictions, particularly the combination of drugs and alcohol.  (RR29 10).  She was a published author and had testified previously as an expert.  (RR29 11-12).  She had significant knowledge of hundreds of studies and specific information regarding the propensity for violence for people with a combined drug and alcohol dependency.  (RR29 18-24).

The State objected to Dr. McQueen, expressing an opinion as to whether alcohol and cocaine addiction had played a role in the murder.  (RR 29 27).  The Court ruled that Dr.

47

McQueen could testify to her conclusions about Mr. Roberts' addictions but not whether his

addictions had any bearing on the murder of the complainant.  (RR29 3)).

The Court of Criminal Appeals rejected this claim:

The prosecutor then asked her what scientific literature supported her opinion, when the research was conducted, and who the researchers were. Dr. McQueen specified a particular anthology of articles, but she was unable to identify the individual authors without looking at her notes or the book itself to refresh her memory, and she had brought neither her notes nor the book with her. When the trial court asked what the correlation was between ingesting the drugs in question and violence, Dr. McQueen stated that "lifetime patterns of violence are significantly higher in people who are dependent on both substances." The trial court then asked whether the studies yielded a particular percentage correlation. Dr. McQueen replied that she was "certain that there is," but she was unable to quote exact percentages without the studies in front of her. The trial court also asked whether there was an error rate, and Dr. McQueen replied that there was, but she did not specify it. The trial court then asked whether she had any materials with her regarding statistics on the matter. She replied that she had a book in her car, but when she later retrieved the book, she indicated that it was not the right book. Instead, she explained that it was an article in a different book and supplied the title and authors.

`       The prosecutor then proceeded to question Dr. McQueen about that article:

Q. You don't have that literature with you, Doctor?

A. I do not.

Q. And can you explain to the Court, I guess, what you know about that research and how it was conducted and what the results of the article were?

A. I can-I can tell you the conclusions of the article were that individuals dependent on both cocaine and alcohol had more past incidences of family and other violent interactions. I would have to look at the article before I would feel comfortable saying under oath exactly how the study was conducted.

Q. Okay. And you are not familiar with any of the statistics and, I guess, statistically how predisposed someone might be as a result of that study to engage in some sort of family violence?

A. No.

Q. Okay. So all you can say, based on your knowledge of that article, is as a general proposition there may be some correlation between drug and alcohol dependence and violence? Correct?

A. That's correct.

After this questioning, the prosecutor argued to the trial court that the defense had failed to meet the reliability requirements for admission of the expert's opinions under *Kelly v. State*. In connection with this argument, the prosecutor alleged that the defense was seeking to elicit a "hard science opinion" rather than a "soft science opinion" when it sought to elicit testimony that "there was correlation or a causal or contributing effect between drugs and alcohol in this offense," and therefore, the trial court had less latitude in allowing this type of testimony. Out of an abundance of caution, the prosecutor stated that he would not object to the expert saying "that based on her knowledge of the literature there is a statistically significant correlation between drug and alcohol dependence and violence," but the prosecutor objected to any opinion about any effect the alcohol and cocaine dependence may have had with respect to the crime committed in this case.

At the end of the hearing, the trial court ruled in accordance with the State's position, permitting Dr. McQueen to testify as follows:

I'm going to let her say that she has reviewed all she has done in
reviewing him. I'm going to let her say that she thinks he has an
alcohol and cocaine addiction. And then I'm going to let her say
the studies say that people with alcohol and cocaine addictions
have a higher propensity for violence.

When appellant asked if the trial court meant to exclude an "opinion about whether that had some bearing on this offense," the trial court replied, "That's correct. The jury can infer whatever they want to from the evidence from that, Counsel."

Before the jury, Dr. McQueen testified that appellant suffered from cocaine dependence and alcohol dependence (both in remission due to his incarceration). She explained that the presence of both alcohol and cocaine in the body would cause the liver to metabolize these substances into a new substance called cocaethylene, which would cause the effects of cocaine to last longer. She also explained that studies showed that chronic abuse of alcohol would enable more cocaine to cross the blood/brain barrier, creating even greater effects on the substance abuser's mental state. She further testified that studies showed "a statistically significant increase in the level of violent activity" in a group of people who were dependent on both cocaine and alcohol than groups who were dependent on only one of the substances. She later clarified, "There is a very strong connection between substance use and dependence and violent acts and, in particular, between dependence on both alcohol and cocaine and violent acts." Appellant attempted later to ask the following question, but was prevented by the trial judge sustaining the

prosecutor's objection: "So in your-your opinion, Dr. McQueen, was there some or is there some relationship to Donnie Roberts' dependence on alcohol, dependence on cocaine, dependence on a combination thereto in relationship to the events of the-of October 15th of 2003?"

During the State's cross-examination, Dr. McQueen acknowledged that she was not a psychiatrist or psychologist, but she admitted that personality played a role in both substance abuse and in criminal behavior. When asked how many subjects of the study involving the correlation between alcohol and cocaine dependence and violence had actually committed murder, she replied, "It would surprise me if any of them had." The State further pressed Dr. McQueen in the following colloquy:

Q. And there is no scientific data out there or anywhere that you are aware of that cocaine abuse or alcohol abuse or the combination of those two predisposes people to commit murder that aren't already inclined to commit murder; isn't that true?

A. In a-there are-there is evidence that up to 80 percent of people who are convicted of capital murder have alcohol and drug dependence.

Q. There is not any research there that supports a cause and effect relationship between the two, is there?

A. No.

*Kelly v. State*, 824 S.W.2d 568 (Tex.Crim.App.1992) requires that the proponent of scientific evidence show that (1) the underlying scientific theory is valid, (2) the technique applying the theory is valid, and (3) the technique was properly applied on the occasion in question. In *Nenno v. State*, we suggested that the *Kelly* framework applied to the soft sciences but with "less rigor" than to the hard sciences. Although the prosecutor contended that the issue was one of "hard science" rather than "soft science," we need not attempt to rigidly classify this evidence under one of those headings. What we can say is that Dr. McQueen was a medical doctor, but not a psychiatrist or a psychologist. Because she lacked training with respect to mental health problems, one would not ordinarily expect from her an opinion about what might have contributed to a person's behavior with respect to a particular incident or how a person might behave in the future. Dr. McQueen did have training as a researcher with regard to the treatment of addictions, and that training appears to have included knowledge of the interaction between cocaine and alcohol in the body and studies showing a correlation between cocaine and alcohol usage and violence. Under this record, however, the trial court could reasonably conclude that the pharmacological knowledge and studies were not a sufficient basis from which to draw a scientific conclusion about how any particular individual would behave. Of course, one might draw

50

a layman's conclusion from evidence of a correlation between drug dependence and violence that a particular drug user's violence resulted from dependence, but that sort of conclusion is one that a jury is well-suited to make on its own, without the assistance of an expert.

Dr. McQueen was permitted to testify about the correlation between alcohol and cocaine usage and violence. In fact, she was permitted to opine that there was "a very strong connection between substance use and dependence and violent acts and, in particular, between dependence on both alcohol and cocaine and violent acts." Under the circumstances, we cannot conclude that the trial court erred when it decided to prevent Dr. McQueen from taking the extra step of opining whether alcohol and drug dependence was related to appellant's violent conduct. Point of error five is overruled. (Footnotes omitted).

*Roberts*,  220 S.W.3d at 528 -531.

As argued in the previous claims, under *Tennard v. Dretke*, it was imperative for the jury to be able to give weight to his addictions and his constitutionally relevant mitigating evidence.   Specifically, Dr. McQueen would have testified that the offense would not have occurred "without both his diagnoses and the presence of substances."  (RR29 15).

Because of the limitation of the trial court, Dr. McQueen's testimony was in the abstract and not personal so that the jury could give effect to the mitigating evidence that "reduced the defendant's moral blameworthiness" as contemplated in *Tennard.*  Indeed, the State can offer with apparent impunity "experts" able to foresee the future of a capital defendant and determine whether he or she will be a future danger.  The Supreme Court held in *Barefoot v. Estelle*, 463 U.S. 880, 896 (1983):

The suggestion that no psychiatrist's testimony may be presented with respect to a defendant's future dangerousness is somewhat like asking us to disinvent the wheel.

If the likelihood of a defendant committing further crimes is a

constitutionally acceptable criterion for imposing the death penalty, which it is, *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and if it is not impossible for even a lay person sensibly to arrive at that conclusion, it makes little sense, if any, to submit that psychiatrists, out of the entire universe of persons who might have an opinion on the issue, would know so little about the subject that they should not be permitted to testify.

*See also United States v. Fields*,  483 F.3d 313 (5th Cir. 2007)(allowing expert testimony regarding future dangerousness as probative and beneficial to jury).

The rejection of this claim by the Court of Criminal Appeals was unreasonable in light of the law on experts and the specific facts in this case.

**CLAIM NUMBER ELEVEN: THE PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO OBJECT TO "VICTIM IMPACT EVIDENCE" FROM A VICTIM NOT NAMED IN THE INDICTMENT.**

**CLAIM NUMBER TWELVE: THE TRIAL COURT ERRED IN ADMITTING VICTIM IMPACT EVIDENCE AND IT DENIED THE PETITIONER DUE PROCESS.**

During the punishment phase, the State called the complainant from an extraneous robbery in Louisiana.  She testified how she had been affected by the crime, and was too frightened to continue employment as a convenience store clerk.  This testimony was inadmissible.  Her testimony was especially harmful to the defense because it played a significant part of the State's case on future dangerousness, was emphasized repeatedly to the jury, and undermined the already difficult time the jury had in giving consideration to Mr. Roberts' lack of moral blameworthiness.

Elizabeth Thomas was one of the State's star witness on punishment; she was the complainant in a robbery committed by Mr. Roberts several years earlier.  (RR26 45). Because of the robbery she was terrified, had nightmares, and had trouble sleeping.  (RR26 46-47).  This testimony was in direct conflict with a Court of Criminal Appeals opinion which had held that victim impact testimony meant testimony from the victims of the primary offense. *Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997).  On direct appeal, the Court of Criminal Appeals retreated from that position:

> In point of error seven, appellant contends that his attorney was ineffective for
> failing to object to the admission of extraneous offense victim impact
> testimony. Elizabeth Thomas, the victim of a robbery appellant had committed

in Baton Rouge a few years earlier, testified about the emotional impact that the robbery had on her life. She testified that she had to quit her job because she was afraid every customer who walked in might rob or kill her. She had difficulty sleeping and was troubled by nightmares. And she spent six months worth of her savings while looking for another job, and even when she found one, she still felt fear while at work. Appellant contends that this evidence was inadmissible as extraneous offense victim impact evidence under *Cantu v. State*.

We disagree. "Victim impact" evidence is evidence of the effect of an offense on people other than the victim. The evidence presented here was evidence of the effect of a different offense on the victim (of the extraneous offense), and thus is distinguishable from the situation presented in *Cantu*. The evidence was admissible. But even if it weren't, counsel was not ineffective for failing to lodge an objection based upon a case that is clearly distinguishable from the present case. Point of error seven is overruled. (Footnotes omitted).

*Roberts*, 220 S.W.3d at 531.  However, where reasonable jurors could disagree came from the dissenting opinion on this point by a third of the Court of Criminal Appeals.  In dissent, Judge Meyers, joined by two other judges, explained why Mr. Roberts was harmed and the death sentence in the case herein is unworthy of confidence:

I agree that this evidence is distinguishable from the evidence presented in *Cantu*. The evidence relating to the extraneous offense in *Cantu* was presented by the victim's mother whereas in this case, the evidence was presented by the victim of the extraneous offense herself. And, in *Cantu,* the victim's mother testified about how the crime impacted their family and about what kind of person the victim was, while here, the victim of the extraneous offense testified about how the prior offense affected her own life. We stated in *Cantu*:

The danger of unfair prejudice to a defendant inherent in the introduction of "victim impact" evidence with respect to a victim not named in the indictment on which he is being tried is unacceptably high. The admission of such evidence would open the door to admission of victim impact evidence arising from any extraneous offense committed by a defendant. Extraneous victim impact evidence, if anything, is more prejudicial than the

54

non-extraneous victim impact evidence found by this Court to be inadmissable in *Smith [ v. State*, 919 S.W.2d 96 (Tex. Crim. App. 1996)]. We hold that such evidence is irrelevant under *Tex. R. Crim. Evid. 401* and therefore irrelevant in the context of the special issues under Art. 37.071.

939 S.W.2d at 637.

In the case before us, the majority seems to imply that when the mother of a victim of an extraneous offense testifies about the impact a crime had on her family, then that testimony is inadmissible extraneous victim-impact evidence under *Cantu*. But, when the victim herself testifies about how an extraneous offense affected her own life, it is admissible. However, it should not matter who presented the evidence. Even if we choose not to call evidence presented by the victim of an extraneous offense "victim-impact evidence," the evidence is still equally prejudicial and should be inadmissible.

While the extraneous offense itself may have been admissible, the effect that the extraneous offense had on the victim of that crime or her family was irrelevant to the matter of future dangerousness. The majority should focus on the real issue in this case-that the evidence is irrelevant and inadmissible-not whether it was "victim-impact evidence" presented by the family of the victim.

Like the evidence in *Cantu*, this testimony regarding the impact of an extraneous offense was unfairly prejudicial and was not relevant to the special issues. Because it was not relevant to the sentence, the testimony was inadmissible under Rule of Evidence 402. And, unless we can determine beyond a reasonable doubt that the testimony did not contribute to the death sentence, we cannot say that the presentation of this inadmissible testimony was harmless. Therefore, I respectfully dissent.

*Roberts*,  220 S.W.3d at  536 (Meyers, J., dissenting)

This issue was raised on direct appeal as a trial error and one of ineffective assistance of counsel.  The Court of Criminal Appeals held that the testimony was distinguishable from *Cantu*, although there is an issue as to whether it really is from a strict reading of the case. Assuming, arguendo, that it is a close call, there was no reason whatsoever for the defense attorney to not object to this testimony.  In fact, there had been an objection before her testimony where the defense counsel stated: " Well, of course, *Mosley,* the case is quoted in

the text of the motion.  It basically says that you -- that they can't broaden the victim impact testimony to  people other than people named in the indictment. " (RR26 11).  The defense counsel asked if he could  approach before any victim impact testimony but was unable to explain to the court exactly why he might have needed to do so.  (RR26 18-20).

Elizabeth Thomas testified without any objection as to the victim impact portion of her testimony for 26 pages.  (RR26 23-49).  The jury even watched the video of the robbery where she identified Mr. Roberts.  (RR26 36-39).  And her fear and the effect of this robbery on her life - which the jury watched on video along with her - was never objected to once, despite the pretrial motion and the request by defense counsel to object.

In what was seemingly an unquestioned ruling, the Houston Court of Appeals determined that clearly extraneous victim impact evidence was inadmissible.  *See Lindsay v. State*, 102 S.W.3d 223 (Tex. App. -- Houston [14th Dist.] 2003)(holding it was error to allow defendant's father and stepmother to give victim-impact testimony regarding appellant's prior indecency with his stepsister-an extraneous crime).  The Court of Criminal Appeals decision that this was not ineffective assistance of counsel is unreasonable in light of the facts and the law.

**CLAIM NUMBER THIRTEEN: THE PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO OBJECT TO THE PROSECUTOR'S REPEATED SUGGESTIONS THAT IF THE JURORS SENTENCED HIM TO LIFE IMPRISONMENT, HE MIGHT BE RELEASED MUCH SOONER THAN 40 YEARS BECAUSE THE PAROLE LAWS MIGHT BE CHANGED IN HIS FAVOR.**

**THE PROSECUTION INVITED THE JURORS TO DISREGARD THE LAW IN THEIR INSTRUCTIONS THAT THE PETITIONER, IF SENTENCED TO LIFE, WOULD HAVE TO SERVE FORTY YEARS IN PRISON BEFORE HE WOULD BE ELIGIBLE TO APPLY FOR RELEASE ON PAROLE.**

The prosecutor may not invite the jurors to disregard the law that has been given to them in their instructions.  Counsel had a duty to file a motion in limine or should have objected and preserved error.

The majority of the State's undermining of the 40 year instruction was done through the cross-examination of John Escobedo, who testified as to the functioning of the Texas Board of Pardons and Paroles.  On direct examination, the defense sought to inform the jury that after 40 years parole was not automatic.  (RR28 24).  The objection by the State was:

> Mr. Hon: Judge, I'm going to object on the basis of speculativeness as to what would happen 40 years from now.  If he is basing his question on what the process is at the time, that's one thing.  But I think to predict what would happen 40 years from now in terms of policy and procedure is inherently speculative, and we would object on that basis.

(RR28 24).

However, in cross-examination the State moved from the question of how parole laws might be applied to a particular defendant, after the 40 years of mandatory ineligibility, (a

matter the instructions plainly tell the jurors <u>not</u> to consider, because such application will depend upon the actions of the Board of Pardons and Paroles) to the very different question whether the 40-year rule itself might be "inherently speculative" because parole laws could be changed in the future. The difference is that the instructions tell the jurors as a matter of law what fact is not speculative, as far as their decision is concerned: that Petitioner Donnie Lee Roberts, if he receives a life sentence, will not be eligible to ask for parole release into free society until he has served 40 calendar years, day-for-day, in prison. (R28, 47).

> Q:     And we don't know -- just as easily as in 1999, when the legislature created this 40-year statute for capital murder, they could just as easily change the law in the spring and reduce it back down to 25 years, could they not?
>
> A:     An inmate that is convicted under the current law, that current law applies 40 years from now.
>
> Q:     Unless the legislature passes a statute that's retroactive; isn't that right?
>
> A:     Correct. Yes.
>
> Q:     I mean, that 40-year statute is established by the Texas legislature; and they could change it just as easily as they created it?
>
> A:     Laws can be changed, correct.
>
> Q:     So we truly, other than what the law is at the time right now, it's kind of speculative to predict what the law is going to be in the future? Agree or disagree?
>
> A:     Correct. No one knows what is going to happen in 40 years.
>
> Q:     And, certainly, a lot of it does depend on the financial condition of the State and the capacity of the prison system, does it not?
>
> A:     Those will be the factors I'm sure the legislature takes into consideration.
>
> Q:     There are other ways that a person sentenced to life on a capital sentence might not have to serve the full 40 years that they are required to by law, wouldn't you agree?

> A:      The only way that a person could be released from
> that 40-year law would be if the governor would grant a full
> pardon or some type of executive clemency. Otherwise, unless
> the laws are changed, that person remains under the 40-year law.

The prosecutor also attempted to render the 40-year requirement speculation, rather than fact, through other means. He questioned Escobedo about issues of overcrowding in the Texas prison system (RR28, 45) and the early release of offenders in order to ease the problem. (RR28, 46)  The defense objected, but only to speculation. (RR28, 46)  The State still elicited testimony, without objection, that the State had dealt with prison overcrowding in the past by "adjusting the parole laws." (RR28, 46-47)

The prosecution, building on this platform of improper testimony about the parole laws, used this evidence in their closing in order to persuade the jury that the problem of overcrowding was so bad that capital murderers would be released earlier than 40 years. (RR32, 72):

> John Escobedo, Larry Fitzgerald, they came in and
> testified about prison and parole laws in this state. And
> what do they tell you about the parole laws and what has
> happened to them over the last 23 years of Mr.
> Escobedo's experience? Right now we're overcrowded
> in the Texas prison system, based on their testimony. We
> are using county jail space right now to house inmates in
> the Texas prison system.

It is improper for the State to argue that a capital murder defendant will be released in less than the statutory 40 years, and that it is ineffective assistance of counsel not to object to such argument.  Counsel has a duty to correct misstatements of law that are detrimental

to his client. This duty derives from counsel's function 'to make the adversarial testing process work in the particular case.' There can be no reasonable trial strategy in failing to correct a misstatement of law that is detrimental to the client. See *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Again, the test for whether a defendant's conviction should be reversed because he received ineffective assistance of counsel at trial is that from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), Roberts' counsel did not know the law that applied to their case, and allowed the prosecution to negate that law, completely nullifying the benefit to their client of the 40-year instruction that was so long pursued and so hard-won.

As in the previous claim of ineffective assistance, there could not have been a strategic reason for allowing the State to invite the jurors to disregard the law in their instructions. No competent counsel could have believed it was somehow to his client's advantage to allow the State to argue that Roberts would not spend a full 40 years in prison if sentenced to life imprisonment. Much of the defense's case at punishment hinged on the idea that Roberts <u>would</u> stay in prison for that long. That was why they called John Escobedo and Larry Fitzgerald as witnesses, and put on evidence of Roberts' good behavior when incarcerated. The failure to object to the State's cross-examination and argument undermined this strategy. There could not have been any tactical reason for allowing the State to do so. This error could only have been made out of ignorance of the law.

60

The record supports the conclusion that the prejudice portion of *Strickland's* test is satisfied.  In the instant case, counsel's failure to correct the prosecutor's repeated suggestions that the jurors should – and could – treat the 40-year rule as merely speculative, rather than as a mandatory fact "from which to assess the appropriate sentence" was certainly sufficient to undermine confidence in the answer to the continuing threat special issue.

Counsel's silence allowed the State to tell the jury that they could ignore much of the defense's punishment evidence, to suggest to the jury that if they did not assess a death sentence Donnie Roberts would be released from prison sooner than forty years, perhaps much sooner. This error unbalanced the whole punishment hearing. Counsel failed in their duty "to make the adversarial process work" for their client; the jurors considered their options not within the required framework of the 40-year imprisonment, but under the impermissible speculation that there was a real danger to the general public in not sentencing Roberts to death. The defense should not have allowed the jury to be so misled.

This was a very close case on punishment, and the defense's error allowed the State to cast doubt on one of the strongest elements of their punishment case, the fact that Roberts would be incarcerated for forty years if not sentenced to death. Because of this harmful error, this Court should reverse Roberts' death sentence and remand to the trial court for new punishment hearing.

The Court of Criminal Appeals rejected these claims determining the record was silent and further, it might have been *strategy*:

In point of error fourteen, appellant contends that he was deprived of his constitutional right to the effective assistance of counsel when the defense attorneys failed to object to the prosecutor's repeated suggestion during questioning that a capital-life inmate might be released much sooner than the forty years the law requires him to serve before becoming eligible for parole. Appellant called Escobedo to testify about the procedures followed by the Board of Pardons and Paroles. Escobedo testified that a capital-life case was treated differently from other cases in that a two-thirds vote of the entire board was required to grant parole. He also explained that a defendant receiving a capital-life sentence under current law would be required to serve forty calendar years before becoming parole-eligible. Escobedo also discussed procedures relating to the consideration of parole and some of the factors the parole board would consider in determining whether to grant parole. In addition, he answered negatively when asked, "Could the board today in any way reduce a capital life sentence of 40 years?" During cross-examination, the prosecutor asked questions regarding various ways in which a capital life inmate might exit the prison system in less than forty years, including: retroactive change in the law lowering parole eligibility, early release in response to overcrowding, and escape. Appellant contends that discussion of the first two of these ways constituted improper speculation and that counsel should have objected.

We decline to find counsel ineffective on this basis on the record before us. As we have done many times before, we point out that the record on direct appeal is usually inadequate to address ineffective assistance claims. Before granting relief on a claim that defense counsel failed to do something, we ordinarily require that counsel be afforded the opportunity to outline the reasons for the omission. To warrant reversal without affording counsel such an opportunity, the challenged conduct must be "so outrageous that no competent attorney would have engaged in it." In *Ripkowski v. State*, we held that defense counsel opened the door to testimony concerning possible changes in parole law by: "(1) eliciting testimony that parole laws had become tougher on inmates throughout the years, (2) eliciting testimony concerning the procedures of the Parole Board and the factors taken into account in determining whether to release someone, and (3) arguing that [the defendant] would never be released on parole." At least the second Ripkowski factor was present in this case when Escobedo testified about the procedures followed by the parole board and some of the factors taken into account when determining whether to grant parole. And, arguably, Escobedo's testimony went further when he indicated that the parole board could not reduce the forty-year sentence. Counsel could have reasonably believed that the direct examination

62

testimony opened the door to the cross-examination of which appellant now complains, and counsel could have reasonably believed that the initial direct examination testimony, even after the State's cross, was to his client's benefit. Point of error fourteen is overruled. (Footnotes omitted).

*Roberts*, 220 S.W.3d at 533-34.  There was no strategy in giving the jury a reason to not

believe the law.  In *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999), the Fifth Circuit

explained that even a deferential review is subject to limitations:

> The Court is, therefore, **not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all**.

There was no strategy for allowing such testimony.  No strategy in allowing the jury

to think that if Mr. Roberts was not given a sentence of death, he might well get out of

prison.

**CLAIM NUMBER FOURTEEN:  THE TRIAL COURT ERRED BY NOT ALLOWING TESTIMONY AS TO HOW A SENTENCE OF DEATH WOULD AFFECT MR. ROBERTS' FAMILY, WHILE ALLOWING SIMILAR TESTIMONY CONCERNING HOW THE VICTIM'S DEATH HAD AFFECTED HERS. THIS PREVENTED MR. ROBERTS FROM OBTAINING THE JURY'S EFFECTIVE CONSIDERATION OF HIS OWN CONSTITUTIONALLY RELEVANT MITIGATING EVIDENCE, PROFFERED AS A CIRCUMSTANCE WHICH A JUROR MIGHT FIND WARRANTED A SENTENCE OF LIFE RATHER THAN DEATH.**

Claims Fourteen through Nineteen were presented on direct appeal and were resoundingly rejected by the Court of Criminal Appeals.[6]  These issues are preserved and

---

[6]

In point of error ten, appellant contends that the mitigation special issue is unconstitutional because no burden of proof is assigned to it. In point of error eleven, he contends that the mitigation issue is unconstitutional because it does not impose a burden of proof on the State's "anti-mitigating" evidence. Citing *Prystash v. State*, Appellant concedes that we have rejected these contentions many times.FN45 He contends that he has a new argument  based on recent decisions of this Court and the United States Supreme Court, but the only case he cites in support of his argument that postdates *Prystash* is the Supreme Court's decision in *Blakely v. Washington*.FN46 We have previously rejected the argument that the *Apprendi*FN47- *Ring*FN48- *Blakely* line of cases requires a burden of proof with regard to the mitigation special issue.FN49 Points of error ten and eleven are overruled.

FN45. 3 S.W.3d 522, 535 (Tex.Crim.App.1999).

FN46. 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

FN47. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

FN48. *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

FN49. *Perry*, 158 S.W.3d at 446-448.

D. Closing Argument

In point of error twelve, appellant contends that the trial court erred in refusing his request to give the concluding argument at punishment on the mitigation special issue. He concedes that we held contrary to his position in *Masterson v. State,*FN50 but he requests that we reconsider that decision. Nothing in his argument convinces us that our decision in Masterson was incorrect. Point of error twelve is overruled.

FN50. 155 S.W.3d 167, 174-175 (Tex.Crim.App.2005), cert. denied, 546 U.S. 1169, 126 S.Ct. 1330, 164 L.Ed.2d 47 (2006).

E. Challenges to the Death Penalty

In point of error nine, appellant contends that the death penalty should have

exhausted and Mr. Roberts believes each one is worthy of relief, despite legal authority to the contrary.

While Mr. Roberts acknowledges that the current posture of this circuit with regard to his legal issues is not in his favor, Mr. Roberts requests that this Court examine his issues on their merit.  "Lest it be forgotten, [d]eath, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305.  The Constitution itself requires careful review of Mr. Roberts' death

---

been precluded in his case because the grand jury did not pass on the punishment special issues when deciding whether to indict him. As authority, he relies upon the *Apprendi-Ring-Blakely* line of cases. We have rejected this claim with respect to *Apprendi* and *Ring*, and *Blakely* does not appear to affect our rationale in doing so.FN51 Point of error nine is overruled.

FN51. *Russeau*, 171 S.W.3d at 886; *Rayford v. State*, 125 S.W.3d 521, 533 (Tex.Crim.App.2003).

In point of error fifteen, appellant contends that the Texas death-penalty scheme is unconstitutional because it fails to provide uniform statewide standards to guide prosecutors in deciding when to seek the death penalty. He contends that this failure constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment. We have previously rejected the notion that there should be "a statewide policy or standard for determining in which cases the State will seek the death penalty as opposed to leaving the decision in the hands of the individual district attorneys." FN52 Appellant relies upon *Bush v. Gore*,FN53 but we have rejected the notion that a disparity in death-penalty decision-making from county to county violates the principles articulated in that decision.FN54 Point of error fifteen is overruled.

FN52. *Crutsinger v. State*, 206 S.W.3d 607, 611-613 (Tex.Crim.App.), *cert. denied*, 549 U.S. 1098, 127 S.Ct. 836, 166 L.Ed.2d 670 (2006); *Hankins v. State*, 132 S.W.3d 380, 387 (Tex.Crim.App.2004).

FN53. 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

FN54. *Threadgill v. State*, 146 S.W.3d 654, 671-672 (Tex.Crim.App.2004)(*citing Rayford*, 125 S.W.3d at 534).

*Roberts*, 220 S.W. 3d at 534-35.

sentence.  The reality is the law is ever evolving.  Indeed, "[t]he genius of the Constitution resides not in any static meaning that it had in a world that was dead and gone, but in its adaptability to interpretations of its greatest principles that cope with current problems and current needs."  William J. Brennan, *Constitutional Adjudication*, 40 Notre Dame Law, 559, 568 (1965).

In *Atkins v. Virginia*, 122 S.Ct. 2242 (2002), the Supreme Court considered the issue of whether executing the mentally retarded violated the Eighth Amendment.  Prior to their decision, the issue was foreclosed.  In reversing precedent, the Court noted:

> A claim that punishment is excessive is judged not by the standards that prevailed in 1685 when Lord Jeffreys presided over the "Bloody Assizes" or when the Bill of Rights was adopted, but rather by those that currently prevail. As Chief Justice Warren explained in his opinion in *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958): "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. ... The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Id., at 100-101, 78 S.Ct. 590.

*Atkins*, 122 S.Ct. at  2247.  If Mr. Atkins had chosen to not present the argument, clearly foreclosed to him at the time he asserted it, he would most likely have been executed by now. The evolving standards that Mr. Chief Justice Warren wrote of in *Trop* in 1958  continue today:

> The exact scope of the constitutional phrase 'cruel and unusual' has not been detailed by this Court.  But the basic policy reflected in these words is firmly established in the Anglo-American tradition of criminal justice. The phrase in our Constitution was taken directly from the English Declaration of Rights of 1688,  and the principle it represents can be traced back to the Magna Carta. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment

66

stands to assure that this power be exercised within the limits of civilized standards. (footnote omitted).

*Trop v. Dulles*, 356 U.S. 86, 99-101, 78 S.Ct. 590, 597-98 (1958).  The evolving standards of decency mandate Mr. Roberts present this issue – and that this Honorable Court consider the same, although seemingly foreclosed.

The Supreme Court has held that there is a very low threshold for relevance governing the admissibility of mitigation evidence in death penalty cases. Once that threshold is met, everything that might possibly warrant a life sentence rather than death, in any juror's mind, should be admitted.

The fact that Mr. Robert's family might suffer if he were sentenced to death certainly falls into this category. It is easy to imagine a juror who would find this evidence weighed in favor of life sentence rather than death. The fact that the victim's family suffered as a result of her death was deemed relevant. Such testimony was admitted, and the prosecution relied heavily on it. These were innocent victims. So are Mr. Roberts' family members.

There is no burden of proof on the mitigation issue and no way to weigh the evidence on this issue. Since any given piece of evidence might persuade any given juror to vote in favor of life rather than death, the exclusion of any defensive evidence that has independent constitutional relevance to the mitigation special issue cannot be harmless.

_____Teresa Breaux, Donnie Roberts' niece, testified that Mr. Roberts had been a mainstay for her in their family, and that he was "the best guy you would ever meet" when not using cocaine. (RR27, 221-22, 228) However, when the defense approached the bench and

67

proposed asking her "if he were given the death penalty how that would affect her," the prosecution objected: "That's irrelevant, Judge." The prosecutor clarified, "How it would affect her is irrelevant." The trial court sustained the objection. (RR27, 230).

On the other hand, the victim Vickie Bowen's mother, son, and father all testified how her death had affected them. The State's last witness in its direct case on punishment was Lea Bivins, Vickie's mother, who testified that she loved her daughter very much: "I have a hole in my heart. It will never heal, I don't think." (RR26, 162).  These were the State's last words before resting. (RR26, 163).

Then in rebuttal the State proposed to call Vickie Bowen's son and father as its last witnesses. The defense objected that these witnesses had nothing to offer in rebuttal of any defense evidence. (RR31, 165). The State's theory seemed to be that if the defense had put on any mitigation evidence, the State could respond with any anti-mitigation evidence, including having these family members "tell how the loss of their mother and daughter, respectively, affects them and their family. And I think that's appropriate rebuttal under the law to the mitigation evidence that the defendant has offered on his behalf." (RR31, 166-67). The trial court allowed the testimony. (RR31, 168).

Joey Bowen then testified extensively about missing his mother. (RR31, 172-176). He missed talking to her, her guidance, having her at holidays and his high school graduation. (RR31, 172, 174).  She had been "the number one person you talk to and the person that made everything better." (RR31, 176).

68

Vickie Bowen's 73-year-old father testified even more emotionally. The prosecutor's first question to him was, "Are you okay, Mr. Bivens?" and the answer was "No." (RR31, 177), then he testified that "every day with Vickie was wonderful. Every day. And then she was the love of my life." (RR31, 179). He still had not gotten over the news of her death, testifying "I don't know that I'll ever get over it." (RR31, 179,186).

Once again, these were the State's last words before closing.  Then the prosecution invoked the continuing suffering the complainant's family faced: "But these people are going to have to live every single day of the rest of their lives in the aftermath dealing with the consequences of what this defendant has done to them." (RR32, 56). Obviously the family members were sitting in the courtroom when this argument was made, and obvious too was the prosecutor's implication that this family would only have justice if a death sentence was returned. Toward the end of the final State's argument, the prosecutor returned to the victim's family: "But there is that trust there still that justice will be served in any individual case. And I know that's the way that Mr. and Mrs. Bivens undoubtedly feel in this case. They turned that trust over to us when we assumed the responsibility of seeking justice for their daughter, and I'm turning that responsibility over to you deliberations in this case." (RR32, 73-74).

The primary authority  for this point of error is *Tennard v. Dretke*, 542, U.S. 274, 124 S.Ct 2562, 159 L.Ed.2d 384 (2004), in which the Supreme Court clarified several basic premises of death penalty litigation. One of these concerned what is relevant to mitigation in the punishment phase of a capital murder trial. The Court held there should be a very low standard for admissibility:

When we addressed directly the relevance standard applicable to mitigating evidence in capital cases in *McKoy v. North Carolina*, 494 U.S. 433, 440-441 (1990), we spoke in the most expansive terms. We established that the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" than in any other context, and thus the general evidentiary standard - - "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" - - applies. *Id*., at 440. We quoted approvingly from a dissenting opinion in the state court: "'Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." Thus, a State cannot bar "the consideration of... evidence if the sentencer could reasonably find that it warrants a sentence less than death."

*Tennard, supra*, 124 U.S. at 284 (most citations omitted).

The Court characterized this as a "low threshold for relevance." Id. at 10.

In *Payne v. Tennessee*, 111 S.Ct. 2597 (1991), the U.S. Supreme Court removed the prior *per se* bar on the introduction of "victim impact statements" by the prosecution as part of aggravating evidence during a capital sentencing hearing. *Id*. at 2603. Chief Justice Rehnquist's opinion for the Court in *Payne* noted that in the context of mitigating evidence, the Court's decisions have allowed the sentencer to consider "'any relevant mitigating evidence' that a defendant proffers in support of a sentence less than death," 111 S.Ct. at 2606 (citing *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)), and that a capital defendant should be "treated as a 'unique individual human being'" during capital sentencing, Id. at 2606-007 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). The Chief Justice then concluded, comparing aggravation and mitigation evidence, that what is good for the goose is good for the gander: that a sentencing jury should be permitted to know about the individual characteristics of the murder victim - - as well as of the convicted capital defendant - - which necessarily includes evidence about the victim's family and their reaction to the murder. *See*, 111 S.Ct. at 2607-09. He held that it was not a bar to introducing such aggravating evidence that it

"was [not] related to the circumstances of Payne's brutal crimes." *Id.* at 2609. As the Chief Justice

noted:

> Human nature being what it is, capable lawyers trying cases to juries try to convey to the jurors that *the people involved in the underlying events [i.e., including the victim's survivors] are...living human beings who have something to be gained or lost from the jury's verdict*. Under the aegis of the Eighth Amendment, we have given the broadest latitude to the defendant to introduce relevant mitigating evidence reflecting his own individual personality. ...[W]e now reject the view...that a state may not permit the prosecutor to similarly argue to the jury the human cost of the crime of which the defendant stands convicted.  ..."[J]ustice, though due to the accused, is due to the accuser also.   ...We are to keep the balance true."  (citing *Snyder v. Massachusetts*, 291 U.S. 97 (1934). Id. (emphasis added).

Justice O'Connor's concurrence in *Payne* also sheds some light on the Court's reasoning. She

noted at the outset of her opinion that "[a] State may decide that the jury, before determining whether

a convicted murder should receive the death penalty, should know the full extent of the harm caused

by the crime, *including its impact on the victim's family*. . ." *Id*. at 2611. She later noted, like the

Chief Justice, that a victim should be portrayed to the jury as a "unique human being" - - which

includes knowledge of the victim's family's reaction to the murder. *See, Id.* at 2612.

Despite that,  Mr. Roberts' family has value - as does the complainant's family.  It was

an unreasonable application of Supreme Court precedent by the Court of Criminal Appeals

in rejecting this challenge.

71

**CLAIM NUMBER FIFTEEN: MR. ROBERTS' MOTION TO PRECLUDE THE DEATH PENALTY SHOULD HAVE BEEN GRANTED. THE FACTORS THAT MADE THIS CASE DEATH-WORTHY SHOULD HAVE BEEN PASSED ON AND SPECIFIED BY A GRAND JURY, RATHER THAN ALLOWING THE STATE UNFETTERED DISCRETION TO SEEK THE DEATH PENALTY OR NOT.**

The state must not only prove but plead every element of an offense. A defendant is entitled to have a grand jury determine that there is probable cause to believe he committed every element of the offense. In this case the facts that would allow a death sentence are elements of the offense, or at least of the punishment. A death sentence cannot be imposed unless other facts are found after the guilty verdict. Therefore those facts are elements of the offense of capital murder - death, and should have to be pled in the indictment.

Not only is the defendant entitled to a grand jury determination of the facts that make his case death-worthy, but such determinations would make the plea-bargaining process more fair. A defendant who knows that a grand jury has found probable cause to believe him death-worthy would be better able to evaluate his case.

This Court should not allow the state unfettered use of such a weapon. The Constitution requires that a grand jury pass on it first.

Mr. Roberts filed a "Motion to Preclude the Death Penalty as a Sentencing Option." (CR1, 53). The motion argued that a fact that increases the penalty for a crime beyond the statutory maximum must be alleged in the indictment and proved to the jury beyond a reasonable doubt, *citing Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d

435 (2000). The motion concluded that because no evidence of the aggravating circumstances was presented to the grand jury in Mr. Roberts' case, no findings had been made as their existence, and that death should be precluded as a sentencing option. (CR1, 56) The trial court heard this motion before the penalty phase of trial and denied it. (RR26, 6, 8, 10).

TEX. CODE CRIM. PROC. art. 37.071(2)(e)(1) is the Texas Legislature's response to *Penry v. Lynaugh*, 492 U.S. 302 (1989), (*Penry I.*)  It is different from the other Texas special issues because it fails to contain a burden of proof assigned to one of the parties.  In *Apprendi v. N.J.*, 530 U.S. 466 (2000), the U. S. Supreme Court articulated the following three-part rule:

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.  With that exception, we endorsed the statement of the rule set for in the concurring opinions in [*Jones*]: [I]t is unconstitutional for the legislature to remove from the jury the assessment of facts that increase the prescribed range of penalty to which a criminal defendant is exposed.  It is equally clear that such facts must be established beyond a reasonable doubt. 526 U.S. at 252-253, 119 S. Ct. 1215 (Opinion Stevens, J.); see also *Id.* at 253, 119 S. Ct. 1215 (Opinion of Scalia, J.)

530 U.S. at 490.  The critical aspect of the aforementioned ruling for this Claim for Relief is the allocation of proof beyond a reasonable doubt to the prosecution on a punishment-increasing factor.  The Court of Criminal Appeals dismissal is unreasonable in light of Supreme Court precedent.

**CLAIM NUMBER SIXTEEN: THE MITIGATION SPECIAL ISSUE IS UNCONSTITUTIONAL BECAUSE IT DOES NOT HAVE A BURDEN OF PROOF, THUS ALLOWING THE JURY TO GIVE NO EFFECT TO MITIGATING EVIDENCE.**

**CLAIM NUMBER SEVENTEEN:  THE MITIGATION SPECIAL ISSUE IS UNCONSTITUTIONAL BECAUSE IT DOES NOT IMPOSE A BURDEN OF PROOF ON THE STATE'S EVIDENCE THAT IS OFFERED AS "ANTI-MITIGATING" EVIDENCE.**

These two claims will be argued together.  Mr. Roberts' jury was not instructed on a burden of proof to apply in deciding wether the mitigating evidence they heard warranted a sentence of imprisonment for life rather than death. Because of this lack of a burden of proof, the jury was unconstitutionally allowed to apply whatever burden of proof each juror wished.

This issue was repeatedly rejected by the Court of Criminal Appeals. *E.g., Prystash v. State*, 3 S.W.3d 522, 535 (Tex.Crim.App. 1999) *cert. denied*, 529 U.S. 1102 (2000) This, though, is a new argument based on recent decisions from this Court and the Supreme Court of the United States. The current instruction, given to this jury, allows each juror to impose such a high burden of proof on the mitigation evidence that he or she will not consider that evidence, even though a constitutional death penalty scheme requires that they do so.

Alternatively, there is no burden of proof on the victim impact evidence offered by the State, which is characterized as "rebuttal" to Mr. Roberts' mitigation evidence. Even more illogical is the Court's continued position that while the State may offer extensive evidence at punishment that the capital defendant committed all manner of unadjudicated extraneous offenses, there is no requirement that the jury be instructed on any independent

burden of proof regarding those offenses. The Court's view that no such burden need be applied independently seems to be based on the fact that the continuing threat special issue itself carries that burden, because its ultimate answer, which must be based upon proof beyond a reasonable doubt "encompasses" the same burden for the underlying evidence of unadjudicated extraneous offenses. *E.g., Prystash v. State*, *supra*, 3 S.W.3d at 533. It is clear also, however, that those same extraneous offenses are relevant to "rebut" the defendant's mitigating evidence, *Id.* at 535, and that special issue carries no burden of proof on the ultimate answer, that could be seen as "encompassing" a burden to prove those offenses by any standard. This kind of "anti-mitigation" evidence along with all the other non-statutory aggravating evidence the State may present at punishment, is evidence that militates in favor of a death sentence. It should only be available to the jury if they first find it true beyond a reasonable doubt.

Mr. Roberts presented this issue to the trial court in a written pre-trial motions, which alleged that Art. 37.071 was unconstitutionally vague and violates the Eight and Fourteenth Amendments to the United States Constitution because it did not give a burden of proof. (CR, 430).   The trial court overruled this motion prior to the punishment phase at trial. (RR21, 44: CR, 432) and then gave the following instructions at the punishment phase of trial:

> In deliberating upon the special issues, you shall consider all evidence admitted at the guilt or innocense stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death

penalty.

You are instructed that the State must prove the first issue beyond a reasonable doubt...

* * *

The second special issue asked:

whether, taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or are sufficient mitigating circumstances to warrant that a sentence of (CR, 451, 453). The jury answered this issue "No." (CR, 457).

This issue has been rejected despite arguments pursuant to *Walton v. Arizona*, 497

U.S. 639 (1990), which mandates that proof beyond a reasonable doubt is not the appropriate

standard to apply to defensive evidence.  The rejection of this claim by the Court of Criminal

Appeals is unreasonable in light of the law and the facts.

**CLAIM NUMBER EIGHTEEN:  THE TRIAL COURT ERRED BY REFUSING MR. ROBERTS' REQUEST TO GIVE THE FINAL ARGUMENT AT PUNISHMENT ON THE MITIGATION SPECIAL ISSUE.**

Mr. Roberts  filed a pre-trial motion asking to be allowed to give the concluding argument to the jury on special number two, concerning mitigation. The State is always allowed to close jury arguments. This is based on the fact that the State has the burden of proof and the burden of persuasion. However, on the mitigation special issue, neither side has the burden of proof, and every suggestion has been that if either party has any burden, it is the capital defendant who bears at least the burden of persuasion.

The trial court overruled his motion. The State went last in argument, as always, and the jury returned death answers to both special issues.

A defendant is entitled to have his attorney present during closing arguments. In noncapital cases, a statute required that the State close jury arguments. However, capital murder cases are controlled by a different statute, which does not address the order of jury arguments. Therefore, the trial court is free to allow the defense to go last.

In some other special issues, such as when a jury only decides the defendant's sanity, the defense has been allowed to argue last, based on the burden of proof. The same should be true regarding the second special issue in a death penalty case. In such a case, where the defendant's life is at stake, the defense should be allowed to present its final argument to the jury last.  Death is different and the trial court erred in rejecting this claim.  *See Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).

**CLAIM NUMBER NINETEEN: MR. ROBERTS WAS DEPRIVED OF DUE PROCESS AS A RESULT OF THE PROSECUTION'S VIOLATION OF A MOTION IN LIMINE IMPROPERLY SUGGESTING TO THE JURY THAT THEIR VERDICT MAY NOT BE THE FINAL DESTINATION OF MR. ROBERTS' SENTENCE DUE TO POSSIBLE REVERSAL BY A HIGHER COURT**.

The state erred in improperly suggesting to the jury that the verdict which they gave in punishment could be reversed by a higher court, and thus there was a chance that Roberts could be released prior to the 40 years which he would be required to serve under capital life sentence. The argument invited the jurors to disregard the 40-year-no-parole instruction that they were given and deprived Mr. Roberts of proper consideration of the future danger which he posed to society.

The defense filed a motion in limine requesting that the state "refrain from making any direct or indirect reference whatsoever, at trial before the jury to anything which might lead the jury to believe that it its responsibility for determining the appropriateness of the sentence rests with either the judge or an appellate court (C.R.1, 104). The motion was granted.  (R.26, 14).

THE COURT: What do you have next there that you are holding in your hand that we can take up, please?

MR. CANTRELL: The –

THE COURT: What is it titled?

MR. CANTRELL: *Caldwell v. Mississippi.*

THE COURT: Okay.

MR. CANTRELL: That it just prohibits - - and I think the case, the Supreme Court case, prohibits the - - any kind of attempt or any kind of mention that the responsibility for determining the appropriateness of the defendant's death rests somewhere else, somewhere other than with the jurors. And if you have to object to that, I wouldn't think you could ever - - I don't think you could ever remove the prejudicial effect of that.

MR. HON: Judge, in the interest of time, I don't think we're going to argue that to the jury.

THE COURT: So this will be granted.

During the cross-examination of John Escobedo (R28 41), the prosecution asked several leading questions designed to suggest to the jury that their verdict would not be final, and that in fact the final determination lay elsewhere.

The state elicited testimony as to the possibility of executive clemency on at least two separate occasions (R28, 48, 49-50):

Q.   There are other ways that a person sentence to life on a capital sentence might not have to serve the full 40 years that they are required to by law, wouldn't you agree?

A.   The only way that a person could be released from that 40-year law would be if the governor would grant a full pardon or some type of executive clemency. Otherwise, unless the laws are changed, that person remains under the 40-year

law.

Q.     And you mentioned the executive clemency process. What does that entail?

A.     An inmate can request of the parole board a recommendation for a full pardon.

       A full pardon would be considered by the parole board. And if the majority of

       the board members would recommend a full pardon to the governor, then that

       recommendation is sent to the governor's office; and the governor would have

       the sole authority to grant or deny it.

Q.     Okay. So clemency and a pardon are, in essence, the same thing when we're

       talking about those two terms, correct?

A.     Yeah. Executive clemency is part of a full pardon.

Q.     What does the term "commutation" mean?

A.     Commutation means that, basically, it requests a modification of a sentence.

Q.     Okay. In other words, a life sentence, for example, could be commuted down

       to some lesser sentence if in the judgment of the parole board and the

       governor's office, I guess, that it was warranted; is that right?

A.     Right.

Q.     And those can be granted for any number of reasons, can they not?

A.     Yes.

The prosecution later referred <u>directly</u> to the possibility of judicial intervention after

the jury's verdict (R28, 51):

Q.     Okay. There is also the possibility of some judicial intervention, too, somewhere down the road in regard to a life sentence, is there not?

A.     Yes.

Q.     In other words, the court, State or Federal court, could order a sentence to be overturned or perhaps commuted; is that correct?

A.     Sure.

In *Caldwell v. Mississippi*, 472 U.S. 320 (1985), the prosecution told the jury that their sentence would be subject to the review of the Mississippi Supreme Court. That statement led the jury to believe that their determination would not be final. The Supreme Court reversed the conviction, holding "it is constitutionally impermissible to rest a death sentence on a decision made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 329.

Although this was not during summation, the reasoning is instructive by the Fifth Circuit:

> There is a line of federal authority addressing federal due process challenges to statements made during a prosecutor's summation. *See Darden v. Wainwright*, 477 U.S. 168, 180, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Caldwell v. Mississippi*, 472 U.S. 320, 337-38, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *Rogers v. Lynaugh*, 848 F.2d 606, 608 (5th Cir.1988) (explaining this "generic substantive due process violation"). While the states are free to develop their own standards to govern the conduct of state prosecutors, **the due process clause of the Fourteenth Amendment provides an independent check on a prosecutor's comments that "so infected the trial with unfairness as to make the resulting conviction [or sentence] a denial**

> **of due process.**" *Rogers*, 848 F.2d at 608 (*quoting Darden*, 477 U.S. at 181,
> 106 S.Ct. 2464) (alteration in original); *see also Whittington*, 704 F.2d at 1422
> (noting that while a federal habeas court may not impose federal supervisory
> standards on state courts, "we can and are required to make an independent
> determination of what is fair under the Constitution").

*Ries v. Quarterman,* 522 F.3d 517, 530 fn. 7 (5th Cir. 2008). Due Process was violated to

the point where the prosecutor's statements infected the very decision-making role of the

jury. This case is too similar to *Caldwell* to be summarily rejected. The Court of Criminal

Appeals' rejection of this claim is unreasonable in light of Supreme Court precedent and the

facts of this case.


Because of these constitutional violations, Mr. Roberts' conviction and sentence of

death must be vacated and the cause remanded for a new trial. Alternatively, Mr. Roberts'

sentence of death should be vacated and a life sentence entered.

# PRAYER

WHEREFORE, PREMISES CONSIDERED, it is respectfully requested that this Honorable Court

1.  Vacate the petitioner's conviction.

2.  Vacate the petitioner's sentence.

3.  Issue a writ of habeas corpus so that the petitioner may be relieved of his illegal restraint of liberty, such restraint being founded upon an unlawful and unconstitutional conviction and sentence based upon ineffective assistance of counsel.

4.  Permit discovery, pursuant to Rule 6, Rules - Section 2254 cases.

5.  Allow the petitioner a period of time within which to file such amendments to this application as might be necessary to bring all proper matters before this Court.

6.  Permit the filing of a traverse or reply to the state's answer.

7.  Finally, to grant such other and further relief as this court may deem appropriate.

Respectfully Submitted,

*/s/ Douglas Milton Barlow*
_____
Douglas Milton Barlow
Attorney At Law
485 Milam
Beaumont, TX 77701
409/838-4259
Fax: 409-832-5611
Email: dmbfed@gtbizclass.com

Attorney for Petitioner,
Donnie Lee Roberts

83

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of May, 2010, a true and correct copy of the foregoing pleading was served upon opposing counsel by ECF filing and by depositing the same in United States Mail, first class, postage prepaid, addressed to:

Assistant Attorney General
Edward Marshall
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548

*/s/ Douglas Milton Barlow*
_____
DOUGLAS BARLOW