IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| DONNIE LEE ROBERTS, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 1:09-cv-419-TH |
| | § | |
| RICK THALER, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| Respondent. | § | |

## RESPONDENT THALER'S ORIGINAL ANSWER

Petitioner Donnie Roberts was properly convicted of capital murder and sentenced to death for fatally shooting Vickie Bowen during a 2003 robbery.  He now challenges his presumptively valid conviction and sentence in this Court pursuant to 28 U.S.C. § 2254. However, Roberts fails to demonstrate that he is entitled to federal habeas corpus relief for the reasons stated below.  Additionally, Respondent Rick Thaler (the Director) denies all allegations of fact made by Roberts except those supported by the record and those specifically admitted herein.[1]

---

[1]    A copy of Roberts's state court records were filed under separate cover on May 24, 2010.

## ROBERTS'S ALLEGATIONS

The Director understands Roberts to raise the following grounds for relief:

1.    Roberts's due process rights under *Giglio v. United States,* 405 U.S. 150 (1972), were violated when State's expert Dr. Gary Mears testified falsely regarding his credentials during the punishment phase of trial.

2.    Roberts's Eighth Amendment rights under *Johnson v. Mississippi,* 486 U.S. 578 (1988), were violated when State's expert Dr. Gary Mears testified falsely regarding his credentials during the punishment phase of trial.

3.    Roberts's due process rights under *Romano v. Oklahoma,* 512 U.S. 1 (1994), were violated when State's expert Dr. Gary Mears testified falsely regarding his credentials during the punishment phase of trial.

4.    Roberts was denied constitutionally effective assistance of counsel when trial counsel failed to peremptorily strike two employees of the Texas Department of Criminal Justice (TDCJ) during voir dire.

5.    Roberts was denied constitutionally effective assistance of counsel when trial counsel failed to prepare and present expert testimony to rebut the State's expert during the punishment phase of trial.

6.    Roberts was denied constitutionally effective assistance of counsel when trial counsel failed to prepare and present evidence—during the guilt/innocence and punishment phases of trial—that he acted in self-defense, as well as evidence that would have mitigated a death sentence during punishment.

7.    Roberts's due process rights were violated when the trial court required the defense to turn over its investigator's

notes to the State during punishment phase cross-examination.

8.   Roberts's Eighth Amendment rights were violated because the statutory jury instruction regarding the mitigation special issue unconstitutionally narrows the definition of mitigating evidence to that which reduces a defendant's moral blameworthiness.

9.   Roberts's Eighth Amendment rights were violated when the trial court refused to submit his requested punishment-phase jury instruction regarding the definition of mitigating evidence under *Tennard v. Dretke,* 542 U.S. 274 (2004).

10.   Roberts's Eighth Amendment rights were violated when the trial court refused to allow defense expert Dr. Kathleen McQueen to testify during punishment that Roberts's combined use of alcohol and crack cocaine caused him to commit capital murder.

11.   Roberts was denied constitutionally effective assistance of counsel when trial counsel failed to object to victim impact evidence from the victim of an extraneous offense.

12.   Roberts's due process rights were violated when the trial court allowed victim impact evidence from the victim of an extraneous offense.

13.   Roberts was denied constitutionally effective assistance of counsel when trial counsel failed to object to the State's cross-examination of defense witness John Escobedo concerning the possibility that Roberts's parole eligibility could be altered by the Legislature at a future date.

14.   Roberts's Eighth Amendment rights were violated when the trial court refused to allow testimony regarding how a death sentence would affect Roberts's family members.

15.   Roberts's Sixth Amendment rights under *Apprendi v. New Jersey,* 530 U.S. 466 (2000), were violated because his

future dangerousness and/or deathworthiness were not presented to a grand jury and alleged in the indictment.

16. Roberts's Sixth Amendment rights under *Apprendi v. New Jersey* were violated because the State was not required to prove a negative answer to the mitigation special issue beyond a reasonable doubt.

17. Roberts's Sixth Amendment rights under *Apprendi v. New Jersey* were violated because the State was not required to prove beyond a reasonable doubt any extraneous offense evidence or the victim impact evidence it offered to rebut his mitigating evidence.

18. Roberts's due process rights were violated when the trial court refused his request to present the final argument at punishment regarding the mitigation special issue.

19. Roberts's due process rights under *Caldwell v. Mississippi*, 472 U.S. 320 (1985), were violated when the State suggested on cross-examination of defense witness John Escobedo that Roberts might not serve forty calendar years minimum if sentenced to life imprisonment.

Claims 1-6 were raised in Roberts's state application for habeas corpus relief. Claims 7-11 and 13-19 were raised on direct appeal. Thus, all claims but Claim 12 are exhausted in this Court as required by 28 U.S.C. § 2254(b)(1). Claim 12 is unexhausted and procedurally defaulted, as explained below.

## STATEMENT OF THE CASE

Roberts was indicted on November 24, 2003 for murdering Vickie Ann Bowen on October 15, 2003 during the course of committing or

attempting to commit robbery.  1 CR 2; PX A.[2]  He was convicted of capital murder as charged in the indictment on October 15, 2004 in the 411th District Court of Polk County, Texas.  2 CR 103.  After a separate punishment trial, the jury answered the special issues—future dangerousness and mitigation—such that the trial court imposed a death sentence on October 27, 2004.  2 CR 129-36; PX B.

Roberts's conviction and sentence were affirmed by the Court of Criminal Appeals of Texas (CCA) on automatic direct appeal.  *Roberts v. State,* 220 S.W.3d 521, *cert. denied,* 552 U.S. 920 (2007).  While his appeal was pending, Roberts filed an application for habeas corpus relief in the trial court in which he raised eight claims for relief.  SHCR 1-216.  Roberts also filed a pro se pleading raising additional claims for relief.  Supp.SHCR 6-16.  The trial court did not hold a hearing but entered detailed findings of fact and conclusions of law recommending denial of habeas relief.  *Id.* at 232-58.  The CCA then reviewed the

---

[2]　　　"CR" refers to the Clerk's Record of pleadings and documents filed with the trial court during trial proceedings.  "RR" refers to the Reporter's Record of transcribed trial proceedings.  "SHCR" refers to the Clerk's Record of pleadings and documents filed with the trial court during state habeas corpus proceedings.  "Supp.SHCR" refers to the supplemental Clerk's Record of additional pleadings and documents filed during state habeas proceedings.  All references are preceded by volume number and followed by page numbers.  "SX" refers to the numbered exhibits offered and admitted into evidence at trial by the State.  "PX" refers to the exhibits attached to Roberts's petition for writ of habeas corpus in this Court, followed by letter designation and page numbers where necessary.

record and adopted the trial court's findings and conclusions with few exceptions. *Ex parte Roberts,* No. 71,573-01, 2009 WL 1337443, *1 (unpublished, per curiam order). The CCA declined to adopt findings of fact (FF) ¶¶ 7, 10, 111, and 116; and conclusions of law (CL) ¶¶ 121, 135, 140, 161, 163, 164, and 181-183. *Id.* Based on its independent review of the record and the trial court's recommendation, the CCA denied relief on May 13, 2009. *Id.* The CCA dismissed Roberts's pro se pleading as an abuse of the writ. *Id.*

The instant petition follows.

## STATEMENT OF FACTS

### I.     Facts of the Crime

The CCA described the evidence supporting Roberts's capital-murder conviction in its opinion below:

> At the time of the murder, [Roberts] lived with the victim, Vicki Bowen.   [Roberts] was unemployed, often drank alcohol, and used cocaine.   Bowen worked as a dental assistant. On October 15, 2003, she went shopping with co-worker Brenda Bland, but she did not show up for work the next day.   Because Bowen was a punctual person who always called if she was going to be late, Bland became concerned and went to Bowen's house to check on her. When Bland arrived at the home, she found the front door open.   After knocking and receiving no answer, Bland entered the home and found Bowen dead.   Bland noticed that Bowen was still in the scrubs she had worn at work the previous day.   She was covered by a blanket and was lying face down with her head turned to the side in a pool of blood.   Blood spatters were present in the living room on

the coffee table, the couch, and the walls.  The medical examiner would later determine that Bowen died from two gunshot wounds to the head.

It was immediately apparent from an examination of the scene that Bowen's television and her son's truck were missing.  That same day, the police found [Roberts] after tracking down the stolen truck.  It was later determined that [Roberts] had taken the truck, the television, Texans/Titans football tickets, jewelry, a Western Union money order, a .22 rifle, and a .22 pistol.  [Roberts] had sold the football tickets for one hundred dollars.  He had bought cocaine from Edwin Gary on October 15 on three different occasions, the last of which involved trading the .22 caliber pistol.  [Roberts] had apparently abandoned the .22 rifle, later determined to be the murder weapon, a few blocks from where he was found.  The Western Union money order was found in the residence at which [Roberts] had parked his truck, but the television and the jewelry were never recovered.

[Roberts] was interviewed and gave a confession.  In that confession, he acknowledged that he had "a crack cocaine problem" and that he would go to bars, get drunk, and then look for drugs.  With regard to the victim's death, [Roberts] said, "I pointed the gun at her and I told her just give me some money."  Later in the interview, [Roberts] stated:

I pointed the gun at her and I said, "if you'd just give me some money."  And she said "No."  And then I said, "Look, it doesn't have to be this way."  That's all I remember saying to her.  And the next thing I know, I shot her.

At trial, [Roberts] testified to a different sequence of events. He claimed that he picked up the .22 rifle because it was out of place, near the door.  He also claimed that he saw what looked like a .22 pistol in Bowen's pocket and that she moved her hand to her pocket to reach for it.  He then said that he "must have chambered a round into the .22 rifle at that time," but he did not remember if he pulled the safety off.  He also claimed that he did not remember his gun

firing but that he knows it did.  [Roberts] further testified that he did not intend to rob Bowen at the time he shot her, but he admitted to taking items of her property later.

*Roberts v. State,* 220 S.W.3d at 524-25.

## II.   Facts Relating to Punishment

### A. State's evidence

During the punishment phase of Roberts's trial, the State introduced videotaped statements by Roberts in which he confessed to several extraneous offenses.  In an interview with Captain Dennis Allen of the Polk County Sheriff's Department, Roberts admitted that he was charged with battery after an altercation with one of his cell mates while he was being held in a Fulton County, Georgia jail for DWI.  25 RR 13-14; SX 118.  Roberts also stated that he fought with his brother the night before Roberts's wedding in Louisiana, and that his brother was airlifted to a hospital because of the extent of his injuries.  25 RR 14; SX 118.  Roberts then stopped the interview and told Captain Allen that he wanted to be placed in his own cell; otherwise, there would be "another killing."  25 RR 14; SX 118.  Roberts also told Captain Allen that he murdered Al Crow in Louisiana in 1992 by shooting him in the head, then set Crow's residence on fire.  25 RR 15-16; SX 118.

In an interview with Natchitoches Parish, Louisiana law enforcement personnel, Roberts also confessed to Mr. Crow's murder. 25 RR 37-41; SX 119.  Mr. Crow's death was originally classified as an accidental death due to asphyxiation, no autopsy was performed, and his remains were cremated.  25 RR 79, 88, 112.  However Roberts told Deputy Sheriff Rob Walsworth there was a pattern of buckshot holes in the trailer neighboring Mr. Crow's residence.  *Id.* at 92; SX 119.  When Deputy Walsworth returned to the location of the Crow murder, Roberts's statement was confirmed.  25 RR 94-95.  Roberts was subsequently indicted for second-degree murder.  *Id.* at 41.

The State then called Elizabeth Thomas, a single mother and convenience-store cashier, to testify that Roberts robbed her at knife-point on Mother's Day in 2001.  26 RR 24-25, 31-32.  Ms. Thomas explained that Roberts's threat to "slice [her] throat" scared her.  *Id.* at 32-33.  While the State played a security-camera recording of the robbery for the jury, Ms. Thomas reiterated that the experience was frightening.  *Id.* at 41-43.  Ms. Thomas also stated that she ended her employment at the convenience store one day later because of her fear of being robbed again.  *Id.* at 46.  This fear caused "[l]ack of sleep, nightmares of the knife pointing at [her], hearing [Roberts's] voice in [her] sleep telling [her Roberts] was going to cut [her] throat."  *Id.* at

47. Eventually, Ms. Thomas resumed working at different convenience stores that provided better security measures. *Id.* at 48. Roberts did not object to any of this testimony. Finally, on redirect examination, Ms. Thomas said she cried every Mother's Day because of the incident. *Id.* at 54.

The State also called Betty Lott, a probation and parole officer in Louisiana who once supervised Roberts. 26 RR 64, 78. During this time, Ms. Lott spoke with Roberts's wife, Jill, and formed the impression that "she was extremely afraid of [Roberts and] that there were incidents in the past where he had threatened her to get money to get drugs." *Id.* at 82-84. Roberts was later sent to a halfway house for drug treatment but he walked away before he completed treatment. *Id.* at 86, 88; 117-18. Richard Hilton, a subsequent probation and parole officer who supervised Roberts, testified that he was "absolutely" dangerous. *Id.* at 128. Mr. Hilton stated that Roberts ultimately absconded in June 2003, only months before murdering Ms. Bowen. *Id.* at 128, 132-33.

The State also presented the testimony of Ms. Bowen's mother, Norma Lee Bivins. 26 RR 144. Ms. Bivins stated that she and her husband were very close to Vickie. *Id.* at 150-56. She described her reaction to the phone call informing her of her daughter's murder as, "I

just went crazy.  I don't remember anything that happened after that."
*Id.* at 157.  Ms. Bivins also testified that holidays and special events
are difficult for her because of the void she feels for Vickie.  *Id.* at 160.
She is continually plagued by the thought, "If [Vickie] was still alive, if
something could have been done."  *Id.* at 161.  Ms. Bowen's son, Joey,
similarly testified that he missed his mother's companionship and
advice.  31 RR 172-74.  He missed three months of high school and
almost did not graduate because of persistent difficulties with sleep.
*Id.* at 175.  Ms. Bowen's father, Clifford Bivins, testified that he had
never gotten over losing his daughter and was unable to delete his
daughter's phone number from his address book.  *Id.* at 183-86.

Dr. Walter Quijano, a forensic psychologist, examined Roberts
and testified that Roberts suffered from alcohol and cocaine addiction
as well as antisocial personality disorder.  29 RR 235, 240, 245.  Dr.
Quijano also stated that Roberts would be a future danger.  *Id.* at 259.
Dr. Gary Mears, also a forensic psychologist, examined Roberts and
concluded that he suffered from antisocial personality disorder and
would be a future danger.  30 RR 248,235, 255.

### B. Defense evidence

Roberts's sister, Donna Harkins, testified for the defense that
Roberts grew up in a large family with six siblings, of which he was the

youngest.  27 RR 12.  Roberts's father was in the Air Force and later became a painting contractor.  *Id.* at 13-15.  He was hospitalized for mental illness on two occasions, developed a severe drinking problem, and verbally abused Roberts's mother, Georgia.  *Id.* at 16, 19, 21, 29. Georgia also testified that Roberts's father had an alcohol problem and verbally abused her, leading to her nervous breakdown and hospitalization.  *Id.* at 129, 132-33.  Roberts's father was also verbally abusive toward Roberts's sister, Jenny.  *Id.* at 21-22, 54.  Two of Roberts's nieces confirmed the chaotic nature of his childhood home. *Id.* at 204-07, 217-20.  Roberts's father discouraged participation in school by his children, and four of the seven children—including Roberts—never graduated from high school.[3]  *Id.* at 24, 45, 136.  Four of Roberts's siblings have alcohol or drug problems as adults, and the family is not very close.  *Id.* at 36-37, 44, 137.  Ms. Harkins did not believe that he was a good father.  *Id.* at 25.

Roberts later came to live with Ms. Harkins in Baton Rouge, Louisiana when he was a nineteen-year-old drug abuser.  27 RR 31. Roberts was married at one point and fathered a daughter, Lauren Roberts.  *Id.* at 32-33.  According to Ms. Harkins, his mother, and his niece, Roberts was a very caring father and a steadying influence in

---

[3]     Roberts later obtained his GED.  27 RR 141-42, 150.

Lauren's life.  *Id.* at 33-34, 145, 227-28.  He was also a good brother and uncle, and never used drugs around Ms. Harkins or her children.  *Id.* at 34-35, 209, 221-25, 228.

Roberts's childhood friend, Chris DeMary, also stated that Roberts's father was a drunk and a bad person.  27 RR 92.  Mr. DeMary remembered Roberts's father as verbally abusive, and once saw Roberts with cuts and bruises.  *Id.* at 93.  Roberts began drinking at age thirteen and used marijuana and mushrooms between thirteen and sixteen.  *Id.* at 96-97.  However, according to Mr. DeMary, Roberts was not violent as a result.  *Id.* at 98.  By 1999, Roberts was using crack cocaine.  *Id.* at 100-01, 116, 142-43.

Jeffery Reid, a painting contractor in Baton Rouge, testified that he employed Roberts for several months in 2000 and would have hired him again for future jobs.  27 RR 187-88, 192.

John Escobedo, a former parole officer and board member for the Texas Board of Pardons and Paroles, testified that Roberts would serve forty calendar years in prison before being parole eligible if he was sentenced to life.  28 RR 20, 23.  Larry Fitzgerald, a retired spokesperson for TDCJ, then explained the classification system that TDCJ uses.  *Id.* at 69-81.  Dr. Dennis Longmire, a criminal justice professor from Sam Houston State University, testified concerning his

research into the behavior of death-row and life-sentenced inmates.  *Id.* at 152, 157-162.  His conclusion was that the statistical likelihood of serious institutional violence by death-sentenced inmates was "very low."  *Id.* at 164.  Five Polk County jailers testified that Roberts had not caused any problems while he was incarcerated awaiting trial.  28 RR 205, 210-11, 217, 223, 235.

Dr. Katherine McQueen, a medical professor and addiction specialist, evaluated Roberts and testified that he was addicted to cocaine and alcohol.  29 RR 34-35, 43-44.  Dr. McQueen explained that alcohol and cocaine dependence could result in loss of control, compulsive behavior, decreased mental functioning, and impaired judgment.  *Id.* at 41-42.  Further, alcohol and cocaine use can result in permanent damage, major depression, and violent behavior.  *Id.* at 46, 54.

Dr. Bill Mosman, a forensic psychologist, then testified that he examined Roberts and administered a battery of tests.  29 RR 145, 152-53.  Dr. Mosman concluded that Roberts's parents were psychotic, abusive, and alcoholic, which caused Roberts to suffer from childhood depression and begin abusing drugs and alcohol at an early age.  *Id.* at 175-76.  Dr. Mosman diagnosed Roberts with depression, alcohol and cocaine addiction, posttraumatic stress disorder, and borderline

intellectual functioning. *Id.* at 191-93. Moreover, Dr. Mosman opined that Roberts suffered from dependent and paranoid personality disorders, but not from antisocial personality disorder. *Id.* at 194. But Dr. Mosman believed that Roberts would thrive in a structured environment. *Id.* at 197.

## ARGUMENT

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court "may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the claim by the state court '(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.'" *Riddle v. Cockrell,* 288 F.3d 713, 716 (5th Cir. 2002) (quoting 28 U.S.C. § 2254(d)(1)-(2)).

The Supreme Court has explained that a state-court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. *(Terry)*

*Williams v. Taylor,* 529 U.S. 362, 405-06 (2000). Alternatively, a state court "unreasonably applies" clearly established federal law if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407-09.

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. *Williams,* 529 U.S. at 409-11. Rather, federal habeas relief is only merited where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion." *Woodford v. Visciotti,* 537 U.S. 19, 27 (2002); *Williams,* 529 U.S. at 411. As the Court has explained,

> the range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

*Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence"). Further, reasonableness does not require citation or even awareness of any particular Supreme Court precedent, so long as the result of the state-court decision does not contradict that precedent. *Early v. Packer,* 537 U.S. 3, 8 (2002).

AEDPA also provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001).

And except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which Roberts would challenge a state court fact

finding must have been presented to the state court.  Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.  28 U.S.C. § 2254(d)(2).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty.  28 U.S.C. § 2254(e)(2).  A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence.  *(Michael) Williams v. Taylor,* 529 U.S. 420, 436 (2000).  For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2).  *(Michael) Williams,*

529 U.S. at 433.  But even if Roberts can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits.  *Clark v. Johnson,* 227 F.3d 273, 284-85 (5th Cir. 2000).

> **I.   Roberts's Due Process Rights under *Giglio v. United States* Were Not Violated by State's Expert Dr. Gary Mears's Testimony Regarding His Credentials During the Punishment Phase of Trial.**

> **II.   Roberts's Eighth Amendment Rights under *Johnson v. Mississippi* Were Not Violated by State's Expert Dr. Gary Mears's Testimony Regarding His Credentials During the Punishment Phase of Trial.**

> **III.   Roberts's Due Process Rights under *Romano v. Oklahoma* Were Not Violated when State's Expert Dr. Gary Mears Testified Falsely Regarding His Credentials During the Punishment Phase of Trial.**

Roberts first argues that State's expert Dr. Mears lied about his credentials during his punishment-phase testimony, and that this perjury violated due process and the Eighth Amendment under a variety of theories.  Petition at 11-20.  Specifically, Roberts alleges that Dr. Mears testified that he held doctorates in educational research and psychometry and neuropsychology.  *Id.* at 11 (citing 30 RR 211-12).  But, in another case, Dr. Mears testified he held Ph.D.'s in research

and statistical methodology and neuropsychology.[4]  *Id.* at 12; PX C at 140.  In a third case, Roberts alleges that Dr. Mears testified he had only one "doctor degree," although no transcript is offered to support this.  Petition at 12.

Roberts suggests that the State was aware of these discrepancies and knowingly sponsored false testimony in violation of *Giglio v. United States,* 405 U.S. 150 (1972).  Petition at 12-13.  Additionally, Roberts avers that the inaccuracy of Dr. Mears's testimony rendered his death sentence so unreliable that it violates the Eighth Amendment under *Johnson v. Mississippi,* 486 U.S. 578 (1988).   *Id.* at 17-19. Finally, Roberts asserts that Dr. Mears's perjured testimony made his sentencing proceeding fundamentally unfair pursuant to *Romano v. Oklahoma,* 512 U.S. 1 (1994).   *Id.* at 20.   However, the state court reasonably applied *Giglio, Johnson,* and *Romano* to the facts underlying Roberts's claim when it denied habeas relief.   Thus, this Court must also deny habeas relief.

---

[4]      Roberts also states that Dr. Mears admitted during his testimony in this case that the curriculum vitae (CV) he submitted there was different than the one he submitted in a third case, and that he submits a different CV to drug companies.  Petition at 12.  However, it is unclear how this relates to any claim that Dr. Mears testified falsely during Roberts's trial, because he does not attach a CV from any of the three cases as an exhibit to his petition. Further, there was no testimony concerning the CV Dr. Mears submits to drug companies in this case.  Supp.SHCR 233, 235 (FF 8; CL 27).

Dr. Mears submitted an affidavit to the state habeas court in which he explained his qualifications.

> First, my Ph.D. degree, from the University of Northern Colorado, was from an amalgamation of methodology disciplines: psychological scaling, quantification of measures (psychometry), psychological testing, and statistical analysis. My degree and specialization was also from two departments at that university: The Department of Psychology, Counseling, and Guidance (PCG), and the Department of Research and Statistical Methodology (RSM). Finally only graduate psychology school hours were also transferred from Texas Christian University, which were also applied to my course requirements for the Ph.D.

> Listed on my Official Transcript are these terms: a Ph.D. in Educational Research and Measurement, with specialization in Research and Statistical Methodology (RSM). In fact, the bulk of all my measurement and psychometric courses were labeled with the prefix RSM. Again, the testimony I gave in the Robert's [sic] trial is consistent and substantially equivalent to these terminologies as they appear on my Official Transcript from the University of Northern Colorado, 1970.

> Therefore, the wording for the Ph.D., and the Official Transcript terminology, is consistent or substantially equivalent to testimony offered in the Donnie Roberts trial, whether I testified that my degree was in measurement theory, research and statistical methodology, educational research and methods, educational research and measurement, or closely related wording. No effort was made, nor do I think it was made, to mislead the Court and jury as to my credentials in this measurement field.

> Finally, as a college teacher who often evaluates transcripts, "majors" are not typically designed on diplomas, with the exception of law, medical, dental, podiatric, and some psychology doctorates as I will mention. Although my testimony, as I recall, did not deal

with diplomas, Official Transcripts, not diplomas are reviewed to determine training, qualifications, and transcripted expertise. My diploma from the University of Northern Colorado lists just Ph.D., no major or specialization is designated.

By contrast, my second doctorate, the Psy.D. (Doctorate of Psychology), and my MS in clinical psychopharmacology both contain parts of the specialization in the heading. These heading[s] are appropriately labeled on my CV's [*sic*]. Nevertheless, my testimony given about my credentials, in the Roberts case or other cases, are consistent and substantially equivalent and do not give the jury or court a false or inaccurate perspective of my training. Indeed, I outlined orally in my live testimony, without the aid of my transcript, what is essentially on my transcript. There was no misrepresentation of my credentials.

Supp.SHCR 182-84.

The state court credited this affidavit and found that Dr. Mears's trial testimony was not perjured or misleading. Supp.SHCR 233-35 (FF 6; CL 18-27). His testimony was consistent with his academic credentials and "[s]light changes in testimony in separate cases, tried eight years apart in different counties do not rise to the level of perjury." *Id.* at 234-35 (CL 19-23); *cf. Hafdahl v. Johnson,* 251 F.3d 528, 534 (5th Cir. 2001) (rejecting perjury claim where expert testimony in 1996 differed somewhat from testimony in 1986 on same subject); *Koch v. Puckett,* 907 F.2d 524, 531 (5th Cir. 1990) (holding that inconsistencies within a witness's trial testimony are to be

resolved by the trier of fact and do not establish perjury).  Rather, Dr. Mears's differing descriptions of his doctorate were both "consistent and truthful," and he does have the degree about which he testified.  *Id.* at 235 (CL 23-26).

As the state court correctly noted, a due process violation occurs only if: (1) the State offers false testimony; (2) the false testimony was material; and (3) the prosecution knowingly failed to correct the false testimony.  Supp.SHCR 235 (CL 31) (citing *Giglio,* 405 U.S. at 53-54); *see also Kutzner v. Johnson,* 242 F.3d 605, 609 (5th Cir. 2001).  "Evidence is false if . . . it is specific misleading evidence important to the prosecution's case in chief.  False evidence is material only if there is any reasonable likelihood that [it] could have affected the jury's verdict."[5]  Supp.SHCR 236 (CL 32) (quoting *Barrientes,* 221 F.3d at 753.  Here, "[t]he prosecution had no knowledge of any allegedly misleading statements made by Dr. Mears," and thus did not fail to

---

[5]     The *Giglio* materiality standard—which embraces the harmless-error rule of *Chapman v. California,* 386 U.S. 18 (1967)—was abrogated by the Supreme Court's opinion in *Brecht v. Abrahamson,* 507 U.S. 619 (1993).  *See Barrientes v. Johnson,* 221 F.3d 741, 756-57 (5th Cir. 2000) (assuming *Brecht* harmless-error standard applies to *Giglio* claims raised in federal habeas proceedings) (citing *Gilday v. Callahan,* 59 F.3d 257, 268 (1st Cir. 1995)).  Because this is a postconviction proceeding, the Director no longer bears the onus of proving harmlessness of trial error under *Chapman*; rather, it is Roberts who must prove harm.  At a minimum, such a showing would require proof of materiality under *United States v. Bagley,* i.e., a reasonable probability that, but for the false testimony, the result of the proceeding would have been different.  473 U.S. 677, 682 (1985).

correct false testimony.  *Id.* at 235-36 (CL 29-30).  The state court credited an affidavit submitted by the State in which the trial prosecutor stated that the testimony of Dr. Mears was consistent with the credentials he provided at the time he was hired.  *Id.* at 186 (affidavit), 237 (CL 38-39).  Finally, the state court noted that "it is not enough that the testimony is . . . inconsistent with prior statements." Supp.SHCR 236 (CL 33) (quoting *United States v. Sutherland,* 656 F.2d 1181, 1203 (5th Cir. 1981)); *see also Kutzner,* 242 F.3d at 609; *Koch,* 907 F.2d at 531.  The court held that the State had no knowledge of any supposedly misleading testimony.  Supp.SHCR 237 (CL 39).

The court also found that Dr. Mears had extensive experience as a forensic practitioner.  Supp.SHCR 234 (FF 11-13).  He was one of twenty-nine punishment witnesses and not the only expert witness to testify.  *Id.* (FF 14).  Further, the court noted that Roberts's sentencing trial lasted for 7 days; that Dr. Mears's testimony comprised 216 pages of more than 8 volumes, and his testimony concerning his doctorate was only a single line.  *Id.* (FF 15-17).  Thus, "[t]he portion of Dr. Mears['s] testimony relevant to [Roberts]'s petition, even if it had been perjured or misleading, was not material to the instant case."  *Id.* at 235 (CL 28).  Observing that the questions before the jury in this case were future dangerousness and mitigation, the state court held that

"[t]he exact title of one of Dr. Mears['s] degrees is not material to either question." *Id.* (CL 35).   Additionally, the evidence of Roberts's deathworthiness was "overwhelming" and the mitigating evidence was "negligible at best." *Id.* (CL 36).  As a result, Roberts failed to establish materiality under *Giglio.  Id.* (CL 37).

Similarly, Roberts fails to prove any constitutional violation under *Johnson* or *Romano*.   As the state court explained, in *Johnson* the defendant was sentenced to death based in part on a prior felony conviction which was later reversed.  Supp.SHCR 237 (CL 42) (citing *Johnson,* 486 U.S. at 580-82).  Johnson's jury was allowed to consider materially inaccurate evidence and, thus, his sentence was unconstitutionally predicated on "mere caprice" or on "factors that are constitutionally impermissible." *Id.* (quoting *Johnson,* 486 U.S. at 584-85).  Roberts's sentence, on the other hand, was not based on materially inaccurate testimony or information. *Id.* at 237-38 (CL 43-48). *Johnson* is inapplicable under these circumstances. *Hernandez v. Johnson,* 213 F.3d 243, 252-54 (5th Cir. 2000).   In any event, the allegedly inaccurate information "was neither the strongest nor the sole evidence of [Roberts's] future dangerousness." *Hughes v. Quarterman,* 530 F.3d 336, 346 (5th Cir. 2008), *cert. denied,* 129 S. Ct. 2378 (2009). Thus, any error was harmless as a matter of law. *Id.* at 345-46

(applying *Brecht* to claim of error under *Johnson v. Mississippi*). Indeed, because Roberts's claim fails the materiality test of *Giglio,* it is by definition harmless error. *Hernandez,* 213 F.3d at 253.

The state court also reasonably rejected Roberts's claim under *Romano.* Supp.SHCR at 238-39 (CL 49-61). Contrary to Roberts's suggestion, his sentencing trial was not infected with unfairness. Dr. Mears did not perjure himself or otherwise mislead the jury. *Id.* at 238 (CL 54-55). It was Dr. Mears's "education, his ongoing work in the field of psychology, his examination of [Roberts] and his findings [which] were material to the question before the jury, not the wording of his title." *Id.* at 239 (CL 57). Further, in light of the overwhelming evidence of Roberts's violent nature, "the exact wording of one of Dr. Mears'[s] many degrees did not so infect [Roberts]'s trial with unfairness as to be a violation of due process." *Id.* (CL 60); *see also Muniz v. Johnson,* 132 F.3d 214, 224 (5th Cir. 1998) (holding "comments were isolated enough that they did not mislead the jury in its sentencing role or diminish its sense of responsibility in considering the death penalty").

The state court reasonably applied *Giglio, Johnson,* and *Romano* and the facts adduced during trial to Roberts's claim and correctly

denied relief in a manner consistent with Fifth Circuit authority.  This Court should also deny habeas relief as a result.

### IV. Roberts Was Not Denied Constitutionally Effective Counsel when Trial Counsel Failed to Peremptorily Strike Two TDCJ Employees during Voir Dire.

Roberts next argues that he was denied his Sixth Amendment right to effective counsel when trial counsel did not assert peremptory strikes against jurors Raymond Epps and Paul Benfer, who were employed by TDCJ as correctional and transportation officers, respectively.   Petition at 21-24.   Further, Mr. Benfer knew the prosecutor through church and his son's baseball team.  *Id.* at 21-22. However, the state court reasonably concluded that trial counsel was not ineffective when they elected not to strike jurors Epps and Benfer. Consequently, this Court should deny habeas relief.

In order to establish a Sixth Amendment violation under *Strickland v. Washington,* 466 U.S. 668 (1984), Roberts must affirmatively prove that: (1) in light of all the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," i.e., counsel's performance was deficient under "prevailing professional norms;" and (2) the resultant prejudice was "so serious as to deprive [him] of a fair trial, a trial whose result is reliable."  *Bell v. Cone,* 535 U.S. 685, 695 (2002);

*Strickland,* 466 U.S. at 687-88, 690.   The failure to prove either element is fatal to the claim.   *Cone,* 535 U.S. at 695; *Strickland,* 466 U.S. at 697.

Concerning the "deficiency" prong of *Strickland,* the Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight."   466 U.S. at 689-90.   Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance."   *Id.* at 689.   But even if counsel's representation was deficient, Roberts must affirmatively prove prejudice that is "so serious as to deprive [him] of a fair trial, a trial whose result is reliable."   *Id.* at 687.   To meet this requirement, he must show a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different; a "reasonable probability" is one sufficient to undermine confidence in the outcome. *Visciotti,* 537 U.S. at 23; *Strickland,* 466 U.S. at 694.   However, "it is insufficient to show only that the errors had some conceivable effect on the outcome of the proceeding."   *Williams,* 529 U.S. at 394; *Strickland,* 466 U.S. at 693; *see also Busby v. Dretke,* 359 F.3d 708, 717 (5th Cir. 2004) ("the test for federal habeas purposes is *not* whether [the petitioner made the showing required under *Strickland*]" but "whether

the state court's decision—that [the petitioner] did *not* make the *Strickland*-showing—was contrary to, or an unreasonable application of" *Strickland*) (quoting *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir. 2003)) (emphasis in original).

The state court considered this claim and found that there were numerous TDCJ employees in the venire because of the high number of TDCJ units in Polk County and surrounding counties.  Supp.SHCR 239 (FF 64-65).  Mr. Epps had been employed at the Polunsky Unit in Polk County for fifteen months prior to Roberts's voir dire.  *Id.* at 240 (FF 67).  Mr. Benfer had worked for TDCJ for twenty years at the time he was questioned.  *Id.*  However, both jurors testified their employment would not affect their consideration of the case or prevent them from being fair and impartial.  *Id.* at 240-41 (FF 69-70,75).  Moreover, Mr. Benfer testified that his passing acquaintance with the prosecutor would not affect his service on the jury or sway his consideration of the evidence.  *Id.* at 241 (FF 76-78).  Defense counsel did not challenge jurors Epps and Benfer for cause and did not exercise peremptory strikes.  *Id.* (FF 82).  In fact, the state court found, Roberts liked both jurors and wanted them to serve on the jury.  *Id.* at 241-42 (FF 83-84).

These findings are supported by defense counsel's affidavit, which refers to notes taken during voir dire.  With regard to Mr.

Benfer, counsel's notes reflect that Roberts "likes Benfer and wants to keep him as a juror – solely [Roberts]'s choice." Supp.SHCR 167. Counsel's notes concerning Mr. Epps are similar: "[Roberts] likes Epps. Short timer at TDCJ. [Roberts] likes Epps more than Benfer." *Id.* at 171. Roberts offers no clear and convincing evidence to rebut the trial court's fact findings or counsel's affidavit.

Moreover, the state court reasonably concluded that Roberts was not denied effective counsel due to his attorneys' acceptance of jurors Epps and Benfer. Supp.SHCR 245-46, 248 (CL 117-20, 123-25, 139). This is because the record established that both jurors would be impartial, and an "attorney's actions during voir dire are considered to be a matter of trial strategy." *Id.* at 246-48 (CL 126, 130-34, 136); *Teague v. Scott,* 60 F.3d 1167, 1172 (5th Cir. 1995); *see also Torres v. Thaler,* No. 07-20225, 2010 WL 3681021, *5 (5th Cir. 2010) (unpublished) (distinguishing *Virgil v. Dretke,* 446 F.3d 598 (5th Cir. 2006)), because juror never clearly indicated he could not be impartial and because trial counsel had a strategy for not striking juror). But, more importantly, Roberts cannot now complain about trial counsel's acceptance of either juror when it was Roberts himself that urged counsel to accept them. *Schriro v. Landrigan,* 550 U.S. 465, 476-78 (2007); *Sonnier v. Quarterman,* 476 F.3d 349, 362 (5th Cir. 2007);

*Roberts v. Dretke,* 381 F.3d 491, 499-500 (5th Cir. 2004); *Dowthitt v. Johnson,* 230 F.3d 733, 748 (5th Cir. 2000); *Autry v. McKaskle,* 727 F.2d 358, 361 (5th Cir. 1984).   Finally, the state court reasonably decided that Roberts failed to demonstrate prejudice due to the overwhelming evidence against him during both the guilt-innocence and punishment phases of trial.  Supp. SHCR 248 (CL 141).  Thus, the state court's rejection of Roberts's claim is not only supported by the record, it is consistent with federal law.   Habeas relief should be denied.

### V.   Roberts Was Not Denied Constitutionally Effective Counsel when Trial Counsel Did Not Prepare and Present Expert Testimony to Rebut the State's Expert During the Punishment Phase of Trial.

Roberts also claims that he was denied his Sixth Amendment right to effective counsel when his trial attorneys were unable to call expert witnesses Dr. John F. Edens and Dr. Roger Saunders to rebut State's experts Drs. Mears and Quijano during the punishment phase of trial.  Petition at 25-26.  Roberts explains that trial counsel were prevented from presenting these experts because they failed to provide advance notice to the State that they would testify.  *Id.*  But the state court reasonably rejected this claim because the expert testimony in

question was duplicative of Roberts's expert, Dr. Longmire, who did testify.  As a result, this Court should also deny habeas relief.

Once again, in order to obtain relief on a claim of ineffective assistance of counsel, Roberts must show that, in light of all the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms." *Strickland,* 466 U.S. at 688.  Second, even if counsel's representation was deficient, Roberts must also affirmatively prove prejudice that is "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id*. at 687.  To meet this requirement, he must show a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different; a "reasonable probability" is one sufficient to undermine confidence in the outcome. *Id*. at 694.  With respect to errors at the sentencing phase of a death-penalty trial, the relevant inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id*. at 695.

The state court found that the State presented eight witnesses during its punishment case in chief.  Supp.SHCR 242 (FF 86).  Defense counsel then presented testimony from sixteen witnesses, including Dr.

McQueen, who testified about alcohol and cocaine intoxication, and Dr. Longmire, who testified about future dangerousness. *Id.* (FF 85, 87-88). In addition, counsel called Dr. Mosman, who testified at length about the results of a psychological examination he conducted on Roberts. The State then presented five rebuttal witnesses, including Drs. Quijano and Mears, who both testified about Roberts's future dangerousness. *Id.* (FF 86); 29 RR 234; 30 RR 211. Following the State's rebuttal case, on October 26, 2004, counsel sought to call Dr. Edens as a surrebuttal witness. Supp.SHCR 242 (FF 89); 31 RR 187.

However, as defense counsel acknowledged during trial and in his postconviction affidavit, the deadline for designating expert witnesses was September 24, 2004. Supp.SHCR 171-72; 31 RR 188. Counsel did not discover Dr. Edens until he announced publication of a new future dangerousness study on October 16, and was not able to meet with him until October 18. Supp.SHCR 172, 174, 242 (FF 90, 92); 31 RR 188. The trial court did not allow Dr. Edens to testify. Supp.SHCR 242 (FF 91). However, Roberts's prior future-dangerousness expert, Dr. Longmire, testified similarly regarding his own future-dangerousness studies. *Id.* at 243 (FF 94); 28 RR 156-65. Moreover, Dr. Longmire alluded to Dr. Edens's study in his testimony. Supp.SHCR 171. Finally, counsel stated in his affidavit that

> DR. SAUNDERS was a consultant for the Defense team, and was never intended to be an Expert Witness for the Defense.  DR. SAUNDERS advised the Defense team that he would act in an advisory capacity only, but would not testify.

Supp.SHCR 174.  Roberts offers nothing to rebut either trial counsel's affidavit or the state court's findings on this issue.

The state court ultimately concluded that, while Dr. Edens was not timely designated as a rebuttal expert witness, his testimony was not proper rebuttal evidence because it was cumulative in nature.  Supp.SHCR 248-49 (CL 143-45).  This is because Dr. Edens's testimony would have been "improper bolstering of Dr. Longmire's testimony presented during the defense's case in chief."  *Id.* (CL 145).  Thus, counsel were not deficient and Roberts was not prejudiced by their failure to designate Dr. Edens as a rebuttal expert in time for him to testify during punishment.  *Id.* (CL 142, 146-49).  Finally, decisions about the employment and presentation of expert witnesses are matters of trial strategy.  *Yohey v. Collins,* 985 F.2d 222, 227 (5th Cir. 1993); *Smith v. Black,* 904 F.2d 950, 979 (5th Cir. 1990).  The state court's decision is fully supported by the record and is consistent with *Strickland* and circuit precedent.  As a result, relief should be denied.

## VI. Roberts Was Not Denied Constitutionally Effective Counsel when Trial Counsel Did Not Prepare and Present Evidence that Roberts Acted in Self-Defense, as well as Additional Mitigating Evidence.

Roberts argues that counsel were ineffective for not calling witnesses who would have testified that Ms. Bowen was violent, a firearm had been discharged inside her mobile home, and Roberts killed her in self-defense. Petition at 32-34. Roberts also asserts that counsel were ineffective for not utilizing testimony from several mitigation witnesses who would have testified that Roberts was an alcoholic survivor of child abuse who was nevertheless a good father and person who did not suffer from any psychopathology; his father was an alcoholic and his mother suffered from a mental illness; Ms. Bowen's murder was committed while Roberts was intoxicated and during a domestic dispute; and Roberts was remorseful and well-behaved while in custody awaiting trial. *Id.* at 34-36. But the state court reasonably rejected this claim because Roberts himself denied acting in self-defense, there was no evidence of self-defense or that the murder occurred during a domestic confrontation, and the additional mitigation evidence was duplicative of the testimony already presented. As a result, this Court should also deny habeas relief.

In order to obtain relief on a claim of ineffective assistance of counsel, Roberts must prove both deficiency and prejudice. *Strickland,* 466 U.S. at 687-88. But claims concerning uncalled witnesses are not favored on federal habeas review because allegations of how a witness would have testified are largely speculative. *Lockhart v. McCotter,* 782 F.2d 1275, 1282 (5th Cir. 1986). And the decision not to call certain witnesses is a matter of trial strategy, considering all facts and circumstances. *United States v. El-Zoubi,* 993 F.2d 442, 448 (5th Cir. 1993). "[O]ur scrutiny of counsel's performance is highly deferential. We must be particularly wary of 'argument[s] that essentially come[] down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.'" *Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir. 2000) (quoting *Kitchens v. Johnson,* 190 F.3d 698, 703 (5th Cir. 1999)). In order to demonstrate prejudice, Roberts must show not only that the testimony of the witness would have been favorable, but also that the witness would have testified at trial as he asserts. *Alexander v. McCotter,* 775 F.2d 595, 602 (5th Cir. 1985).

### A. Counsel were not ineffective for failing to investigate or present evidence of self-defense.

Initially, the state court found that Roberts gave numerous videotaped statements to investigating officers and never claimed self-defense, that he felt threatened by the victim, or believed her to have a pistol.  Supp.SHCR 243 (FF 98, 100); 23 RR 96-101.  Instead, Roberts claimed that he shot and killed Ms. Bowen because she would not give him any money to purchase cocaine.  Supp.SHCR 243 (FF 98-99).  Roberts counters that these statements were deliberately false because, at the time they were made, he wanted the death penalty.  Petition at 33.  Roberts was certainly obtuse about the truth of his recorded statements during his trial testimony.  23 RR 110, 153, 159-60, 162.  However, Roberts refused to claim that he killed Ms. Bowen in self-defense or that he felt threatened in any way.  Supp.SHCR 243 (FF 95, 97); 23 RR 189-99.  Moreover, the crime-scene evidence did not support a claim of self-defense.  Supp.SHCR 243 (FF 96).

The state court credited trial counsel's affidavit, in which trial counsel stated that Roberts never told him Ms. Bowen threatened him with a .22 pistol at the time of the shooting.  Supp.SHCR 179, 243 (FF 101).  Further, trial counsel's investigation did not reveal that Ms. Bowen was violent or aggressive.  *Id.* at 244 (FF 102).  In order to show

prejudice because counsel failed to call a witness, Roberts must "name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman,* 566 F.3d 527, 538 (5th Cir. 2009).  This heightened standard "is not a matter of formalism," but must be fully complied with before relief can be granted.  *Woodfox v. Cain,* 609 F.3d 774, 808 (5th Cir. 2010).   Roberts submits an investigator's affidavit which states that Charles Jones, Gail Collins, and Brenda Bland all stated that Ms. Bowen was violent, unruly, or mean.  PX D at 1-4; PX D Attachment A at 1-4; PX D Attachment B at 1-5.  But it does not appear that any of these witnesses were available or willing to testify to these matters.  In fact, Ms. Bland testified for the State during trial but did not mention that Ms. Bowen was predisposed to violence.  21 RR 49-70, 72-94.  Counsel did not recall her during punishment.

Consequently, it appears that the evidence—from Roberts and the crime scene—was remarkably consistent concerning the nature of Ms. Bowen's murder from the time of Roberts's arrest until his testimony at trial.  His current claim of self-defense is worthy of skepticism and certainly does not call into question the trial court's

findings or trial counsel's credible statements to the contrary, all of which are supported by the evidence and the record.  The state court ultimately concluded that Roberts was not denied effective assistance of counsel because counsel had no knowledge that Roberts claimed to act in self-defense and, thus, no reason to present self-defense at trial. Supp.SHCR 249 (CL 150-51).  Roberts's "desire to have a specific defense theory presented does not amount to ineffective assistance on federal habeas review."  *Johnson v. Cockrell,* 301 F.3d 234, 239 (5th Cir. 2002) (quoting *Strickland,* 466 U.S. at 689) ("[C]ourts must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance'").  The state court concluded that Roberts could not have been prejudiced by counsel's failure to put on evidence of self-defense because there was no such evidence.  *Id.* at 250 (CL 159).

### B. Counsel were not ineffective for failing to investigate and present cumulative and repetitive mitigating evidence.

Next, the trial court found that defense counsel called numerous mitigation witnesses and that, contrary to Roberts's allegation, his sister Donna Harkins was among them.  Supp.SHCR 244 (FF 104-05); *cf.* Petition at 34.  Further, there was abundant evidence presented of Roberts's alcoholism and drug use, his parents' psychological and

substance-abuse problems, his deprived upbringing, and his positive relationship with his daughter.   Supp.SHCR 244 (FF 107-10). Additionally, none of the witnesses Roberts now identifies had any personal knowledge of his intoxication at the time of the murder or the nature of any "domestic dispute."  They were not present when Roberts killed Ms. Bowen.   *Id.* at 244-45 (FF 112, 114).   Further, Roberts's former employer testified that Roberts was a good employee, numerous Polk County jailers testified that he was well behaved during his pretrial incarceration, and Roberts himself stated to the jury that he was remorseful during his guilt-innocence testimony.  23 RR 78, 95; 27 RR 187-88, 192; 28 RR 205, 210-11, 217, 223, 235.

Again, Roberts must identify uncalled witnesses, show that they were willing and able to testify, and set out the content of that testimony, and show that it would have been favorable.  *Day,* 566 F.3d at 538.  Roberts submits another investigator's affidavit which names eight witnesses who would have been "beneficial" punishment witnesses.  PX E at 1; PX F at 1.  There is no indication whether any of these witnesses were willing and able to testify.  Yet four of them did. *See* 27 RR 9 (Roberts's sister, Ms. Hawkins); *id.* at 88 (Roberts's friend, Mr. DeMary); *id.* at 184 (Roberts's former employer, Mr. Reid); *id.* at 216 (Roberts's niece, Teresa Breaux).   Counsel cannot be deemed

ineffective for calling the only four witnesses that were clearly willing and able to testify favorably about Roberts.

Similarly, the laundry list of mitigating circumstances Roberts claims these uncalled witnesses would have testified to is identical to the mitigating circumstances the called witnesses did testify to. *Cf.* PX F at 2 and Statement of Facts § II.B., *supra.*  Thus, counsel were not ineffective when they declined to put on repetitious mitigation evidence.  Supp.SHCR 250 (CL 162); *Coble v. Quarterman,* 496 F.3d 430, 436 (5th Cir. 2007).  The state court's conclusions with regard to both guilt-innocence and punishment phases of trial are reasonable applications of *Strickland* to the facts of Roberts case, and habeas relief should be denied as a result.

## VII.   Roberts's Due Process Rights Were Not Violated when the Trial Court Required the Defense to Turn Over Its Investigator's Notes to the State during Punishment Phase Cross-Examination.

Roberts further claims that he was denied due process when the trial court ordered him to turn over his mitigation specialist's notes— which contained prior statements by mitigation witnesses—to the State for cross-examination during the punishment phase of trial.  Petition at 38-40.  However, Roberts procedurally defaulted this claim when he failed to make a bill of exception in order to place the surrendered notes

in the record on appeal. *Roberts v. State,* 220 S.W.3d at 527. This procedural ruling is an independent and adequate bar to federal habeas relief. *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977); *Duncan v. Cain,* 278 F.3d 537, 541 (5th Cir. 2002). Roberts makes no attempt to show cause and prejudice to excuse his default; nor does he argue that it would result in a fundamental miscarriage of justice. *Sawyer v. Whitley,* 505 U.S. 333, 350 (1992); *Murray v. Carrier,* 477 U.S. 478, 488 (1986); *Engle v. Isaac,* 456 U.S. 107, 134 (1982). In any event, assuming for the sake of argument the claim was not defaulted, it is without merit. Finally, even if Roberts has demonstrated a constitutional violation, it is harmless error. As a result, habeas relief should be denied.

Roberts contests the state court's default ruling by pointing out that he did object when the trial court ordered his investigator's notes turned over. Petition at 39 (citing 27 RR 72, 104-05). But the trial court made it clear that only direct statements by the witnesses were to be turned over, not the opinions of Roberts's investigator concerning those statements. *Roberts v. State,* 220 S.W.3d at 526-27. Thus, as the state court explained, Roberts defaulted the claim by not including the redacted notes in the record. *Id.* at 527. Without the notes, there is no way of knowing whether something more than mere witness

statements was turned over and, therefore, no way of knowing whether any privileged material was disclosed.  *Id.*

In any event, the Supreme Court has held that due process does not prohibit disclosure of statements made by third parties in a defense investigator's report, where those third parties were available as witnesses to both the prosecution and the defense.  *United States v. Nobles,* 422 U.S. 225, 233-34 (1975).  This is because Roberts did not prepare the report and it did not contain any information that he conveyed to the investigator.  *Id.* at 234.  Where third-party statements were elicited by a defense investigator, they are not protected by the Fifth Amendment because requiring their production "would not in any sense compel respondent to be a witness against himself or extort communications from him."  *Id.*  Thus, "the Fifth Amendment privilege against compulsory self-incrimination . . . does not extend to the testimony or statements of third parties called as witnesses at trial." *Id.*  The procedural default notwithstanding, there is simply no constitutional error, and there is no proof that the trial court's order had a substantial or injurious effect upon Roberts's trial.  *Brecht,* 507 U.S. at 623.  Relief should be denied.

**VIII. Roberts's Eighth Amendment Rights Were Not Violated by the Statutory Jury Instruction Defining Mitigating Evidence as Evidence that Reduces a Defendant's Moral Blameworthiness.**

**IX.  Roberts's Eighth Amendment Rights Were Not Violated when the Trial Court Refused to Submit His Requested Punishment-Phase Jury Instruction Regarding the Definition of Mitigating Evidence under *Tennard v. Dretke*.**

Roberts next claims that his Eighth Amendment rights were violated when the trial court submitted the statutory definition of mitigating evidence to the jury during punishment deliberations and, concomitantly, refused to submit his own definition based on *Tennard v. Dretke*.  Petition at 41-46.  Essentially, Roberts argues that the mitigation special issue is unconstitutional because it limits the jury's consideration of mitigating evidence to evidence reducing his "moral blameworthiness."  The state court reasonably applied clearly established Supreme Court law in rejecting this claim.  *Roberts v. State,* 220 S.W.3d at 534 (citing *Perry v. State,* 158 S.W.3d 438, 449 (Tex. Crim. App. 2004)).  Indeed, as the state court noted in *Perry, Tennard* involved an earlier version of the Texas death penalty statute which did not include a mitigation instruction or special issue.  158 S.W.3d at 449.

The mitigation special issue was enacted following the Supreme

Court's decision in *Penry v. Lynaugh,* 492 U.S. 302 (1989) (*Penry I*).

> The court shall instruct the jury that if the jury returns an
> affirmative finding to each issue submitted under
> Subsection (b), it shall answer the following issue:
>
> Whether, *taking into consideration all of the evidence,*
> *including the circumstances of the offense, the defendant's*
> *character and background, and the personal moral*
> *culpability of the defendant,* there is a sufficient mitigating
> circumstance or circumstances to warrant that a sentence
> of life imprisonment without parole rather than a death
> sentence be imposed.

Tex. Code Crim. Proc. Art. 37.071, § 2(e)(1) (Vernon's 1991) (emphasis

added).   The instruction Roberts complains about appears in Art.

37.071, § 2(f)(4) and states in relevant part that the jury "shall consider

mitigating evidence to be evidence that a juror might regard as

reducing the defendant's moral blameworthiness."

In *Penry I,* the Supreme Court held that a sentencing jury must

be able to consider and give effect to evidence about the defendant's

background and character so that the ultimate sentence reflects a

reasoned *moral* response to the defendant's background, character, and

crime.   492 U.S. at 319 (citing *California v. Brown,* 479 U.S. 538, 545

(1987) (O'Connor, J., concurring)) (emphasis in *Penry I*).   The concept of

blameworthiness comes directly from *Penry I* itself.   *Id.* at 324, 336; *see*

*also Cabana v. Bullock,* 474 U.S. 376, 405 (1986); *Enmund v. Florida,*

458 U.S. 782, 815 (1982).  Indeed, accepting Roberts's reasoning would punish the State of Texas for doing exactly as it was told to do in *Penry I*: allow the jury discretion to consider mitigating circumstances and impose a life sentence if appropriate.

In any event, the jury was specifically instructed to consider "all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant."  Tex. Code Crim. Proc. Art. 37.071, § 2(e)(1).   And "juries are presumed to follow their instructions." *Richardson v. Marsh,* 481 U.S. 200, 211 (1987).  In fact, Roberts's claim has been repeatedly rejected by the Fifth Circuit, both before and after *Tennard* and *Abdul-Kabir v. Quarterman,* 550 U.S. 233 (2007).  *Beazley v. Johnson,* 242 F.3d 248, 260 (5th Cir.2001); *Cantu v. Quarterman,* 341 Fed.Appx. 55, 61 (5th Cir. 2009); *Roach v. Quarterman,* 220 Fed.Appx. 270, 277 (5th Cir. 2007); *Jackson v. Dretke,* 181 Fed.Appx. 400, 413-14 (5th Cir. 2006); *O'Brien v. Dretke,* 156 Fed.Appx. 724, 735-36 (5th Cir. 2005).   And the Supreme Court implicitly approved the Texas mitigation special issue in *Penry v. Johnson,* when the Court noted that

> [a] clearly drafted catchall instruction on mitigating evidence also might have complied with *Penry.* Texas'[s] current capital sentencing scheme (revised after Penry's second trial and sentencing) provides a helpful frame of reference.  . . .  Penry's counsel, while not conceding the

> issue, admitted  that he "would have a tough time saying that *Penry* was not complied with under the new Texas procedure."

532 U.S. 782, 803 (2001) (*Penry II*).  Thus, the state court decision is a reasonable application of Supreme Court precedent and habeas relief should be denied.

Finally, any error was harmless as a matter of law.  Jury-charge errors are ordinarily trial errors subject to harmless-error analysis.  *See Washington v. Recuenco,* 548 U.S. 212, 218-22 (2006) (failure to submit sentencing factor to jury); *Mitchell v. Esparza,* 540 U.S. 12, 16 (2003) (per curiam) (instruction omitted an element of offense); *Neder v. United States,* 527 U.S. 1, 8-9 (1999) (instruction omitted an element of offense); *Calderon v. Coleman,* 525 U.S. 141, 146-47 (1998) (misleading jury instruction); *Clemons v. Mississippi,* 494 U.S. 738, 752-54 (1990) (improper sentencing instruction); *Carella v. California,* 491 U.S. 263, 266 (1989) (erroneous conclusive presumption in jury instruction); *Pope v. Illinois,* 481 U.S. 497, 501-04 (1987) (jury instruction contained wrong constitutional standard); *Rose v. Clark,* 478 U.S. 570, 579-80 (1986) (instruction improperly shifted burden of proof on element of crime).  And error caused by a statute which limits the mitigating circumstances considered by the jury may also be harmless.  *Singletary v. Smith,* 507 U.S. 1048 (1993); *Stringer v. Black,*

503 U.S. 222, 232 (1992); *Hitchcock v. Dugger*, 481 U.S. 393, 395-96 (1987).   The instruction Roberts complains about did not have a substantial or injurious effect on the jury's sentencing verdict.   Relief should be denied for all of the foregoing reasons.

> **X.   Roberts's Eighth Amendment Rights Were Not Violated when the Trial Court Refused to Allow Defense Expert Kathleen McQueen to Testify during Punishment that Roberts's Combined Use of Alcohol and Crack Cocaine Caused Him to Commit Capital Murder.**

Roberts suggests that the trial court violated his Eighth Amendment rights when it prevented Dr. McQueen from testifying that Roberts's use of alcohol and crack cocaine caused him to murder Ms. Bowen.   Petition at 47-52.   But Roberts procedurally defaulted this claim when he failed to adequately brief it on direct appeal.   *Roberts v. State*, 220 S.W.3d at 528 & n.17 (citing Tex. R. App. P. 38.1(h)).   This procedural disposition is an independent and adequate bar to federal habeas relief.   *Sykes*, 433 U.S. at 87; *Duncan*, 278 F.3d at 541.   Roberts does not show cause and prejudice or a fundamental miscarriage of justice, much less acknowledge his default.   *Sawyer*, 505 U.S. at 350; *Murray*, 477 U.S. at 488; *Isaac*, 456 U.S. at 134.   Nevertheless, the CCA reasonably rejected the claim on its merits in the alternative and any error was harmless.   As a result, habeas relief should be denied.

The CCA found that the testimony was properly excluded because Roberts failed to establish its reliability under state law. *Roberts v. State,* 220 S.W.3d at 528-30 (citing Tex. R. Evid. 702 and *Kelly v. State,* 824 S.W.2d 568 (Tex.Crim.App. 1992). Roberts does not quibble with this conclusion. Rather, he argues that Dr. McQueen's proffered testimony was relevant mitigating evidence under *Tennard* and was excluded in violation of *Lockett v. Ohio,* 438 U.S. 586 (1978) (plurality opinion), and *Eddings v. Oklahoma,* 455 U.S. 104 (1982). Petition at 51. However, it is important to distinguish what Dr. McQueen was allowed to testify about—and what other witnesses also told the jury—from her opinion that Roberts's drug addiction *caused* the murder of Ms. Bowen.

It is well settled that a capital-sentencing jury may not be precluded from considering, as a mitigating factor, the character of the offender and the circumstances of the offense. *Eddings,* 455 U.S. at 111-12. However, Dr. McQueen's opinion that cocaine and alcohol addiction caused Roberts to murder Ms. Bowen is not mitigating evidence concerning his character or the circumstances of the crime. As the Supreme Court recently recognized, *Lockett* and *Eddings* each involved traditional mitigating evidence: "evidence that tended to show *how,* not *whether,* the defendant committed the crime." *Oregon v.*

*Guzek,* 546 U.S. 517, 524 (2006) (emphasis in original).  In *Lockett,* the

defendant sought to introduce mitigating evidence of rehabilitation: he

suffered from drug addiction and was receiving treatment, but the Ohio

statute precluded its consideration. 438 U.S. at 594.   Similarly, in

*Eddings,* the trial court refused to consider the defendant's unhappy

and abusive childhood and his severe emotional disturbance.  455 U.S.

at 116.

> In this case, the jury heard Dr. McQueen testify that Roberts
>
> suffered from cocaine dependence and alcohol dependence
> (both in remission due to his incarceration).  She explained
> that the presence of both alcohol and cocaine in the body
> would cause the liver to metabolize these substances into a
> new substance called cocaethylene, which would cause the
> effects of cocaine to last longer.  She also explained that
> studies showed that chronic abuse of alcohol would enable
> more cocaine to cross the blood/brain barrier, creating even
> greater effects on the substance abuser's mental state. She
> further testified that studies showed "a statistically
> significant increase in the level of violent activity" in a
> group of people who were dependent on both cocaine and
> alcohol than groups who were dependent on only one of the
> substances.  She later clarified, "There is a very strong
> connection between substance use and dependence and
> violent acts and, in particular, between dependence on both
> alcohol and cocaine and violent acts."

*Roberts v. State,* 220 S.W.3d at 529.   Roberts's other expert, Dr.

Mosman, also testified that Roberts was addicted to these substances,

and the jury heard testimony from multiple witnesses that Roberts's

father and other siblings had similar substance abuse problems.  The

only testimony the court prohibited was related to an *element* of capital murder: whether Roberts intended to murder Ms. Bowen or was merely compelled to do so by his drug abuse and addiction.

The Fifth Circuit rejected a similar claim recently in *Holland v. Anderson,* 583 F.3d 267 (5th Cir. 2009), *cert. denied,* 130 S. Ct. 2100 (2010). The court of appeals held that the exclusion of expert testimony concerning an element of the crime did not violate the Eighth Amendment because it was relevant to whether—not how—the defendant committed the crime, and "the parties previously litigated the issue to which the evidence is relevant." *Id.* at 278 (citing *Guzek,* 546 U.S. at 528 (Scalia, J., concurring)). Thus, the inmate "does not have the right to present evidence at resentencing that is inconsistent with the verdict of the guilt-phase jury." *Id.* at 280. And at a minimum, the state court's refusal to find constitutional error was not an unreasonable application of *Lockett* and *Eddings* in light of *Guzek*. *Id.*

Roberts did not have an Eighth Amendment right to relitigate the issue of intent by presenting expert testimony that his murder of Ms. Bowen was caused by his drug addiction. He was generously allowed to present evidence of his drug addiction, the effect of drug use on his body and mind, and expert opinion that cocaine and alcohol use

and dependence and violent acts are strongly connected.  His jury could have easily inferred the rest.  Nevertheless, the state court's decision that the Eighth Amendment was not violated was not unreasonable as explained in *Holland*.  Further, given the amount of evidence before the jury concerning Roberts's drug problems, there is also no proof that the trial court's action had a substantial or injurious effect upon Roberts's sentencing proceeding.  *Brecht,* 507 U.S. at 623.  Habeas relief should be denied for this procedurally defaulted and meritless claim.

**XI.  Roberts Was Not Denied Constitutionally Effective Assistance of Counsel when Trial Counsel Failed to Object to Testimony from the Victim of an Extraneous Offense.**

**XII.  Roberts Was Not Denied Due Process when the Trial Court Allowed the Same Testimony.  Moreover, this Claim Is Unexhausted and Procedurally Defaulted.**

Roberts argues that his Sixth Amendment right to effective counsel was violated when trial counsel did not object to Elizabeth Thomas's punishment-phase testimony that she was frightened when Roberts robbed her at knifepoint and that the robbery continued to haunt her.  Petition at 53-56.  He also alleges that his due process rights were violated by the same testimony.  *Id.*  Roberts characterizes this testimony as "victim impact" evidence.  *Id.*  However, Ms. Thomas's description of Roberts's prior criminal act and its emotional

impact on her is not victim impact evidence and does not implicate due process. Moreover, any error is harmless. As a result, counsel was not ineffective when he chose not to lodge a futile objection against properly admitted testimony which did not have a substantial impact on the jury's verdict. Nor was Roberts prejudiced by Ms. Thomas's testimony because of the abundant additional evidence regarding Roberts's violent disposition. Roberts's claims for relief should be denied.

On direct appeal, Roberts raised the same ineffective-assistance-of-counsel claim. Appellant's Brief at 55-59. The CCA rejected it, explaining that

> "Victim impact" evidence is evidence of the effect of an offense on people *other* than the victim.[6] The evidence presented here was evidence of the effect of a different offense on *the victim* (of the extraneous offense), and thus is distinguishable from the situation presented in *Cantu* [*v. State,* 939 S.W.2d 627, 637 (Tex. Crim. App. 1997)]. The evidence was admissible. But even if it weren't, counsel was not ineffective for failing to lodge an objection based upon a case that is clearly distinguishable from the present case.

---

[6]     *Garcia v. State,* 126 S.W.3d 921, 929 (Tex. Crim. App. 2004) (medical records of injured bystander admissible over "victim impact" objection); *Guevara v. State,* 97 S.W.3d 579, 583 (Tex. Crim. App. 2003) (discussing meaning of "victim impact" testimony); *Mathis v. State,* 67 S.W.3d 918, 928 (Tex. Crim. App. 2002) (testimony not "victim impact" evidence because not about effect on third person or about victim's character). *See also Payne v. Tennessee,* 501 U.S. 808, 817 [] (1991).

*Roberts,* 220 S.W.3d at 531 (emphasis in original, footnote omitted). Roberts did not raise a due process claim with regard to Ms. Thomas's testimony.

Initially, Roberts's due process claim is unexhausted and procedurally defaulted.  Federal habeas corpus relief is not available unless "the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1).  Roberts did not present this argument during direct appeal or state habeas proceedings.  As a result, Roberts's due process claim is procedurally defaulted in this Court because, if raised in a subsequent state habeas application, it would be dismissed as an abuse of the writ.  *Keeney v. Tamayo-Reyes,* 504 U.S. 1, 9-10 (1992); *Martinez v. Johnson,* 255 F.3d 229, 239 (5th Cir. 2001); *see* Tex. Code Crim. Proc. art. 11.071, § 5 (barring subsequent state habeas applications absent a showing of cause or actual innocence) (Vernon's 2009).  Moreover, Roberts fails to show cause for his default, resultant prejudice, or a fundamental miscarriage of justice that might excuse his default.  *Coleman v. Thompson,* 501 U.S. 722, 749-50 (1991); *Martinez,* 255 F.3d at 239.  As demonstrated below, counsel was not constitutionally ineffective and his failure to object to the testimony in question cannot constitute cause and prejudice for Roberts's default of his due process claim.

As the state court reasonably concluded, Ms. Thomas's testimony was not victim impact testimony because it is not "evidence of the effect of an offense on people *other* than the victim." *Roberts v. State,* 220 S.W.3d at 531 (emphasis in original, footnote omitted).  Ms. Thomas's testimony about the effect of Roberts's robbery of her at knifepoint was "evidence of the effect of a different offense on *the victim* (of the extraneous offense)."  *Id.*  This is precisely the same distinction drawn by the Supreme Court in *Payne*: victim impact testimony is "evidence relating to . . . the emotional impact of the crimes *on the victim's family,*" not the surviving victim herself.  501 U.S. at 817 (emphasis added).  For example, in *Payne,* the prosecution presented testimony from the mother and grandmother of two murder victims concerning how her three-year-old grandson had been emotionally affected by the murders of his mother and sister.  *Id.* at 814-15.  Similarly, in *Booth v. Maryland,* a victim impact statement was submitted from a murdered elderly couple's son, daughter, son-in-law, and granddaughter, including "the emotional and personal problems the family members have faced as a result of the crimes."  482 U.S. 496, 498-99 (1987), *overruled by Payne,* 501 U.S. at 830.

Neither case involved testimony or statements from the crime victim concerning the crime itself and any resulting emotional impact.

Such evidence is not victim impact; it merely provides context for the extraneous offense.  *See Mathis,* 67 S.W.3d at 929 (distinguishing victim impact evidence, "which concerns the emotional consequences upon the crime victim's relatives" from "evidence which concerns the physical or psychological consequences of the defendant's conduct upon a crime victim himself") (Cochran, J., concurring); *see also Mays v. State,* 318 S.W.3d 368, 393 (Tex. Crim. App. 2010) (explaining that testimony about one's own injuries and losses was admissible as same-transaction testimony, and could not be categorized as victim impact testimony).  It certainly does not implicate the Eighth Amendment concerns of *Payne.  See* 501 U.S. at 840-41 (Souter, J., concurring) ("[T]he usual standards of trial relevance afford factfinders enough information about surrounding circumstances to let them make sense of the narrowly material facts of the crime itself.  No one claims that jurors in a capital case should be deprived of such common contextual evidence").  Indeed, the Supreme Court of South Carolina recently reached the same conclusion.  In *State v. Bennett,* that court held that evidence of the psychological impact of an extraneous aggravated assault on the victim—evidenced by a disturbing dream described by the victim—was not victim impact evidence.  632 S.E.2d 281, 286-87 (2006).

Nevertheless, "[v]ictim impact evidence is constitutionally acceptable so long as it is not 'so unduly prejudicial that it renders the trial fundamentally unfair.'" *Wiley v. Puckett,* 969 F.2d 86, 105 (5th Cir. 1992) (citing *Payne,* 501 U.S. at 2608); *Black v. Collins,* 962 F.2d 394, 408 (5th Cir. 1992).   The fact that Ms. Thomas's robbery experience at knifepoint frightened her and made her think twice about working late hours at a convenience store is certainly not surprising nor is it unduly prejudicial.  Thus, even assuming that the testimony is victim impact evidence, it is admissible and any objection would have been futile.  And trial counsel is not deficient for failing to lodge a futile objection to admissible evidence.  *Clark v. Collins,* 194 F.3d 959, 966 (5th Cir. 1994).

Finally, any error was harmless and could not have prejudiced the outcome of Roberts's sentencing trial.  The familiar harmless-error standard contained in *Brecht* is whether the testimony "had a substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 623.  Harmlessness depends on "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of testimony corroborating or contradicting the witness on material points . . . and, of course, the overall strength of the prosecution's case." *Delaware v.*

*Van Arsdall,* 475 U.S. 673, 684 (1986).   But Ms. Thomas's testimony was not a crucial part of the State's case on punishment.   The jury received evidence that Roberts murdered another man with a shotgun in Louisiana twelve years earlier, perpetrated several violent assaults, repeatedly threatened others with violence or death, and routinely violated his parole.   25 RR 41, 94-95; 26 RR 84-85, 88, 117-18; 34 RR at SX 118.   The jury also heard Drs. Walter Quijano and Gary Mears, the State's psychologist and neuropsychologist, testify that Roberts was antisocial.   29 RR 240, 250-51; 30 RR 256-58.   Further, Ms. Thomas's description of the robbery was corroborated by a Louisiana law enforcement official.   26 RR 56-61.   Clearly, the State's evidence of Roberts's violent nature was overwhelming, and there is no probability Ms. Thomas's brief statements regarding her emotional reactions affected the jury's verdict whatsoever.   Consequently, habeas relief should be denied.

### XIII. Roberts Was Not Denied Constitutionally Effective Counsel when Trial Counsel Failed to Object to the State's Cross-Examination of Defense Witness John Escobedo Concerning the Possibility that Roberts's Parole Eligibility Could Be Altered by the Legislature at a Future Date.

Roberts claims that he was denied his Sixth Amendment right to effective counsel because the State cross-examined a defense witness

about the possibility Roberts would not serve forty years if sentenced to life and his trial attorney failed to object.  Petition at 57-63.  To the extent Roberts's claim is read as a freestanding due process claim, it is unexhausted and procedurally defaulted because it was not raised on direct appeal or during state habeas proceedings.   28 U.S.C. § 2254(b)(1); *Martinez,* 255 F.3d at 239.  Moreover, Roberts fails to show cause and prejudice for his default because, as demonstrated below, the state court reasonably concluded counsel was not constitutionally ineffective when he declined to object to the State's cross-examination of Mr. Escobedo.  As a result, habeas relief should be denied.

Roberts raised his ineffective assistance claim on direct appeal and the CCA rejected it.

> We decline to find counsel ineffective on this basis on the record before us.  As we have done many times before, we point out that the record on direct appeal is usually inadequate to address ineffective assistance claims.[7] Before granting relief on a claim that defense counsel failed to do something, we ordinarily require that counsel be afforded the opportunity to outline the reasons for the omission.[8]  To warrant reversal without affording counsel such an opportunity, the challenged conduct must be "so outrageous that no competent attorney would have engaged in it."[9]  In *Ripkowski v. State,* we held that defense counsel opened the door to testimony concerning possible changes in parole law by: "(1) eliciting testimony that parole laws

---

[7]   *Goodspeed v. State,* 187 S.W.3d 390, 392 (Tex.Crim.App. 2005).

[8]   *Id.*

[9]   *Id.*

had become tougher on inmates throughout the years, (2) eliciting testimony concerning the procedures of the Parole Board and the factors taken into account in determining whether to release someone, and (3) arguing that [the defendant] would never be released on parole."[10]  At least the second *Ripkowski* factor was present in this case when Escobedo testified about the procedures followed by the parole board and some of the factors taken into account when determining whether to grant parole.  And, arguably, Escobedo's testimony went further when he indicated that the parole board could not reduce the forty-year sentence.  Counsel could have reasonably believed that the direct examination testimony opened the door to the cross-examination of which [Roberts] now complains, and counsel could have reasonably believed that the initial direct examination testimony, even after the State's cross, was to his client's benefit.  Point of error fourteen is overruled.

*Roberts v. State,* 220 S.W.3d at 533-34.

The CCA's decision is supported by the record.[11]  Mr. Escobedo did testify extensively about Board of Pardons and Paroles procedures; in fact, he was parole board member for nine years.  28 RR 20-28, 39.

---

[10]  61 S.W.3d 378, 394 (Tex.Crim.App. 2001).

[11]  It should be noted that Roberts is prohibited from impeaching this decision by 28 U.S.C. § 2254(e)(2).  As the state court noted, Roberts presented this claim on direct appeal and, thus, there is no evidence in the record concerning counsel's strategy.  *Roberts v. State,* 220 S.W.3d at 533.  However, Roberts did not raise the claim in his state habeas application, where counsel could have addressed it in his affidavit, as he did the *Strickland* claims discussed *supra.*  This is a textbook failure to develop the factual basis of his claim under § 2254(e)(2).  Further development of the claim is now barred because the factual predicate of Roberts's claim was previously discoverable if he had diligently pursued the claim during state habeas proceedings.  *Pierce v. Thaler,* 355 Fed.Appx. 784, 792-94 (5th Cir. 2009).  Moreover, Roberts cannot demonstrate that these facts would show that no reasonable jury would have convicted him but for the prosecutor's cross-examination of Mr. Escobedo.  28 U.S.C. § 2254(e)(2)(B).  Mr. Escobedo testified in the punishment phase of trial.

Mr. Escobedo also specifically testified that Roberts would have to serve forty calendar years under current law before he would be eligible for parole. *Id.* at 23. He explained that the forty-year rule had been in effect for only a few years and that no one sentenced under it had yet become eligible for parole. *Id.* at 24. Therefore, he could only speculate about the review process that might occur in 2044, when Roberts would become parole eligible if sentenced to life. *Id.* at 25-27. But he clearly stated the Board could *not* reduce that forty-year sentence in any way. *Id.* at 27. The State merely clarified, on cross-examination, that the Legislature could reduce it, at any time in the next forty years, and that the forty-year rule itself had fluctuated throughout the years. *Id.* at 44-47.

As discussed *supra,* Roberts must prove both deficiency and prejudice in order to prevail on a claim of ineffective assistance of counsel. *Strickland,* 466 U.S. at 687-88. Initially, trial counsel is not deficient for failing to lodge a futile objection. *Clark,* 194 F.3d at 966. Here, where defense counsel invited the complained of cross-examination by eliciting testimony that the parole board lacked any power to change parole laws, it would have been futile to object to the State's clarifying questions, which were appropriate under state law. It

certainly was not deficient performance.  *Ries v. Quarterman,* 522 F.3d

517, 530-31 (5th Cir. 2008).

Nor was Roberts prejudiced.   The information provided by the

witness on both direct and cross-examination was accurate.   The jury

was properly instructed by the court prior to its deliberations.

> Under the law applicable in this case, if the Defendant is
> sentenced to imprisonment in the institutional division of
> the Texas Department of Criminal Justice for life, the
> Defendant will become eligible for release on parole, but
> not until the actual time served by the Defendant equals 40
> years, without consideration of any good conduct time.  It
> cannot accurately be predicted how the parole laws might
> be applied to this Defendant if the Defendant is sentenced
> to a term of imprisonment for life because the application of
> those laws will depend on decisions made by prison and
> parole authorities, but eligibility for parole does not
> guarantee that parole will be granted.

2 CR 125; *cf.* Tex. Code Crim. Proc. Art. 37.071, § 2(e)(2)(B) (Vernon's

2003).

In *Moore v. Cockrell,* the Fifth Circuit held that counsel's failure

to object to a prosecutor's improper comment—that the defendant

might receive parole "somewhere far down the road"—was not

prejudicial where the jury later was instructed not to consider parole

eligibility.   54 Fed.Appx. 591, *3 (2002) (citing *Sawyer v. Butler,* 848

F.2d 582, 590-91 (5th Cir. 1988)).  This is because juries are presumed

to follow their instructions.  *Id.* at n.7 (citing *Zafiro v. United States,*

- 62 -

506 U.S. 534, 540 (1993)).  In this case, the trial court did not merely instruct the jury not to consider parole, it provided detailed instructions on the operation of parole law–what was a certainty and what was speculation.   Neither the witness's testimony nor the prosecutor's cross-examination contradicted that instruction. Consequently, there is no reasonable probability the outcome of the punishment phase would have been different had defense counsel objected.  The state court's rejection of this claim was reasonable and this Court should deny habeas relief.

### XIV. Roberts's Eighth Amendment Rights Were Not Violated when the Trial Court Refused to Allow Execution Impact Testimony Regarding How a Death Sentence Would Affect Roberts's Family Members.

Roberts contends that the trial court's exclusion of his niece's testimony—concerning the effect Roberts's death sentence would have on her—violates the Eighth Amendment.  Petition at 64-71.  Roberts claims that such testimony is relevant mitigating evidence as defined by *Tennard v. Dretke,* and because victim impact testimony is allowed, it is unreasonable for the state court not to extend *Payne* to execution impact testimony.  *Id.* at 69-71.  However, execution impact testimony is not constitutionally relevant mitigating evidence, and there is no Eighth Amendment requirement that a jury be allowed to consider it.

Thus, the state court did not act unreasonably when it refused to allow it into evidence.  Finally, any error is harmless and habeas relief should be denied.

As an initial matter, Roberts's claim is procedurally defaulted. Roberts raised this complaint on direct appeal, Appellant's Brief at 59-73, and it was dismissed because of Roberts's failure to comply with a reasonable rule of state procedure: "[t]o preserve error regarding the exclusion of evidence, the offering party must make an 'offer of proof' conveying the substance of the proffered evidence.[12]  Because [Roberts] failed to do so, he failed to preserve error." *Roberts v. State,* 220 S.W.3d at 532.   Federal courts are barred from reviewing questions of constitutional law where, as here, the last state court considering the claim expressly relies on a state ground for denying relief, and that ground is both independent of the merits of the federal claim and an adequate basis for the court's decision.  *Finley v. Johnson,* 243 F.3d 215, 218 (5th Cir. 2001) (citing *Coleman,* 501 U.S. at 729-30, and *Sykes,* 433 U.S. at 81, 87).   Moreover, Roberts fails to show cause for his default, resultant prejudice, or a fundamental miscarriage of justice that might excuse his default.  *Coleman,* 501 U.S. at 749-50; *Martinez,* 255 F.3d at 239.

---

[12]    Tex.R. Evid. 103(a)(2).

The state court alternatively rejected Roberts's claim on its merits. *Roberts v. State,* 220 S.W.3d at 532 (citing *Jackson v. State,* 33 S.W.3d 828, 834 (Tex. Crim. App. 2000)).   This decision does not undermine the adequacy of the state court's express procedural ruling or its independence from federal law.   *Coleman,* 501 U.S. at 733; *Caldwell v. Mississippi,* 472 U.S. 320, 327 (1985); *Michigan v. Long,* 463 U.S. 1032, 1041 (1983).   Indeed, the Supreme Court has specifically explained that a state court's holding that a claim is "not preserved for appeal" satisfies the *Long* plain-statement rule even where the court notes that, "[i]n any event, [the] claims here have no merit."   *Sochor v. Florida,* 504 U.S. 527, 534 (1992).   This is because

> [t]he quoted passage indicates with requisite clarity that the rejection of Sochor's claim was based on the alternative state ground that the claim was "not preserved for appeal," and Sochor has said nothing in this Court to persuade us that this state ground is either not adequate or not independent.   Hence, we hold ourselves to be without authority to address Sochor's claim based on the jury instruction about the heinousness factor.

*Id.*   The state court's holding in this case, i.e., Roberts "failed to preserve error" under a state evidentiary rule, is likewise a clear, express, independent, and adequate state-law basis for the court's decision.   Thus, notwithstanding any alternative decision on the merits,

this Court should deny habeas review based on Roberts's procedural default.

In any event, it is well settled that a capital-sentencing jury may not be precluded as a matter of law from considering, as a mitigating factor, the character and record of the individual offender, as well as the circumstances of the particular offense. *Eddings,* 455 U.S. at 111-12. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry I,* 492 U.S. at 319 (quoting *California v. Brown,* 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).   However, as the state court has explained, execution impact testimony is not "evidence concerning [Roberts's] background, character, or record, or the circumstances surrounding the offense." *Fuller v. State,* 827 S.W.2d 919, 936 (Tex. Crim. App. 1992); *see also Jackson v. Dretke,* 450 F.3d 614, 618 (5th Cir. 2006) ("Evidence of impact on friends and family does not reflect on Jackson's background or character or the circumstances of his crime."); *Jackson v. State,* 33 S.W.3d 828, 834 (Tex. Crim. App. 2000).   Rather, evidence about the

impact Roberts's execution would have on others is *evidence about others.*

As such, it does not "tend[] logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value," and is not constitutionally relevant. *Tennard,* 542 U.S. at 285 (quoting *McKoy v. North Carolina,* 494 U.S. 433, 440-441 (1990)); *see also Jackson,* 450 F.3d at 618 (execution impact evidence "is not relevant either to the degree of harm Jackson's crime caused or to Jackson's moral culpability for the crime"). The exclusion of similarly irrelevant "extraneous emotional factors" like sympathy does not violate the Eighth Amendment; in fact, "it fosters the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Brown,* 479 U.S. at 542-43 (quoting *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976)); *see also Saffle v. Parks,* 494 U.S. 484, 493-94 (1990) (Eighth Amendment requirement that "capital sentencing must be reliable, accurate, and nonarbitrary" prohibits consideration of "emotional responses that are not rooted in the aggravating and mitigating evidence").[13]

---

[13]   In fact, every court except one that has considered this issue has determined that testimony regarding the impact the execution would have on family or friends is inadmissible. *Williams v. State,* 168 S.W.3d 433, 445 (Mo. 2005) (citing *Commonwealth v. Harris,* 817 A.2d 1033, 1054 (Pa. 2002);

Roberts suggests that it is unfair to exclude execution impact testimony where the State has already introduced victim impact testimony.  Petition at 69-71.  But this contention is not well taken because *Payne*—which allows the introduction of victim impact evidence—was designed to *even* the scales, not tip them in the prosecution's favor.  In *Payne,* the Supreme Court recognized that "while virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances, the State is barred from either offering a quick glimpse of the life which a defendant chose to extinguish or demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide."  501 U.S. at 822.  Thus, "for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant."  *Id.* at 825.  This is because "'[t]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer

---

*Burns v. State,* 699 So.2d 646, 654 (Fla. 1997); *State v. Stenson,* 940 P.2d 1239, 1282 (Wash. 1997); and *People v. Sanders,* 905 P.2d 420, 459 (Cal. 1995); *but see State v. Stevens,* 879 P.2d 162, 167 (Or. 1994) (holding, based upon a state statute, that the defendant's wife could testify as to whether it would be better for her and her daughter if the defendant was executed or spent his life in prison)).

that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.'" *Id.* (quoting *Booth,* 482 U.S. at 517 (White, J., dissenting)).  As a result, it is clear that *Payne* actually *remedied* an inequity in capital murder trials; it did not create one.  *See Burns,* 699 So.2d at 654 (due process does not require the introduction of execution impact testimony "because the State introduced victim impact evidence," and there is no "merit in this kind of quid pro quo assertion").

Nonetheless, any error is harmless.  *Brecht,* 507 U.S. at 623.  As explained above, the State presented abundant evidence of Roberts's deathworthiness and Roberts introduced a great deal of mitigating evidence.  The opinion of Roberts's niece concerning the impact his execution would have on her would not have substantially affected the jury's verdict.  *See Lugo v. State,* 845 So.2d 74, 115 (Fla. 2003) (noting execution impact evidence carries little weight).  Consequently, habeas relief should be denied.

**XV.**   **Roberts's Sixth Amendment Rights under** *Apprendi v.* *New Jersey* **Were Not Violated Because His Future Dangerousness and/or Deathworthiness Were Not Presented to a Grand Jury and Alleged in the Indictment.**

**XVI.**   **Roberts's Sixth Amendment Rights under** *Apprendi v.* *New Jersey* **Were Not Violated Because the State Was Not Required to Prove a Negative Answer to the Mitigation Special Issue beyond a Reasonable Doubt.**

**XVII.** **Roberts's Sixth Amendment Rights under** *Apprendi v.* *New Jersey* **Were Not Violated Because the State Was Not Required to Prove beyond a Reasonable Doubt any Extraneous Offense Evidence or the Victim Impact Evidence It Offered to Rebut His Mitigating Evidence.**

Roberts further claims that his Sixth Amendment rights were violated when the trial court failed to preclude the death penalty as a punishment because the "facts that make his case death-worthy" were not alleged in the indictment and submitted to the grand jury. Petition at 72-73. He also argues that the Sixth Amendment was violated because (1) the State failed to prove that the answer to the mitigation special issue was "no" beyond a reasonable doubt; and (2) the State did not prove its own "anti-mitigation" evidence, i.e., extraneous offense and victim impact evidence, beyond a reasonable doubt. *Id.* at 74-76. However, Roberts is not entitled to habeas relief for these claims because the state court reasonably applied *Apprendi* to his claims and

any contrary holding would violate the non-retroactivity rule of *Teague v. Lane,* 489 U.S. 288 (1989).

The CCA considered and dismissed Roberts's claims on direct appeal. *Roberts v. State,* 220 S.W.3d at 534-35 (citing *Rayford v. State,* 125 S.W.3d 521, 533 (Tex. Crim. App. 2003); and *Prystash v. State,* 3 S.W.3d 522, 535 (Tex. Crim. App. 1999)). As the CCA explained in *Rayford,*

> *Apprendi* applies to facts that increase the penalty beyond the "prescribed statutory maximum." Under Article 37.071, the statutory maximum is fixed at death. There are no statutory enhancements. A positive jury finding on the mitigation issue does not have the potential of increasing the penalty; rather, it has the potential to reduce a defendant's sentence.
>
> *Apprendi* does not compel the State to allege the special issues under Article 37.071 in the indictment. Point of error sixteen is overruled.

125 S.W.3d at 534 (citing *Resendiz v. State,* 112 S.W.3d 541, 550 (Tex. Crim. App. 2003). "Further, with respect to [Roberts]'s claim the State should bear the burden of proof as to mitigation, *Apprendi* does not address this burden." *Resendiz,* 112 S.W.3d at 550.

The Fifth Circuit has recognized that these are reasonable applications of *Apprendi. See Anderson v. Quarterman,* 204 Fed.Appx. 402, 409 (5th Cir. 2006) (rejecting claim that special issues must be alleged in indictment); *Woodard v. Thaler,* 702 F.Supp.2d 738, 782

(S.D. Tex. 2010) (same); *Granados v. Quarterman,* 455 F.3d 529, 536-37 (5th Cir. 2006) (rejecting claim that absence of mitigation must be proved beyond reasonable doubt); *Oliver v. Quarterman,* 254 Fed.Appx 381, 385-86 (5th Cir. 2007) (same); *Kunkle v. Dretke,* 352 F.3d 980, 986 (5th Cir. 2003) (rejecting claim that anti-mitigation evidence must be proved beyond reasonable doubt).

Moreover, extending *Apprendi* to cover Roberts's arguments would violate the non-retroactivity rule of *Teague v. Lane.   Rowell v. Dretke,* 398 F.3d 370, 377-78 (5th Cir. 2005); *Kunkle,* 352 F.3d at 986; *Harris v. Johnson,* 81 F.3d 535, 542 (5th Cir. 1996).   Under *Teague,* new rules of constitutional criminal procedure will not be announced during postconviction proceedings and then be given retroactive effect unless an exception applies.   489 U.S. at 310.   The first exception to *Teague*'s retroactivity limitation is for rules of substantive law that alter the type of conduct or class of persons who may be punished under the law.   *Schriro v. Summerlin,* 542 U.S. 348, 352-53 (2004); *Graham v. Collins,* 506 U.S. 461, 477 (1993).   Roberts's proposed rules are not substantive ones.   *Summerlin,* 542 U.S. at 353-54.   The second *Teague* exception is reserved for bedrock rules of criminal procedure that are necessary to ensure a fundamentally fair trial.   *Graham,* 506 U.S. at 478.   With regard to this exception, the *Summerlin* Court also rejected

*Apprendi* as a watershed procedural rule.  542 U.S. at 355-58.  As the Court explained in *Beard v. Banks,* "it should come as no surprise that we have yet to find a new rule that falls under the second *Teague* exception."  542 U.S. 406, 417 (2004). Thus, the allegations are *Teague*-barred and habeas relief should be denied.

### XVIII.   Roberts's Due Process Rights Were Not Violated when the Trial Court Refused His Request to Present the Final Argument at Punishment Regarding the Mitigation Special Issue.

Roberts contends that he should have been allowed to present the final argument at punishment because he bears the burden of persuasion on the mitigation special issue.  Petition at 77.  He presents no authority other than to suggest that "death is different."  *Id.*  The state court reasonably rejected this claim and, thus, Roberts is not entitled to habeas relief in this Court.  Further, any contrary holding would violate the non-retroactivity rule of *Teague v. Lane.*  And finally, any error in this regard was harmless.

The CCA rejected this claim on direct appeal.  *Roberts v. State,* 220 S.W.3d at 535 (citing *Masterson v. State,* 155 S.W.3d 167, 174-75 (Tex. Crim. App. 2005)).   In *Masterson,* the CCA held that Tex. Code Crim. Proc. Art. 36.07 controls the issue by providing that "[t]he order of argument may be regulated by the presiding judge; but the State's

counsel shall have the right to make the concluding address to the jury." 155 S.W.3d at 174-75 (citing *Norris v. State,* 902 S.W.2d 428, 442 (Tex. Crim. App. 1995), and *Martinez v. State,* 501 S.W.2d 130, 131-32 (Tex. Crim. App. 1973)). The mitigation special issue imposes a burden of proof on neither party; thus, nothing about it deprives the defendant of any constitutional right in conjunction with Article 36.07. *Id.* at 175 (citing *Escamilla v. State,* 143 S.W.3d 814, 828 (Tex. Crim. App. 2004)).

The Fifth Circuit has rejected the argument that Texas's mitigation special issue somehow shifts the burden of proof to the defendant. *Hughes v. Johnson,* 191 F.3d 607, 625-26 (5th Cir. 1999). Therefore, the state court had no reason to deviate from Article 36.07 and permit Roberts to argue last. Finally, because no court has held a defendant has the burden of proof on mitigation, any due process right to the final argument during punishment, or that Article 36.07 is unconstitutional, Roberts's allegation is barred under *Teague v. Lane.* Roberts's proposed rule is neither substantive nor is it a bedrock rule of criminal procedure that is necessary to ensure a fundamentally fair trial. As a result, no exception to *Teague* applies. Because the state court's decision was a reasonable application of due process, Roberts is not entitled to habeas relief in this Court. And even assuming that the state court unreasonably denied relief and Roberts can meet an

exception to *Teague,* any error was harmless because the trial court's decision did not have a substantial or injurious effect upon Roberts's trial. *Brecht,* 507 U.S. at 623.

### XIX. Roberts's Due Process Rights under *Caldwell v. Mississippi* Were Not Violated when the State Suggested on Cross-Examination of Defense Witness John Escobedo that Roberts Might Not Serve Forty Calendar Years Minimum if Sentenced to Life Imprisonment.

Roberts final argument is that the State violated *Caldwell v. Mississippi* by suggesting that he might receive executive clemency or that another court might overturn his sentence. Petition at 78-82. The alleged error occurred during the State's cross-examination of a defense witness who was a former member of the Board of Pardons and Paroles. 28 RR 20, 41, 48-50. However, Roberts did not object to the prosecutor's questioning or the witness's answers and therefore procedurally defaulted his claim. *Roberts v. State,* 220 S.W.3d at 533. Roberts fails to show cause and prejudice or a fundamental miscarriage of justice that might excuse his default. *See* Argument § XIII, *supra* (explaining why Roberts's related ineffective assistance of counsel claim is without merit).

In *Caldwell v. Mississippi,* the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a

determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."   472 U.S. at 328-29.   However, the totality of Roberts's trial makes it clear that the jury was well aware of its role and of the result of its answers to the special issues.   *See Montoya v. Scott,* 65 F.3d 405, 420 (5th Cir. 1995) (holding that "total trial scene" must be considered in evaluating *Caldwell* claims).   Both the court and counsel clearly explained throughout voir dire, closing argument, and the jury instructions that affirmative answers to the special issues would result in a death sentence and negative answers would result in a life sentence.   *See, e.g., Cotton v. Cockrell,* 343 F.3d 746, 755 (5th Cir. 2003); *Miniel v. Cockrell,* 339 F.3d 331, 343-44 (5th Cir. 2003); *cf.* 25 RR 6; 32 RR 5-19, 47-54, 74-75.   Neither the court nor the prosecution ever told the jury that the responsibility for answering those questions or for determining whether a life or death sentence would result lay somewhere else.   Thus, it cannot be argued that the jury was misled concerning its sentencing role and there was no *Caldwell* error as a result.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that Roberts's petition for writ of habeas corpus be denied with prejudice, no discovery or hearing be granted, and that no certificate of appealability issue with regard to any of the claims raised therein.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

ERIC J.R. NICHOLS
Deputy Attorney General
For Criminal Justice


/s/Edward L. Marshall
EDWARD L. MARSHALL
Chief, Postconviction
Litigation Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel: (512) 936-2891
Fax: (512) 320-8132
Email: elm@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing pleading was electronically served pursuant to Local Rule CV-5(a)(3)(C), on October 27, 2010.

/s/ Edward L. Marshall
EDWARD L. MARSHALL
Chief, Postconviction
Litigation Division