## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

## BEAUMONT DIVISION

**DONNIE LEE ROBERTS,**            §

         Petitioner,            §

v.            §            No. 1:09cv419

**RICK THALER, Director**,            §
Texas Department of Criminal Justice,
Correctional Institutions Division,            §

         Respondent.

## <u>MEMORANDUM OPINION</u>

Donnie Lee Roberts ("Roberts"), an inmate confined to the Texas Department of Criminal

Justice, Correctional Institutions Division, filed an application for a writ of *habeas corpus* pursuant

to 28 U.S.C. § 2254.  Roberts challenged the capital murder conviction and death sentence imposed

by the 411th Judicial District Court of Polk County, Texas, in cause No. 17,493, styled *The State of*

*Texas vs. Donnie Lee Roberts, Jr.*  Having considered the circumstances alleged and authorities cited

by the parties, and having reviewed the record and the applicable law, the Court finds that the

application is not well-taken and it will be denied.

**Facts** [1]

> At the time of the murder, [Roberts] lived with the victim, Vicki Bowen.
> [Roberts] was unemployed, often drank alcohol, and used cocaine. Bowen
> worked as a dental assistant. On October 15, 2003, she went shopping with
> co-worker Brenda Bland, but she did not show up for work the next day.
> Because Bowen was a punctual person who always called if she was going to

---

[1] From the opinion in *Roberts v. State*, 220 S.W.3d 521, 524-25 (Tex. Crim. App.), *cert. denied*, 552 U.S. 920 (2007).

1

be late, Bland became concerned and went to Bowen's house to check on her. When Bland arrived at the home, she found the front door open. After knocking and receiving no answer, Bland entered the home and found Bowen dead. Bland noticed that Bowen was still in the scrubs she had worn at work the previous day. She was covered by a blanket and was lying face down with her head turned to the side in a pool of blood. Blood spatters were present in the living room on the coffee table, the couch, and the walls. The medical examiner would later determine that Bowen died from two gunshot wounds to the head.

It was immediately apparent from an examination of the scene that Bowen's television and her son's truck were missing. That same day, the police found [Roberts] after tracking down the stolen truck. It was later determined that [Roberts] had taken the truck, the television, Texans/Titans football tickets, jewelry, a Western Union money order, a .22 rifle, and a .22 pistol. [Roberts] had sold the football tickets for one hundred dollars. He had bought cocaine from Edwin Gary on October 15 on three different occasions, the last of which involved trading the .22 caliber pistol. [Roberts] had apparently abandoned the .22 rifle, later determined to be the murder weapon, a few blocks from where he was found. The Western Union money order was found in the residence at which [Roberts] had parked his truck, but the television and the jewelry were never recovered.

[Roberts] was interviewed and gave a confession. In that confession, he acknowledged that he had "a crack cocaine problem" and that he would go to bars, get drunk, and then look for drugs. With regard to the victim's death, [Roberts] said, "I pointed the gun at her and I told her just give me some money." Later in the interview, [Roberts] stated: "I pointed the gun at her and I said, 'if you'd just give me some money.' And she said 'No.' And then I said, 'Look, it doesn't have to be this way.' That's all I remember saying to her. And the next thing I know, I shot her."

At trial, [Roberts] testified to a different sequence of events. He claimed that he picked up the .22 rifle because it was out of place, near the door. He also claimed that he saw what looked like a .22 pistol in Bowen's pocket and that she moved her hand to her pocket to reach for it. He then said that he "must have chambered a round into the .22 rifle at that time," but he did not remember if he pulled the safety off. He also claimed that he did not remember his gun firing but that he knows it did. [Roberts] further testified that he did not intend to rob Bowen at the time he shot her, but he admitted to taking items of her property later.

**Procedural History**

On November 24, 2003, Roberts was indicted on a charge of capital murder by a grand jury empaneled by the 258th Judicial District Court of Polk County, Texas.[2]  On October 15, 2004, after a jury trial, Roberts was found guilty of the charge, and on October 27, 2004, after a separate sentencing hearing, and based upon the jury's answers to the Texas special sentencing issues, the trial judge sentenced Roberts to death.[3]

On appeal, his conviction and sentence were affirmed, and he filed a petition for a writ of *certiorari*, but it was denied.  *See Roberts v. State,* 220 S.W.3d 521, 524-25 (Tex. Crim. App.), *cert. denied*, 552 U.S. 920 (2007).   While his appeal was pending, Roberts filed a petition for state post-conviction relief.  The trial court entered findings of fact and conclusions of law and recommended that his petition be denied, and the Texas Court of Criminal Appeals denied Robert's petition, although it declined to adopt all of the trial court's findings and conclusions.  *See Ex parte Roberts*, Nos. 71,573-01 and 71,573-02, 2009 WL 1337443 (Tex. Crim. App. May 13, 2009) (*per curiam*) (not designated for publication).  On May 11, 2010, Roberts filed an application for a writ of *habeas corpus* with this Court.

---

[2] TEX. PENAL CODE Sec. 19.03 (a)(2) defines capital murder as murder intentionally committed in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, or obstruction or retaliation, or terroristic threat.

[3] The two issues are whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, *see* TEX. CODE CRIM. PROC. Art. 37.071, Sec. 2 (b)(1), and whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.  *See* TEX. CODE CRIM. PROC. Art. 37.071, Sec. 2 (e)(1).

**Claims**

Roberts raised nineteen claims for relief:

1) His due process rights under *Giglio v. United States*, 405 U.S. 150 (1972), were violated when the State's expert, Dr. Frederick Mears, testified falsely regarding his academic credentials during the punishment determination phase of Roberts's capital murder trial.

2) His right to be free from cruel and unusual punishment was violated when Dr. Mears testified falsely regarding his credentials during the punishment determination phase of the trial.

3) His due process rights under *Romano v. Oklahoma*, 512 U.S. 1 (1994), were violated when  Dr. Mears testified falsely regarding his credentials during the punishment determination phase of the trial.

4) He received ineffective assistance of counsel when his trial counsel failed to use peremptory strikes on two employees of the Texas Department of Criminal Justice (TDCJ) during *voir dire*.

5) He received ineffective assistance of counsel when his trial counsel failed to prepare and present expert testimony to rebut the State's expert during the punishment determination phase of his trial.

6) He received ineffective assistance of counsel when his trial counsel failed to prepare and present mitigating evidence during the guilt determination and the punishment determination phases of trial.

7) His due process rights were violated when the trial court required the defense to turn over its investigator's notes to the prosecution during the punishment determination phase of his trial.

8) His right to be free from cruel and unusual punishment was violated because the statutory jury instruction regarding the mitigation special issue unconstitutionally narrows the definition of mitigating evidence to that which reduces a defendant's moral blameworthiness.

9) His right to be free from cruel and unusual punishment was violated when the trial court refused to submit his requested punishment phase jury instruction regarding the definition of mitigating evidence under *Tennard v. Dretke*, 542 U.S. 274 (2004).

10) His right to be free from cruel and unusual punishment was violated when the trial court refused to allow defense expert Dr. Kathleen McQueen to testify during punishment that Roberts's combined use of alcohol and crack cocaine caused him to commit capital murder.

11) His right to the effective assistance of counsel was denied when his trial counsel failed to object to victim impact evidence from the victim of an extraneous offense.

12) His due process rights were violated when the trial court allowed victim impact evidence from the victim of an extraneous offense.

4

13) He received ineffective assistance of counsel when his trial counsel failed to object to the prosecution's repeated suggestions that Roberts's parole eligibility could be altered by the Legislature at a future date.

14) His right to be free from cruel and unusual punishment was violated when the trial court refused to allow testimony regarding how a death sentence would affect his family members.

15) His right to trial by jury was violated because his future dangerousness and death worthiness were not presented to a grand jury and alleged in the indictment.

16) His due process rights and his right to be free from cruel and unusual punishment were violated because the jury instructions on mitigating evidence did not contain a burden of proof.

17) His due process rights and his right to be free from cruel and unusual punishment were violated because the State was not required to prove beyond a reasonable doubt any extraneous offense evidence or the victim impact evidence it offered to rebut his mitigating evidence.

18) His due process rights were violated when the trial court refused his request to present his final argument on the mitigation special issue after, rather than before, the prosecution presented its final argument on the issue.

19) His due process rights under *Caldwell v. Mississippi*, 472 U.S. 320 (1985), were violated when the prosecution suggested that Roberts might not serve forty calendar years minimum if sentenced to life imprisonment.

**Standard of review**

Because Roberts's application for a writ of *habeas corpus* was filed after 1996, the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies to his claims.  Under the AEDPA, a state prisoner seeking to raise claims in a federal petition for *habeas corpus* ordinarily must fairly present those claims to the state court and thereby exhaust his state remedies.  *Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001), *cert. denied sub nom. Martinez v. Cockrell*, 534 U.S. 1163 (2002). If an applicant raises a claim in his federal *habeas corpus* application that was not fairly presented to the state courts, the federal court has three options:  It can allow the applicant to return to state court and present the claim to the state court in a successive petition, either by dismissing the entire petition without prejudice, *see Rose v. Lundy*, 455 U.S. 509, 520-22 (1982), or by staying the federal

proceedings, s*ee Rhines v. Weber*, 544 U.S. 269, 278 (2005).  If it is entirely clear that the state court would refuse to consider the merits of the claim if the applicant were to return to state court and present it in a successive petition, the federal court will treat the unexhausted claims as if the state court had already refused to hear them on procedural grounds.  *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).  If it is not entirely clear that the state court would refuse to hear a successive petition containing the new claims, however, the federal court will allow the state court the first opportunity to consider them.  *See Wilder v. Cockrell,* 274 F.3d 255, 262-63 (5th Cir. 2001).  Finally, the Court can deny the claim on its merits.  *See* 28 U.S.C. § 2254(b)(2).

Federal courts do not review claims that the state courts have refused to review based on adequate and independent state grounds unless the applicant can establish either that he had good cause for failing to fairly present his claims and he would be prejudiced by not being given an opportunity to do so in the federal court, or that the federal court's failing to address the claims on their merits would result in a fundamental miscarriage of justice because the petitioner is actually innocent of the offense.  *See Coleman v. Thompson,* 501 U.S. 722, 749-50 (1991); *Finley v. Johnson,* 243 F.3d 215, 220 (5th Cir. 2001).

If the state court denied the claim on its merits, a federal court may only grant relief if the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, *see* 28 U.S.C. § 2254(d)(1), or if the state court's adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, *see* 28 U.S.C. § 2254(d)(2).  In reviewing a state court decision, this Court reviews questions of law and mixed questions of law and fact under section

2254(d)(1), and reviews questions of fact under section 2254(d)(2). The state court's findings of fact are presumed to be correct, and the applicant has the burden of rebutting this presumption of correctness by clear and convincing evidence. *Richardson v. Quarterman,* 537 F.3d 466, 472-73 (5th Cir. 2008), *cert. denied*, 129 S.Ct. 1355 (2009). If a claim was presented to the state court but not adjudicated by that court, this Court will determine it *de novo,* just as factual issues not determined by the state court are determined *de novo*. *See Miller v. Johnson,* 200 F.3d 274, 281 n.4 (5th Cir.), *cert. denied,* 531 U.S. 849 (2000).

If the state court based its decision on the alternative grounds of procedural default and rejecting the claim on its merits, the general rule in this circuit is that a federal court must, in the absence of good cause and prejudice or a fundamental miscarriage of justice, deny relief because of the procedural default, *see Hughes v. Dretke*, 412 F.3d 582, 592 (5th Cir. 2005), *cert. denied*, 546 U.S. 1177 (2006). But the rule is not absolute; a court can look past the question of procedural default if the claims can be resolved more easily on the merits. *See Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir.), *cert. denied*, 541 U.S. 1087 (2004).

**Analysis**

Roberts's first claim is that his due process rights under *Giglio v. United States*, 405 U.S. 150 (1972), were violated when the State's expert, Dr. Frederick Mears, testified falsely regarding his credentials during the punishment determination phase of Roberts's capital murder trial. This claim was adjudicated on its merits by the state court, *see* State Habeas Record ("SHR") Vol. 1, pp. 232-37, para. 1-40, so the question for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or was based upon

7

an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

During the punishment determination phase of the trial, the prosecution offered the expert opinion of Dr. Frederick Mears that there was a probability that Roberts would commit acts of criminal violence which would constitute a continuing threat to society. Because a finding of future dangerousness renders a defendant death eligible, Dr. Mears's testimony was of considerable importance in the case. In order to qualify him as an expert, and in order to bolster his credibility to the jury, the prosecution questioned him about his credentials.

Dr. Mears testified that he had a Bachelor's Degree in Psychology from East Texas State University, a Master of Arts Degree in Experimental Psychology from Texas Christian University, a Doctor of Philosophy Degree in Educational Research and Psychometry from the University of Northern Colorado, a second Doctor of Philosophy Degree in Neuropsychology from Forrest Institute in Springfield, Missouri, and a Master of Science Degree in Psychopharmacology from the California Institute of Professional Psychology. *See* Reporter's Record ("RR") Vol. 30, pp. 211-12.

Roberts contends that Dr. Mears's testimony about his credentials was inconsistent with his testimony in an earlier case, in which he testified that he had a Doctor of Philosophy Degree in Psychology and another Doctor of Philosophy Degree in Neuropsychology. Roberts also contends that in another case, Dr. Mears testified that he had only one doctorate degree. In Roberts's state post-conviction proceedings, Dr. Mears submitted an affidavit in which he stated that he did have two doctorate degrees, but because of the different courses he took to obtain the first one, it would be accurate to characterize his degree as a Doctorate of Philosophy in measurement theory, in research and statistical methodology, in educational research and methods, or in educational research

8

and measurement.  See SHR Vol. 1, pp. 182-84.

Assuming *arguendo* that Dr. Mears characterized his credentials differently in two previous cases than he did in the present case, the issue for the Court is whether Dr. Mears's testimony about his credentials in this case was accurate. Roberts does not point to any discrepancy between Dr. Mears's description of his credentials in the present case and the degrees he actually earned, so the Court finds that the state court's finding that Dr. Mears did not mislead the jury as to his credentials in the present case was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The Court will deny Roberts's first claim.

Roberts's second claim is that his right to be free from cruel and unusual punishment was violated when Dr. Mears testified falsely regarding his credentials during the punishment determination phase of his trial.  This claim was adjudicated on its merits by the state court, *see* SHR Vol. 1, pp. 237-38, para. 41-48, so the question for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Because the Court found in its analysis of the previous claim that the state court's determination that Dr. Mears did not testify falsely about his credentials was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, it will deny Roberts's second claim.

9

Roberts's third claim is that his due process rights under *Romano v. Oklahoma*, 512 U.S. 1 (1994), were violated when Dr. Mears testified falsely regarding his credentials during the punishment determination phase of his trial.  This claim was adjudicated on its merits by the state court, *see* SHR Vol. 1, pp. 238-39, para.49-61, so the question for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Because the Court found in its analysis of Roberts's first claim that the state court's determination that Dr. Mears did not testify falsely about his credentials was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, it will deny Roberts's third claim.

Roberts's fourth claim is that he received ineffective assistance of counsel when his trial counsel failed to use peremptory strikes on two employees of the Texas Department of Criminal Justice (TDCJ) during *voir dire*.  This claim was adjudicated on its merits by the state court, *see* SHR Vol. 1, pp. 239-42, para. 62-84, and pp. 243-48, para. 124-41, so the question for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Several members of the jury venire in Roberts's case were associated with the Texas Department of Criminal Justice, and two of them were seated on his *petit* jury.  One worked for 15 months as a correctional officer at the facility where death row is housed; the other worked for 20 years as a transportation officer.  One of the prosecutors coached a team for which the transportation officer's son played, and they attended the same church.  The transportation officer stated that he would not be swayed by their acquaintance.  Both stated they would be fair and impartial to each side and that they would follow the law.  Roberts's trial counsel stated by affidavit that when these two jurors were questioned, Roberts told him that he wanted them to serve as jurors in his case.  *See* SHR Vol. 1, pp. 164-71.  Roberts contends that his counsel rendered ineffective assistance by not using peremptory challenges to remove the two men from the jury venire.

To prevail on a claim of ineffective assistance of counsel, a defendant must establish that his counsel's performance was deficient and the deficiency prejudiced the defense.  To establish deficient performance, a defendant must show that counsel's behavior fell below an objective standard of reasonableness.  The proper measure of attorney performance is simply reasonableness under prevailing professional norms.  *Wiggins v. Smith,* 539 U.S. 510, 521 (2003).  To establish prejudice, a defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id.* at 534.  If a defendant is unable to establish one of the two elements of the test, a court need not analyze whether he can establish the other element.  *See Strickland v. Washington*, 466 U.S. 668, 697 (1984).

The Sixth Amendment guarantees the right to trial by an impartial jury.  If a potential juror admits that he could not be impartial in considering the evidence  or could not follow the law, he can be removed from the venire by a challenge for cause, *see Patton v. Yount*, 467 U.S. 1025, 1037

11

(1984), and failing to challenge a person who made such an admission would constitute deficient performance. *See Virgil v. Dretke*, 446 F.3d 598, 609-10 (5th Cir. 2006). Even if a venireperson states that he could be fair and impartial, he can still be challenged for cause if, based upon his circumstances or the way he answers questions, an implication arises that he would be biased against the defendant. *See Smith v. Phillips,* 455 U.S. 209, 222 (1982)(O'Connor, J., concurring).

In *United States v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001), *cert. denied*, 535 U.S. 1016 (2002), the United States Court of Appeals for the Fifth Circuit held that juror bias may be implied only in extreme circumstances, as in when the juror is employed by the prosecuting agency, is a close relative of a participant in the trial, or is somehow involved in the transaction that is the subject of the trial. In *Solis v. Cockrell,* 342 F.3d 392 (5th Cir. 2003), *cert. denied*, 540 U.S. 1151 (2004), the same court discussed several implied bias decisions in rejecting a claim that a juror in a burglary trial should be presumed biased as a matter of law because he believed that the defendant and his brothers had a reputation for breaking into houses.

Roberts contends, in essence, that his attorney should have presumed that a potential juror who works for the Texas Department of Criminal Justice or is acquainted with the prosecutor through church and volunteer activities involving the juror's children would be biased against a capital murder defendant. He does not contend that bias would be implied as a matter of law in this situation, and neither the general rule of *Bishop* nor the particular examples in *Solis* suggest that the law would imply the two veniremen were biased. Rather, Roberts contends that his counsel should have exercised peremptory challenges against the two veniremen, not that he should have challenged them for cause.

12

This claim cannot prevail for two reasons.  First, the use of peremptory challenges is usually a matter of trial strategy, which federal courts in *habeas corpus* proceedings will not second guess. *Tolliver v. United States*, No. 07-cv-525-JPG, 2009 WL 1393300 (S.D. Ill. May 15, 2009) (unpublished).  A peremptory challenge is appropriate when something about the potential juror's appearance, demeanor, circumstances or responses suggests that he might be biased, but the evidence is not strong enough to support a challenge for cause.  The number of peremptory challenges is limited; a defense attorney is often faced with the dilemma of having more jurors that he would like to remove than peremptory challenges to remove them.  Roberts has not rebutted the presumption that the potential jurors that counsel did peremptorily challenge were even more problematic for the defense than the two TDCJ employees.

Second, in order to show that he was prejudiced, Roberts would have to show that the two jurors who were not removed were actually or impliedly biased.  *See Lawrence v. Ryan*, No. CV-06-1422-PHX-GMS, 2009 WL 1098917 (D.Ariz. April 23, 2009)(unpublished).

Since biased jurors are susceptible to challenges for cause, a claim of ineffective assistance based solely upon a failure to use a peremptory challenge -- because the potential juror could not be challenged for cause on the basis of  actual or implied bias -- fails to state a claim for which relief can be granted.

Because  the Court finds that the state court's rejection of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States in *Wiggins, Strickland and Phillips,* it will deny Roberts's fourth claim.

Roberts's fifth claim is that he received ineffective assistance of counsel when trial counsel failed to prepare and present expert testimony to rebut the State's expert during the punishment determination phase of his trial.  This claim was adjudicated on its merits by the state court, *see* SHR Vol. 1, pp. 242-43, para. 85-94, and pp. 248-49, para. 142-49, so the question for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Roberts contends that after prosecution witness Dr. Mears provided extremely damaging testimony that there was a probability that Roberts would be dangerous in the future, it became critically important for the defense to rebut this evidence with testimony from its own experts.  His counsel failed to do so, even though they had available two expert witnesses who could have done so: Dr. John F. Edens and Dr. Roger Saunders.

In his affidavit, Roberts's trial counsel stated that September 24, 2004 was the deadline for each side to designate expert witnesses intended to be called at trial.  Roberts's trial counsel became aware through conversations with witness Dr. Dennis Longmire that Dr. Edens conducted a study of 155 death row inmates entitled "Disinventing the Rule," and which was due to be published in *Law and Human Behavior*.  Dr. Longmire intended to reference this study in his own testimony.  On October 18, 2004, after the jury found Roberts guilty, the defense team met with Dr. Edens, and the next day they sent a letter to the prosecution stating that they intended to call Dr. Edens as a witness during the punishment determination phase of the trial.  *See* SHR Vol. 1, pp. 171-74.  The prosecution objected on the grounds that the notice was untimely, and Dr. Edens's testimony would

14

be cumulative of Dr. Longmire's testimony.

As stated above, to prevail on a claim of ineffective assistance of counsel, a defendant must establish that trial counsel's performance was objectively unreasonable in light of prevailing professional norms.  Because the study by Dr. Edens had not been published by the September 24, 2004 deadline for designating expert witnesses, the Court finds that defense counsel's failure to designate him as an expert witness by that date was not objectively unreasonable in light of prevailing professional norms.  In addition, because Dr. Saunders advised the defense that he would act only in an advisory capacity and would not testify, the defense counsel's failure to call him as a witness is not unreasonable in light of prevailing professional norms.  Because Roberts cannot establish that trial counsel's actions constituted deficient performance, it is unnecessary to analyze whether he was prejudiced, and the state court's rejection of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Strickland.*  The Court will deny Roberts's fifth claim.

Roberts's sixth claim is that he received ineffective assistance of counsel when trial counsel failed to prepare and present evidence during the guilt determination and punishment determination phases of his trial.  This claim consists of two sub-claims.  The first is that the defense should have presented evidence that the victim was violent when she drank and had been violent toward her previous boyfriend on more than one occasion, including threatening him with a pistol and stabbing him in the leg.  The second is that the defense should have investigated and presented additional evidence that would have mitigated against a death sentence.  These sub-claims were rejected by the state court  in post-conviction proceedings, *see* SHR Vol. 1, pp. 243- 45, para. 95-116, and pp. 249-51, para. 150 - 166, so the question for the Court is whether the state court's adjudication of the

15

claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Regarding the first sub-claim, Roberts told police investigators that he pointed a rifle at the victim, told her to give him money for drugs, and then shot her when she refused to do so.  He told a different story to the state's mental health expert, saying that when he arrived at their home at 6:30 p.m. he noticed unusual things, like a loaded rifle by the door and that the victim had a pistol in her uniform pocket.  He told the expert that the victim was angry, and he felt she would confront him to leave because her parents were coming over to visit and her father was a former police chief.  Roberts said that the victim yelled something that he did not remember and that he shot her, but that he does not remember pulling the trigger.  *See* RR Vol. 29, p. 292.

At trial, Roberts testified in accordance with what he told the state's mental health expert rather than what he told police investigators.  He said that when he arrived at the trailer, the victim was behaving strangely.  He noticed a pistol in her uniform pocket and a rifle (which was usually kept by the couch and unloaded) was propped against the wall by the door.  He testified that he picked the rifle up solely to check whether it was in fact loaded, but when it appeared that she was reaching for the pistol, he shot her.  Roberts denied that he threatened to shoot her unless she gave him money for drugs.  *See* RR Vol. 23, pp. 71-76.

In his closing argument, Roberts's trial counsel took a middle course, arguing that the evidence showed that Roberts and the victim truly loved each other and there would have been no need for him to rob her.  He contended that the killing occurred because of a domestic dispute of

some sort, but stopped short of arguing that Roberts killed her in self-defense, stating: "I don't know if Vickie Bowen had the pistol.  The pistols (sic) weren't printed.  The cartridges weren't printed. It wasn't tested for blood.  We have no idea whether she had the pistol herself.   We do know, I believe, that the holster for the pistol was found beneath the couch."  *See* RR Vol. 24, p.56.  The defense contended that Roberts was guilty of murder, but because he was not attempting to rob the victim, he was not guilty of capital murder.

Roberts contends the reason he told police investigators he threatened to shoot the victim unless she gave him money and then shot her when she refused, was because he wanted to receive the death penalty.  He contends that because his attorneys were aware of the victim's propensity for violence, they should have presented evidence that an altercation was starting at the time he killed her.  Defense counsel stated in an affidavit, however, that Roberts never told him, prior to testifying at trial that the victim threatened him with the pistol or that he acted in self defense.

Roberts's conflicting statements rendered his credibility highly suspect.  Given that the less inculpatory statement was bereft of details, the argument chosen by the defense – what actually happened was unclear, but what was clear was that Roberts loved the victim, and he did not need to rob her, so in the absence of definitive physical evidence this case appeared to be a domestic dispute, and domestic disputes should not be prosecuted as capital murder – does not appear unreasonable. Roberts is correct, however, that evidence of the victim's propensity for violence, especially when drinking, would have provided some support for the defense's theory that the killing occurred as a result of a domestic dispute spiraling out of control, though not necessarily as a result of self defense.

The issue for the court, however, is not whether in hindsight the defense might have been strengthened by the presentation of this evidence; it is whether it was unreasonable for counsel not

to have done so. The defense sought to show that Roberts accepted responsibility for his actions and felt remorse, presumably in order to increase the likelihood of his receiving a life sentence. It would not have been unreasonable for counsel to conclude that disparaging the character of the victim might reduce the jury's sympathy for Roberts, and that suggesting that the victim was partly to blame would undermine their perception that he accepted responsibility for his actions. The Court finds that counsel's failure to present evidence of the victim's propensity for violence was not an unreasonable professional judgment under the circumstances. It therefore finds that Roberts cannot establish that his counsel rendered deficient performance.

Because Roberts is unable to establish the deficient performance element of ineffective assistance of counsel under the *Strickland* test, it is unnecessary for the Court to analyze whether he can establish the prejudice element. The Court finds that the state court's rejection of this sub-claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States in *Strickland.*

Regarding the second sub-claim, Roberts contends his attorneys should have called four witnesses: Adolph Harkins, Gary Welch, Mike Smith and Donna Harkins. Roberts contends that they could have provided mitigating evidence about the following matters: his abusive upbringing, his intoxication at the time of the offense, his good work record, his good record as a parent, his lack of psychiatric illness, and his good behavior in structured environments. The state court found, however, that Roberts's attorneys did present evidence as to each of these mitigating factors. First, the defense did call Donna Harkins. *See* RR Vol. 27, pp. 9-87. Second, the defense presented testimony about these mitigating factors through the testimony of Chris DeMary, Jeffrey Reid, Dr. Katherine McQueen, Dr. William Mossman and several others. Roberts fails to acknowledge this,

18

and does not even contend, much less establish, that the state court's findings to this effect are incorrect and unreasonable. Because Roberts has failed to rebut the state court's finding that defense counsel's decision not to call Adolph Harkins, Gary Welch and Mike Smith did not constitute deficient performance, it is unnecessary for the Court to analyze whether Roberts was prejudiced by the decision. The state court's rejection of this sub-claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States in *Strickland.*

Because the state court's rejection of both sub-claims of Roberts's sixth claim was neither contrary to, nor the result of, an unreasonable interpretation of clearly established federal law as determined by the Supreme Court of the United States, the Court will deny this claim.

Roberts's seventh claim is that his due process rights were violated when the trial court required the defense to turn over its investigator's notes to the prosecution during the punishment determination phase of his trial. The Texas Court of Criminal Appeals refused to address the merits of this claim on direct appeal because Roberts did not include the notes at issue in the record on appeal. *See Roberts,* 220 S.W.3d at 526-27. Federal courts generally do not review procedurally defaulted claims unless the applicant can establish either that he had good cause for failing to fairly present his claims and he would be prejudiced by not being given an opportunity to do so in the federal court, or that the federal court's failing to address the claims on their merits would result in a fundamental miscarriage of justice, either because he is actually innocent of the offense, *see Coleman v. Thompson,* 501 U.S. 722, 749-50 (1991), or because but for the constitutional error no rational juror would have found him eligible for the death penalty under state law. *See Sawyer v. Whitley*, 505 U.S. 333, 336 (1992). Roberts does not contend that he had good cause for failing to

include the notes in the record, and he does not contend that he is either actually innocent or that no rational juror would have sentenced him to death.  Accordingly, the Court is prohibited from reviewing the merits of this claim, and it will dismiss Roberts's seventh claim with prejudice.

Roberts's eighth claim is that his right to be free from cruel and unusual punishment was violated because the statutory jury instruction regarding the mitigation special issue unconstitutionally narrows the definition of mitigating evidence to that which reduces a defendant's moral blameworthiness.  This claim was denied on the merits on direct appeal, *see Roberts*, 220 S.W.3d at 534, so the question for the Court is whether state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

In *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982), the Supreme Court held that a state may not by statute preclude a jury from considering any relevant mitigating evidence which a capital defendant offers as a basis for a sentence less than death.  Texas Code Crim. Proc. Art. 37.071 §2(f)(4) provides in relevant part: "[T]he jury shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."  Roberts contends that because relevant mitigating evidence may exist which capital defendants could offer as a basis for receiving a sentence less than death but, which under Texas law could not be admitted because it would not reduce their moral blameworthiness, the statutory limitation is unconstitutional.

In the abstract, this argument is not without appeal.  For example, a capital defendant may want to introduce as mitigating evidence that a co-defendant received a sentence less than death to

appeal to the jury's sense of fairness, even though such evidence does not necessarily bear upon his own moral blameworthiness for the crime.  Texas law directs jurors not to consider such evidence as mitigation.[4]  The problem with Roberts's argument is that the mitigating evidence he introduced -- that he was neglected and abused as a child, that he suffered from alcohol and cocaine addiction, and that he had a low I.Q. – was relevant to moral blameworthiness.[5]  As such, Texas law did not limit the jury's ability to consider Roberts's mitigating evidence.  The state court's denial of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States in *Eddings*, so it will deny Roberts's eighth claim.

Roberts's ninth claim is that his right to be free from cruel and unusual punishment was violated when the trial court refused to submit his requested punishment phase jury instruction regarding the definition of mitigating evidence under *Tennard v. Dretke*, 542 U.S. 274 (2004).  This claim was denied on the merits on direct appeal, *see Roberts*, 220 S.W.3d at 534, so the question for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

---

[4]  *Compare Joubert v. State*, 235 S.W.3d 729 (Tex. Crim. App. 2007), *cert. denied*, 552 U.S. 1232 (2008), *with Boulender v. Singletary*, 16 F.3d 1547 (11th Cir.), *cert. denied*, 513 U.S. 1022 (1994).

[5]  Roberts's other evidence – that he was a good father, a good family member, and a good worker – is more directly relevant to the future dangerousness issue than to his moral blameworthiness for his crime.  The Court nevertheless finds that the jury would have considered it in the context of the mitigation special issue, because the closer the question of his future dangerousness, the less mitigation evidence would seem necessary to convince a juror to vote for a life sentence.

In *Tennard*, the Supreme Court struck down the United States Court of Appeals for the Fifth Circuit's requirement that mitigating evidence be "constitutionally relevant," which it defined as evidence of a "uniquely severe permanent handicap with which the defendant was burdened through no fault of his own," and the criminal act had to be "attributable to this severe, permanent condition." The Court reaffirmed what it said in *Eddings*: the jury must be allowed to consider any evidence which makes more likely any fact which a juror might find mitigates against imposing a death sentence. *See* 542 U.S. at 284-85.

In Roberts's case, the trial court rejected his proffered instruction and gave the jury the statutory instruction, which stated that mitigating evidence is evidence which a juror might regard as reducing the defendant's moral blameworthiness. As he did in his eighth claim, Roberts contends this definition is too narrow. As the Court said in denying that claim, although it can imagine factual circumstances in which this type of claim might prevail, this case does not present those circumstances. Because the jury was able to give full effect to the mitigating evidence Roberts offered in the punishment determination phase of his trial, the Court finds that the state court's rejection of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law as determined by the Supreme Court in *Tennard*. The Court will deny Roberts's ninth claim.

Roberts's tenth claim is that his right to be free from cruel and unusual punishment was violated when the trial court refused to allow defense expert Dr. Kathleen McQueen to testify during the punishment determination phase of his trial. Dr. McQueen would have testified that in her opinion, Roberts's combined use of alcohol and crack cocaine caused him to commit capital murder. The state court found that this claim was subject to rejection because it had been inadequately

briefed, but also denied the claim on its merits. *See* 220 S.W.3d at 527-28. In these circumstances, the rule in this Circuit is that a federal court must limit its analysis to the procedural default issue unless the claim can be resolved more easily on the merits.

For a state court procedural default to bar federal review of the merits of a claim, the state procedural rule that was violated must be both adequate and independent. *See Rocha v. Thaler*, 626 F.3d 815, 820-21 (5th Cir. 2010), *pet. for cert. filed* (U.S. Mar. 17, 2011)(No. 10-9659). To be adequate, a procedural rule must have been strictly or regularly applied evenhandedly to the vast majority of similar claims. *Id.* The parties have not cited, and this Court has not found, authority holding that the rule forbidding inadequate briefing is strictly or regularly applied evenhandedly to the vast majority of similar claims. In light of this uncertainty, the Court finds it easier to resolve this claim on its merits. The question for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

During the punishment determination phase of Roberts's trial, the defense called Dr. Katherine McQueen to testify that: (1) studies show that people who ingest both cocaine and alcohol were more violent than people who ingest either substance on its own, (2) Roberts had ingested both substances at the time of the killing, (3) in her opinion, had Roberts not ingested both substances he would not have killed the victim, and (4) people who are forced to abstain from using cocaine and alcohol have less involvement with the criminal justice system than those who do not abstain. The trial court allowed Dr. McQueen to testify to all but the third proposition, finding that she had not

shown that she had employed scientifically reliable methodology in reaching her opinion about the effects of cocaine and alcohol on Roberts's ability to resist the temptation to commit the crime at issue. *See* RR Vol. 29, pp. 29-30.

Roberts contends that the trial court's ruling was either contrary to, or the result of an unreasonable application of, Eighth Amendment principles announced in *Tennard v. Dretke*, 542 U.S. 274 (2004), and *Barefoot v. Estelle*, 463 U.S. 880 (1983). In *Tennard*, the Supreme Court of the United States held that jury instructions in the punishment determination phase of a capital trial must allow the jury to give meaningful effect to mitigating evidence. In *Barefoot*, the Court held that a psychiatrist may provide expert opinion testimony as to whether there is a probability that an inmate will commit acts of criminal violence which will constitute a continuing threat to society.

Regarding the rule in *Tennard*, Dr. McQueen's opinion that Roberts would not have committed the murder had he not been intoxicated by a combination of cocaine and alcohol is mitigating in two ways. First, since Roberts would not have access to cocaine and alcohol in prison, it supports the proposition that he would be less likely to be dangerous in the future. Second, because his criminal conduct would not have occurred had he not been intoxicated, he is less morally culpable for his actions, *i.e.*, less evil than if he had killed while sober and in control. Roberts contends that the trial court's refusal to allow Dr. McQueen to provide this testimony deprived the jury of the opportunity to give meaningful effect to this mitigating evidence.

Roberts's argument fails because the Court did not prevent the jury from giving effect to mitigating evidence. Rather, it precluded an expert witness from providing an opinion which would have been mitigating because it found that there was not sufficient scientific support for that opinion. The Court's ruling did not prevent the jury from giving meaningful effect to the evidence provided

by Dr. McQueen, including inferring the exact proposition that she would have testified was her opinion.

Regarding the rule in *Barefoot*, the Supreme Court in that case allowed psychiatric testimony as to the likelihood of the defendant's future dangerousness even though the American Psychiatric Association pointed out that such testimony was unreliable, *i.e.*, it was wrong more often than it was correct. In *Daubert v. Merill Dow Pharmecuticals*, 509 U.S. 579, 590 (1993), that Court held that in order to be admissible, scientific evidence must be reliable. In a concurring opinion in *Flores v. Johnson*, 210 F.3d 456, 464-65 (5th Cir.), *cert. denied*, 531 U.S. 987 (2000), Judge Emilio Garza pointed out that in light of *Daubert*, the continuing vitality of *Barefoot* is questionable. Roberts contends that there is no principled distinction between the psychiatric prediction that a defendant will likely be dangerous in the future and the psychiatric opinion that were he not under the influence of alcohol and cocaine, he would not have killed the victim. Accordingly, he argues that the trial court's refusal to admit Dr. McQueen's opinion is contrary to or the result of an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States in *Barefoot*.

Assuming *arguendo* that Roberts is correct, the issue for the Court is whether the trial court's exclusion of Dr. McQueen's conclusion – that Roberts would not have committed the crime had he not been under the influence alcohol and cocaine – had a substantial and injurious effect or influence in determining the jury's verdicts on the issues of future dangerousness and mitigation. *See Boyd v. French*, 147 F.3d 319, 327-28 (4th Cir. 1998), *cert. denied*, 525 U.S. 1150 (1999), *citing Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). The Court finds that, for two reasons, it did not. First, Dr. McQueen testified that people who ingest alcohol and cocaine are considerably more dangerous

than people who ingest either intoxicant exclusively, and Roberts was under the influence of both substances at the time of the killing.  That he would have been able to resist the urge to commit the crime had he not been under the influence of both substances simultaneously is a reasonable and logical inference, which counsel could themselves have argued at closing.  Not only did counsel not argue this proposition, they chose to not even mention the idea that intoxication might have had any connection with the commission of the crime.  Within this strategy, it seems unlikely that the single statement by Dr. McQueen would have had a significant impact on the jury.

Second, in allowing experts to opine on the probability of a defendant's future dangerousness despite scientific consensus that such predictions were unreliable, the Supreme Court of the United States stated that the reliability issue was relevant to the weight the jury should give the evidence, not to the admissibility of the evidence.  *See Barefoot*, 463 U.S. at 896-98.  Accordingly, the cross-examination of Dr. McQueen during her *voir dire,* which revealed that the methodology underlying her conclusion was so lacking in reliability that the trial court ruled that she would  not be permitted to testify to it, would likely have led the jury to give her conclusion little weight.

For these two reasons, the Court finds that the trial court's exclusion of Dr. McQueen's testimony  that Roberts would not have committed the crime had he not been under the influence of both cocaine and alcohol did not have a substantial and injurious effect or influence in determining the jury's verdict on either the future dangerousness or general mitigation issues during the punishment determination phase of his capital murder trial.  Accordingly, the Court finds that the state court's rejection of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Tennard, Barefoot and  Brecht.*  The Court will deny Roberts's tenth claim.

Roberts's eleventh claim is that he received ineffective assistance of counsel when defense counsel failed to object to victim impact evidence from the victim of an extraneous offense.  This claim was denied on the merits on direct appeal, *see* 220 S.W.3d at 531, so the question for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

To establish that trial counsel's performance fell below what is constitutionally acceptable, a defendant must show both that counsel's performance was deficient and that the deficiency prejudiced the defense.  To establish deficient performance, he must demonstrate that counsel's behavior fell below an objective standard of reasonableness.  The proper measure of attorney performance is reasonableness under prevailing professional norms.  *See Wiggins v. Smith,* 539 U.S. 510, 521 (2003).  To establish prejudice, he must demonstrate that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 534.  Because the state court determined both of these issues adversely to Roberts, to prevail in *habeas corpus* he must establish that both determinations were unreasonable.  *See Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 1402 n.12 (2011).

At the punishment determination phase of Roberts's trial, Elizabeth Thomas, the victim of a robbery that Roberts committed prior to this capital offense, testified as to the emotional impact the robbery had on her life.  She testified that she had to quit her job because she was afraid every customer who walked in might rob or kill her.  She had difficulty sleeping and was troubled by nightmares.  She had to spend six month's worth of her savings while looking for another job.  When

she finally found employment, she continued to experience fear at work. *See* RR Vol. 26, pp. 45-49. Roberts contends that trial counsel should have objected to Thomas's testimony on the grounds that evidence of the impact of an extraneous crime committed by the defendant is inadmissible.  To analyze whether counsel's failure to do so constituted deficient performance, it is necessary to examine the state of the law at the time of Roberts's trial.

Evidence is generally admissible if it is relevant to a material issue in dispute.  If its relevance is substantially outweighed by the risk that it will unfairly prejudice the jury against the defendant, however, it is inadmissible.[6]  The Supreme Court of the United States initially held there was an irrebutable presumption that the relevance of evidence of the good character of the victim, and evidence of the impact of the victim's death on his family, were substantially outweighed by the danger of unfair prejudice to the defendant.  *See e.g., Booth v. Maryland,* 482 U.S. 496, 507 n.10 (1987) and *South Carolina v. Gathers*, 490 U.S. 805 (1989).  In *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), however, the Court overruled *Booth* and *Gathers*, stating:

> We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar.  A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.  There is no reason to treat such evidence differently than other relevant evidence is treated.

In a concurring opinion, three justices pointed out:

> We do not hold today that victim impact evidence must be admitted, or even that it should be admitted.  We hold merely that if a State decides to permit consideration of this evidence, "the Eighth Amendment erects no *per se* bar." (citation omitted) If, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment.

---

[6] *See* Fed.R.Evid.402 and 403.  Texas Rules of Evidence 402 and 403 are identical to the federal rules.

*Id.* at 831.  *Payne* thus stands for the proposition that victim impact evidence is relevant to the determination of whether death is appropriate punishment, but the concurrence contends that it remains subject to the same relevance/ unfair prejudice analysis as all other evidence.

The Texas Court of Criminal Appeals has accepted the invitation of the majority opinion in *Payne*, without adopting the limitations of the concurring opinion.  Initially, in *Ford v. Texas,* 919 S.W.2d 107, 116 (Tex. Crim. App. 1996), the court held that victim impact evidence – testimony by the family members of the victim as to the effect of his death on their lives – was "arguably relevant" to the decision of whether to sentence the defendant to death or to life imprisonment.  The Court also found that the trial court did not abuse its discretion in denying counsel's objection that the relevance of such testimony was substantially outweighed by the danger of unfair prejudice to the defendant.

In *Smith v. Texas*, 919 S.W.2d 96 (Tex. Crim. App.), *cert. denied*, 519 U.S. 1030 (1996), the court held that testimony about the victim's good nature, hobbies, and work ethic was not relevant to sentencing and therefore should not have been admitted.

In *Cantu v. Texas*, 939 S.W.2d 627 (Tex. Crim. App.), *cert. denied*, 522 U.S. 994 (1997)*,* the defendant was the leader of a gang who attacked and murdered two teenage girls, Ertman and Peña. Cantu was tried for the murder of Peña, but during the punishment determination phase of the trial the trial court admitted testimony by family members of Ertman about the effect her death had on their lives.  The Texas Court of Criminal Appeals found that victim impact evidence about the effect of an extraneous crime was inadmissible.  The Court could reasonably have held that such evidence was irrelevant, or, that even if it were relevant, its probative value was substantially outweighed by the risk of unfair prejudice to the defendant.  It instead collapsed the two inquiries into one:

> The danger of unfair prejudice to a defendant inherent in the introduction of "victim impact" evidence with respect to a victim not named in the indictment is unacceptably high.  The admission of such evidence would open the door to admission of victim impact evidence arising from *any* extraneous offense committed by a defendant.  Extraneous victim impact evidence, if anything, is more prejudicial than the non-extraneous victim impact evidence found by this Court to be inadmissible in *Smith*. . .  We hold that such evidence is irrelevant under TEX.R.CRIM.EVID. 401 and therefore irrelevant in the context of the special issues under Art. 37.071.

*Id.* at 637 (emphasis in original).

Five years after *Cantu*, the Texas Court of Criminal Appeals reached a different result in a case with similar facts.  In *Mathis v. State*, 67 S.W.3d 918 (Tex. Crim. App. 2002), the defendant shot three people, Brown, Hibbard and Almaguer.  Hibbard died and Almaguer was paralyzed from the neck down.  Mathis was tried solely for the murder of Hibbard, but during the punishment determination phase of his trial the prosecution called the nurse caring for Almaguer to testify to the extent of the care she provided on a daily basis.  Mathis contended that since he was not on trial for shooting Almaguer, evidence of the impact of the shooting on her life was irrelevant to the issue of what constituted appropriate punishment for the killing of Hibbard and served no purpose other than to inflame the jury.

Rather than address whether the evidence was irrelevant, or, if relevant, unfairly prejudicial, the Texas Court of Criminal Appeals distinguished the case from prior precedent based upon its characterization of the evidence:

> In *Mosley v. State* (citation omitted) we discussed the meaning of "victim impact" and "victim character" evidence.  We explained that "victim impact" evidence is evidence that is "generally recognized as evidence concerning the effect that the victim's death will have on others, particularly the victim's family members." . . "Victim character" was defined as evidence that is "generally recognized as evidence concerning good qualities possessed by the victim."

> The testimony at issue here does not fall under either category of victim-related evidence. Unlike in *Cantu*, in which the evidence involved testimony regarding both the victim's good qualities and the effect that her death had on family members, the testimony in the present case did not involve testimony about how third persons were affected by the crime, nor was there any discussion about the character of the victim. Manning's testimony focused solely on the medical procedures involved in the care of Almaguer. Appellant's characterization of Manning's testimony as victim impact evidence is incorrect. Point of error nine is overruled.

*Id.* at 928.

This was the state of Texas law at the time of Roberts's trial. The concurring opinion in *Payne* suggests that counsel should object to the introduction of victim impact evidence if a good faith argument can be made that the danger of unfair prejudice substantially outweighs its relevance to the issue of whether the defendant should die for the offense for which he has been convicted. A fair reading of *Ford*, *Cantu* and *Mathis*, however, suggests that under Texas law, unless the evidence at issue concerns the impact on the family members of the victim of an extraneous offense, or evidence of the good character of the victim, any objection whatsoever would be futile. The Texas Court of Criminal Appeals's opinion in Roberts's own case says as much:

> In point of error seven, appellant contends that his attorney was ineffective for failing to object to the admission of extraneous offense victim impact testimony. Elizabeth Thomas, the victim of a robbery [Roberts] had committed in Baton Rouge a few years earlier, testified about the emotional impact that the robbery had on her life. . . . [Roberts] contends that this evidence was inadmissible as extraneous offense victim impact evidence under *Cantu v. State.*

> We disagree. "Victim impact" evidence is evidence of the effect of an offense on people other than the victim. The evidence presented here was evidence of the effect of a different offense on the victim (of the extraneous offense) and is thus distinguishable from the situation presented in *Cantu*. The evidence was admissible. But even if it weren't, counsel was not ineffective for failing to lodge an objection based upon a case that is clearly distinguishable from the present case. Point of error seven is overruled.

220 S.W.3d at 531.

31

Roberts points out that three justices dissented from this opinion on the grounds that the distinction between the victim impact evidence in *Cantu* and the victim impact evidence presented in the present case was not legally significant, and that the victim impact evidence presented in Roberts's trial was both irrelevant and unfairly prejudicial.  He contends that the divided opinion demonstrates that it is a "close call" as to whether the victim impact evidence offered in his case was distinguishable from the victim impact evidence prohibited in the *Cantu* case.  He argues that in a close call situation "there was no reason whatsoever for the defense attorney not to object to this testimony."  *See* Petition at 55.  This, however, is neither the legal standard the Court applies, nor the authority the Court considers, in resolving this claim.  "Counsel is not constitutionally deficient if, at time of trial, such objection would have been futile in light of existing state law and the right was not clearly established under federal law."  *Meanes v. Johnson*, 138 F.3d 1007, 1012 (5th Cir.), *cert. denied*, 525 U.S. 968 (1998).  The Court finds that Roberts's trial counsel could reasonably have believed, based upon state court precedent, that objecting to the admission of the victim impact evidence in his case would have been futile.  And, because it was only the concurrence in *Payne* that suggested that the Rule 403 relevance / unfair prejudice balancing test should be performed, this Court cannot say that Roberts's right to object to this kind of evidence as unfairly prejudicial was clearly established under federal law.  The Court finds that the state court's rejection of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States in *Wiggins* and *Payne*.  The Court will deny Roberts's eleventh claim.

Roberts's twelfth claim is that his due process rights were violated when the trial court allowed victim impact evidence from the victim of an extraneous offense.  Because this claim has not been presented to the state courts, it is unexhausted.  In this circumstance, the Court has three options: allow Roberts to return to state court and present the claim to the state court in a successive petition, treat the claim as if it were procedurally defaulted, or deny the claim on its merits.

The Court must first determine whether to allow Roberts to return to state court to present this claim.  If it is entirely clear that the state court would refuse to hear a successive petition containing the new claim, the Court must treat the claim as if the state court had already rejected it on procedural grounds. *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).  The first question for the Court is whether it is entirely clear that the state court would refuse to consider the merits of this claim if Roberts were to present it in a successive petition.

To answer this question the Court applies Texas law.  TEX. CODE CRIM. PROC. Art. 11.071 §5(a) provides that if a successive application for a writ of *habeas corpus* is filed after filing an initial application, a court may not consider the merits or grant relief on the application unless the application contains specific facts establishing that:

> (1) the current claims and issues have not been presented previously because the factual or legal basis of the claim was unavailable on the date the applicant filed the initial application;
>
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or
>
> (3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor on one or more of the three sentencing issues.

In the present case, Roberts does not contend either that the factual or legal basis of this claim was unavailable at the time he filed his initial state post-conviction application for relief.  Nor does he contend that in the absence of any constitutional errors no rational juror could have voted to convict him or sentence him to death.  Accordingly, it is entirely clear that the state court would refuse to reach the merits of this claim if the Court allowed Roberts to return to that forum and present this claim in a successive petition.  The Court will treat this claim as if it had already been procedurally defaulted.

As explained above, federal courts generally do not review procedurally defaulted claims unless the applicant can establish either: (1) he had good cause for failing to fairly present his claims, and he would be prejudiced by not being given an opportunity to do so in the federal court, or (2) failing to address the claims on their merits would result in a fundamental miscarriage of justice, either because he is actually innocent of the offense or because but for the constitutional error no rational juror would have found him eligible for the death penalty under state law.  Roberts does not contend that he had good cause for failing to raise this claim in his state proceedings, and he does not contend either that he is actually innocent of capital murder or that no reasonable juror would have voted to sentence him to death had they known the facts in this case.  Accordingly, the Court will dismiss his twelfth claim with prejudice.

Roberts's thirteenth claim is that he was denied constitutionally effective assistance of counsel when the defense failed to object to the prosecution's repeated suggestions that Roberts's parole eligibility could be altered by the Legislature at a future date.  Roberts raised this claim on direct appeal.  The Texas Court of Criminal Appeals pointed out that the preferred forum for litigating ineffective assistance of counsel claims is in collateral proceedings rather than on direct appeal, and that if the claim is raised on direct appeal, relief cannot be granted unless the challenged

34

conduct was so outrageous that no competent attorney would have engaged in it.  *See* 220 S.W.3d at 533-34.  The court then found that defense counsel's failure to object was not outrageous. *Id.* This appears to be similar but not identical to finding that the claim was procedurally defaulted because it was brought at the wrong stage in the proceedings, but in the alternative, denying the claim on the merits.  As stated above, the rule in this Circuit is that if the state court based its decision on the alternative grounds of procedural default and of rejecting the claim on its merits, a federal court must, in the absence of good cause and prejudice, or a fundamental miscarriage of justice, deny relief because of the procedural default, unless the claim can be resolved more easily on its merits.  Because it is arguable whether the state court decided this claim on both procedural and substantive grounds[7], the Court will review the merits of the claim. The issue for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

As stated above, to establish that trial counsel's performance fell below what is constitutionally acceptable, a defendant must show both that counsel's performance was deficient and that the deficiency prejudiced the defense.  To establish deficient performance, Roberts must demonstrate that counsel's behavior fell below an objective standard of reasonableness.  The proper measure of attorney performance is reasonableness under prevailing professional norms.  *See Wiggins v. Smith,* 539 U.S. 510, 521 (2003).  Because the state court determined both of these issues adversely to Roberts, to obtain relief in *habeas corpus* he must establish that both of the state court's

---

[7] *Cf. Thompson v. Texas,* 9 S.W.3d 808, 814 n.6 (Tex. Crim. App. 1999)("This opinion should not be read as a declaration that no claim of ineffective assistance of counsel can be brought on direct appeal.  However, in the vast majority of cases, the undeveloped record on appeal will be insufficient for an appellant to satisfy the dual prongs of *Strickland.*")

determinations were unreasonable.  *See Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 1402 n.12 (2011).

For Roberts to be eligible to receive the death sentence, the jurors were required to find beyond a reasonable doubt that there was a probability that he would commit acts of criminal violence which would constitute a continuing threat to society.  Part of the defense's argument against future dangerousness was that Roberts would not have the opportunity to commit criminal acts within the rigid structure and close oversight of the prison environment, and that over time, the likelihood that he would commit such acts would decrease because people become less dangerous as they age.  Further, they argued that if he was sentenced to life in prison he would remain in that structured environment for a minimum of 40 years, and he would not be released unless the parole board was satisfied that he had been rehabilitated and was no longer dangerous.  To support this argument, the defense called witness John Escobedo to testify about the functioning of the Texas Board of Pardons and Paroles.

On cross-examination the prosecution asked Escobedo whether the 40 year minimum could be changed by the legislature to a lesser amount of time and whether Roberts could be released in less than 40 years due to prison overcrowding.  *See* RR. Vol. 28, pp. 23-47.  The prosecution also alluded to these possibilities in final argument.  *See* RR Vol. 32, p. 72.  Roberts contends that this line of inquiry and argument was improper, and that his counsel rendered ineffective assistance by failing to object to it.

The Court agrees that as a general matter it is improper for a prosecutor to suggest that because of prison overcrowding, it is possible that an inmate sentenced to life in prison might serve less than the 40 years he would be required to serve before becoming eligible for parole, and that the jurors should take that into account in deciding whether to sentence a defendant to life imprisonment

36

or death.  The problem is that Roberts's claim rests on the additional premise that "it is ineffective assistance of counsel not to object to such argument." *See* Petition, p. 59.  An attorney does not perform deficiently in failing to object if the impropriety of the evidence or argument at issue is unclear at the time of the trial.  *See e.g., Cobb v. Perini*, 832 F.2d 342, 347-48 (6th Cir. 1987), *cert. denied*, 486 U.S. 1024 (1988).  Roberts cites to no case authority addressing this issue, and applicable precedent suggests that at the time of his trial the issue was not clear-cut.  For example, in *Daniels v. Texas*, 633 S.W.2d 899, 902 (Tex. Crim. App. 1982), the court held that although urging the jury to consider the effect of the parole laws in determining the appropriate length of a sentence is improper, it was not error for the prosecution to point out, in response to the defense's statement that the defendant is likely to serve the entire term of his sentence, that the possibility of parole rendered such an assertion inaccurate.  In light of the similarity of Roberts's case to *Daniels,* the Court finds that it would not have been unreasonable for defense counsel to believe that by eliciting testimony that Roberts would be incarcerated for at least 40 years, and the parole board could not reduce that time period, he "opened the door" for the prosecution to show that the Legislature could alter that 40 year time period, and that it had in fact done so on more than one occasion.  At the very least, it was not clear that such evidence was improper under the circumstances.

The Court finds that the state court's conclusion that defense counsel's failure to object to the prosecution's questioning and argument was not deficient performance was not unreasonable. Accordingly, its rejection of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States in *Wiggins and Pinholster.*  The Court will deny Roberts's thirteenth claim.

Roberts's fourteenth claim is that his right to be free from cruel and unusual punishment was violated when the trial court refused to allow testimony regarding how a death sentence would affect his family members.  The Texas Court of Criminal Appeals found that this claim had been procedurally defaulted because Roberts failed to preserve error at trial by making an offer of proof as to the substance of the excluded testimony.  Alternatively, it denied the claim on its merits. *See* 220 S.W.3d at 532.  As explained above, in this circumstance the general rule in this circuit is that a federal court must review the state court's procedural default ruling, unless it is easier to review the denial of the claim on the merits.

As stated above, to obtain review of a procedurally defaulted claim, Roberts must establish either that he had good cause for failing to fairly present the claim and he would be prejudiced by not being given an opportunity to do so in the federal court, or that failing to address the claims on their merits would result in a fundamental miscarriage of justice, because he is actually innocent of the offense, or because but for the constitutional error no rational juror would have found him eligible for the death penalty under state law.  Because Roberts does not contend that he meets either exception, the Court will dismiss his fourteenth claim with prejudice.

Roberts's fifteenth claim is that his right to a jury trial was violated because his future dangerousness and death worthiness were not presented to a grand jury and alleged in the indictment. The state court denied this claim on the merits on direct appeal, *see* 220 S.W.3d at 535, so the question for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Roberts filed a motion *in limine* to preclude the death penalty as a sentencing option on the grounds that the state must prove to the jury every element of the offense beyond a reasonable doubt and plead every element of the offense in the indictment. He notes that the indictment did not contain facts which would result in findings of future dangerousness and lack of mitigation. On appeal, he contended that the trial court erred in denying the motion. Roberts contends that the state court's denial of this claim was the result of an unreasonable interpretation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi,* the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact which increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and must be proved beyond a reasonable doubt." *Id.* at 490. In *Ring v. Arizona,* 536 U.S. 584, 609 (2002), the Court held that aggravating factors in capital punishment trials were subject to this standard.

There is precedent for the proposition that the prosecution must allege aggravating circumstances, such as future dangerousness, in its indictment if its seeks the death penalty in a capital murder case. *See e.g. United States v. Robinson*, 367 F.3d 278, 284 (5th Cir.), *cert. denied*, 543 U.S. 1005 (2004). The problem with Roberts's argument is that the rule applies only to federal prosecutions. Because defendants in state prosecutions do not have a constitutional right to be indicted, *Apprendi* is inapplicable to state court capital murder indictments. *See Woodard v. Thaler*, 702 F.Supp.2d 738, 782 (S.D. Tex. 2010). *Woodard* persuades the Court that the state court's rejection of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law as determined by the Supreme Court in *Apprendi* and *Ring.* The Court will deny Roberts's fifteenth claim.

Roberts's sixteenth claim is that his due process rights and his right to be free from cruel and unusual punishment were violated because the jury instructions on mitigating evidence did not contain a burden of proof. This claim was rejected on the merits on direct appeal, *see* 220 S.W.3d at 534-35, so the question for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

As explained above, once the jury found beyond a reasonable doubt that there was a probability that Roberts would be dangerous in the future, it was required to decide whether there was a sufficient mitigating circumstance or circumstances to warrant imposing a sentence of life imprisonment, rather than death. Roberts is correct that this mitigation instruction does not provide a burden of proof. As also stated above, *Ring* established that statutory aggravating factors in capital cases must be proved beyond a reasonable doubt. The opinion addresses only the appropriate burden of proof for aggravating evidence. It does not address whether a burden of proof is required for mitigating evidence.

In *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir.), *cert. denied*, 546 U.S. 848 (2005), the Fifth Circuit held that *Ring* did not render the Texas special sentencing mitigation issue's lack of a burden of proof unconstitutional. *Rowell* persuades the Court that the Texas Court of Criminal Appeals' rejection of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law as determined by the Supreme Court in *Ring*. The Court will deny Roberts's sixteenth claim.

40

Roberts's seventeenth claim is that his due process rights and his right to be free from cruel and unusual punishment were violated because the state was not required to prove beyond a reasonable doubt any extraneous offense evidence or the victim impact evidence it offered to rebut his mitigating evidence. This claim was rejected on the merits on direct appeal, *see* 220 S.W.3d at 534-35, so the issue is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

The Court's analysis again begins with the rule from *Ring* that statutory aggravating factors which increase the penalty for capital murder from life imprisonment to death must be submitted to a jury and must be proved beyond a reasonable doubt. Under Texas law, however, the statutory factor which increases the penalty from life imprisonment to death is the probability that the defendant will engage in acts of criminal violence which constitute a continuing threat to society, which is often referred to as "future dangerousness," and under Texas law this finding must be proven beyond a reasonable doubt. Although extraneous offenses are relevant to the future dangerousness inquiry, they are not in and of themselves facts which increase the penalty for capital murder from life imprisonment to death, so they need not be proven beyond a reasonable doubt. *See Harris v. Cockrell*, 313 F.3d 238, 246 (5th Cir. 2002), *cert. denied*, 540 U.S. 1218 (2004).

In addition, under Texas law victim impact evidence is considered in the context of the mitigation special issue. *See Mosley v. Texas*, 983 S.W.2d 249, 262 (Tex.Crim.App. 1998), *cert. denied*, 526 U.S. 1070 (1999).

41

In *Johnson v. Norris*, 537 F.3d 840, 851 (8th Cir. 2008), *cert. denied*, ___ U.S. ___, 129 S.Ct. 1334 (2009), the court held that if victim impact evidence is not an aggravating factor, it does not have to be proven beyond a reasonable doubt.  *Johnson* persuades the Court that the state court's rejection of this claim is neither contrary to, nor the result of an unreasonable interpretation of, clearly established federal law as determined by the Supreme Court of the United States in *Apprendi* and *Ring.*  The Court will deny Roberts's seventeenth claim.

Roberts's eighteenth claim is that his due process rights were violated when the trial court refused his request to present his final argument on the mitigation special issue after, rather than before, the prosecution presented its final argument.  This claim was rejected on the merits on direct appeal, *see Roberts*, 220 S.W.3d at 535,  so the question for the Court is whether the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Roberts is correct that "traditional notions of fairness favor giving the privilege of opening and closing to the party who carries the burden of proof." *See U.S. v. 2,353.28 Acres of Land, More or Less, in Brevard and Volusia Counties, State of Fla.*, 414 F.2d 965, 972 (5th Cir. 1969).  As he concedes, however, on the mitigation issue, neither side has the burden of proof, and more importantly, he cites to no Supreme Court precedent suggesting that the Due Process Clause of the United States Constitution requires that defendants be allowed to present opening and closing arguments under certain or indeed any circumstances.  In the absence of such authority, the Court finds that the state court's rejection of this claim is neither contrary to, nor the result of an

unreasonable interpretation of, clearly established federal law as determined by the Supreme Court of the United States.  The Court will deny Roberts's eighteenth claim.

Roberts's nineteenth and final claim is that his due process rights under *Caldwell v. Mississippi*, 472 U.S. 320 (1985), were violated when the prosecution suggested that Roberts might not serve a minimum of forty calendar years if sentenced to life imprisonment.  The state court found that this claim had been procedurally defaulted because defense counsel failed to object during the cross-examination.  *See* 220 S.W.3d at 533.  As stated above, if the state court refuses to reach the merits of a claim because the applicant failed to observe state procedural requirements, this Court is barred from reviewing the merits of the claim unless the applicant can establish either that he had good cause for failing to fairly present his claim and he would be prejudiced by not being given an opportunity to do so, or that failing to address the merits of the claim would result in a fundamental miscarriage of justice, either because he is actually innocent of the offense or because but for the constitutional error no rational juror would have found him eligible for the death penalty under state law.  Roberts does not contend that he meets either exception, so the Court will dismiss his nineteenth claim with prejudice.

**Conclusion**

For the above reasons, the Court will dismiss Roberts's twelfth, fourteenth and nineteenth claims with prejudice and it will deny his remaining sixteen claims.  An Order and Judgment to this effect will be entered.

SIGNED this the 7  day of **November, 2011.**

Thad Heartfield
United States District Judge

43